**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

| | |
|---|---|
| NORTH CAROLINA GREEN PARTY, ANTHONY NDEGE, MICHAEL TRUDEAU, MATTHEW HOH, SAMANTHA WORRELL, SAMANTHA SPENCE, K. RYAN PARKER AND AARON MOHAMMED,<br><br>*Plaintiffs*,<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS,<br><br>*Defendant*. | Case No. 4:22-cv-00078-D-BM |

**[PROPOSED] INTERVENOR-DEFENDANTS' MOTION TO DISMISS**

The North Carolina Democratic Party and DSCC (the "Intervenors") hereby file their motion to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). A memorandum in support of this motion is filed herewith.

Dated: _____, 2022

Respectfully submitted,

/s/ Narendra K. Ghosh
Narendra K. Ghosh, NC Bar No. 37649
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27517
Telephone: 919.942.5200
nghosh@pathlaw.com

Aria C. Branch*
Christopher D. Dodge*
Christina A. Ford*
Richard Medina*
Daniel Cohen*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
abranch@elias.law
cdodge@elias.law
cford@elias.law
rmedina@elias.law
dcohen@elias.law

*Counsel for Proposed Intervenor-Defendants
DSCC and North Carolina Democratic Party*

*Notice of Special Appearance Forthcoming

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

| | |
|---|---|
| NORTH CAROLINA GREEN PARTY, ANTHONY NDEGE, MICHAEL TRUDEAU, MATTHEW HOH, SAMANTHA WORRELL, SAMANTHA SPENCE, K. RYAN PARKER AND AARON MOHAMMED, | **Case No. 4:22-cv-00078-D-BM** |
| *Plaintiffs*, | |
| v. | |
| NORTH CAROLINA STATE BOARD OF ELECTIONS. | |
| *Defendant*. | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 3

   I.   North Carolina's requirements for party recognition. ....................................... 3

   II.  NCSBE Staff's ongoing investigation into fraudulent petitions submitted as part of the NCGP's flawed petition drive. ..................................................................... 6

   III.  NCSBE Staff was unable to determine the sufficiency of NCGP's petitions and advised the Board not to certify pending further investigation. ................................... 11

   IV.  The NCGP's lawsuit and allegations involving Proposed Intervenors. .......................... 13

LEGAL STANDARD ................................................................................................... 14

ARGUMENT ............................................................................................................... 14

   I.   Plaintiffs' claims are not ripe for adjudication .............................................. 15

   II.  This Court should abstain while NCSBE's investigation continues. ............................ 18

      A.  The Court should abstain under *Burford*. .......................................... 19

      B.  The Court should abstain under the *Colorado River* doctrine. ................... 21

   III.  Plaintiffs fail to state a claim. ..................................................................... 24

CONCLUSION ............................................................................................................ 28

## INTRODUCTION

The North Carolina legislature has tasked the North Carolina State Board of Elections ("NCSBE") with the duty of "determin[ing] the sufficiency of petitions filed with it" by groups of voters seeking to obtain recognition of new political parties. N.C. Gen. Stat. § 163-96(a)(2). That is precisely what it is in the process of doing with respect to the North Carolina Green Party's ("NCGP") application to become a political party in the state. After the NCGP presented NCSBE with new-party petition sheets, "several [County Boards of Election] alerted the NCSBE of irregularities identified during review of petitions" which led NCSBE to open an investigation revealing that "[n]umerous petition pages have obvious signs of fraud or irregularities."[1] NCSBE's investigators uncovered additional evidence of fraud and when the Board met on June 30 to consider the sufficiency of the NCGP's petitions, NCSBE staff advised that the "[n]umber of known questionable signatures exceeds the 2,088 signature threshold," requiring "further investigation, including subject interviews."[2] They recommended the Board "[t]able consideration" of NCGP's petitions "to a future date," preserving NCSBE's ability to recognize the party after completing its investigation.[3] As Staff explained, they "don't have the information at this point to make a decision on the sufficiency of the petitions."[4] The Board adopted this recommendation by a 3-2 vote, and even one member who voted to certify acknowledged a "significant number of questions as to whether the threshold was actually met based upon the

---

[1] Mot. to Intervene ("MTI") Ex. B at 11-12.

[2] *Id.* at 17.

[3] NCSBE June 30, 2022 Meeting ("NCSBE Meeting"), available at
https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2022-06-30/State%20Board%20of%20Elections%20Meeting-20220630%201300-1.mp4), at 1:20-21 (last visited July 17, 2022).

[4] *Id.* at 1:28:53-59.

1

[current] status" and "those questions at this point remain unanswered."[5] NCSBE has made clear that its investigation proceeds apace.

Despite the NCSBE's ongoing investigation—and the fact that the legislature has committing determining the "sufficiency" of petitions to the Board's judgment—NCGP now asks this Court to declare it a recognized political party under North Carolina law. That is not appropriate for a host of reasons. Most notably, the NCGP has not yet suffered an Article III injury—the NCSBE may yet determine the party has met the signature threshold and recognize it as a political party before printing ballots in mid-August. Relatedly, NCGP's claims are not ripe. The factual basis of its claims remains in flux—NCSBE investigators are in the middle of a criminal investigation into NCGP circulators who have thus far refused to comply with calls to give testimony. NCGP cannot expect this Court to resolve fact-heavy questions about the sufficiency of its petitions when it is not yet clear how many, if any, signatures NCSBE will invalidate or on what grounds. By the same token, NCSBE may yet *approve* the party's petitions, mooting this federal action altogether. This Court should also abstain from hearing the case under abstention doctrines that counsel against federal courts interfering in parallel state proceedings.

Even if this Court had jurisdiction, NCGP's claims must be dismissed. Their grievance, at bottom, is with how NCSBE is choosing to fulfill its duty to determine the "sufficiency" of NCGP's petitions. That is a pure matter of state law. Mere disagreement with how NCSBE exercises its discretion under state law does not plead a federal claim, particularly as the Board has not yet finished its investigation. This Court should not short circuit an ongoing state investigation into whether the NCGP has met the threshold requirement for recognition—itself a question of state law committed to the NCSBE's judgment.

---

[5] *Id.* at 1:39-40.

# BACKGROUND

## I.  North Carolina's requirements for party recognition.

North Carolina law prescribes three ways for a political party to obtain recognition. *See generally* N.C. Gen. Stat. Ann. § 163-96(a).[6] As relevant here, a group of voters may obtain recognition for a new political party by filing with the North Carolina State Board of Elections ("NCSBE") "petitions for the formulation of a new political party which are signed by registered and qualified voters in [North Carolina] equal in number to one-quarter of one percent (0.25%) of the total number of voters who voted in the most recent general election for Governor." *Id.* § 163-96(a)(2).

The North Carolina Green Party previously "cease[d] to be a political party" under North Carolina law because "at the last preceding general State election," its "candidate for Governor, or for presidential electors" failed to obtain "at least two percent (2%) of the entire vote cast in the State for Governor for presidential electors." N.C. Gen. Stat. § 163-97 (incorporating N.C. Gen. Stat. § 163-96(a)(1)). Based on the number of votes in the 2020 gubernatorial election, it was required to obtain 13,865 valid signatures from qualified and registered voters.

Voters seeking to obtain recognition of a new political party must comply with several statutory requirements in obtaining petition signatures. For example, "[p]etitions for the creation

---

[6] A party also may obtain recognition when "at the last preceding general State election," a group of voters "polled for its candidate for Governor, or for presidential electors, at least two percent (2%) of the entire vote cast in the State for Governor or for presidential electors." *Id.* § 163-96(a)(1). It also may file documentation with the Board showing that "the group of voters had a candidate nominated by that group on the general election ballot of at least seventy percent (70%) of the states in the prior Presidential election." *Id.* § 163-96(a)(3). The NCDP, for example, qualifies under either of these provisions because its gubernatorial candidate, Governor Roy Cooper, obtained 51.5 percent of the vote during the last State general election and its presidential candidate, Joseph R. Biden, was on the ballot in all fifty states and the District of Columbia.

of a new political party *shall* contain on the heading of each page of the petition in bold print or all in capital letters the words:

> 'THE UNDERSIGNED REGISTERED VOTERS IN _____ COUNTY HEREBY PETITION FOR THE FORMATION OF A NEW POLITICAL PARTY TO BE NAMED _____ AND WHOSE STATE CHAIRMAN IS _____, RESIDING AT _____ AND WHO CAN BE REACHED BY TELEPHONE AT _____.'"

N.C. Gen. Stat. Ann. § 163-96(b). Consistent with this language, the petitions "must specify the name selected for the proposed political party." *Id.* And they likewise "must state the name and address of the State chairman of the proposed new political party." *Id.*

North Carolina law also requires that, "[i]n addition to the form of the petition, the organizers and petition circulators shall inform the signers of the general purpose and intent of the new party." *Id.* The Fourth Circuit has also recently affirmed the importance of this disclosure requirement in obtaining recognition for a new political party, in part because it entitles the group of voters seeking recognition a *lower* signature threshold than unaffiliated candidates. In return for this lower signature threshold, "a group of voters seeking recognition as a new political party must satisfy additional requirements to attain and retain such recognition." *Buscemi v. Bell*, 964 F.3d 252, 265 (4th Cir. 2020) (citing N.C. Gen. Stat. § 163-96). This includes the requirement that "new political parties must 'inform the signers of the general purpose and intent of the new party.'" *Id.* (quoting N.C. Gen. Stat. § 163-96(b)). The disclosure requirement is therefore not an idle command—it explains "why new political parties have an initial signature requirement lower than the signature requirement for an unaffiliated candidate." *Id.*

Finally, state law also sets out the procedures by which a potential new party's petition sheets are reviewed, beginning with the County Boards of Election. *See generally* N.C. Gen. Stat. § 163-96(c). First, the "group of petitioners shall submit the petitions to the chairman of the county

board of elections in the county in which the signatures were obtained no later than 5:00 P.M. on the fifteenth day preceding the date the petitions are due to be filed with the State Board of Elections as provided in subsection [subdivision] (a)(2) of this section." *Id.* The North Carolina Green Party's petitions therefore were required to be filed with the relevant County Boards of Election by 5:00 p.m. on May 17, 2022.

The prospective new party's petitions "shall be presented to the chairman of the board of elections of the county in which the signatures were obtained." *Id.* It "shall [then] be the chairman's duty" to:

1) To *examine the signatures on the petition* and place a check mark on the petition by the name of *each signer* who is *qualified and registered to vote* in his county.

2) To attach to the petition his signed certificate: (a) Stating that *the signatures on the petition have been checked against the registration records* and (b) Indicating the number found *qualified and registered* to vote in his county.

3) To return each petition, together with the certificate required by the preceding subdivision, to the person who presented it to him for checking.

*See* N.C. Gen. Stat. § 163-96(c) (emphases added). "Provided the petitions are timely submitted, the chairman of the county board of elections shall proceed to examine and verify the signatures under the provisions of this subsection" and "[v]erification shall be completed within two weeks from the date such petitions are presented." *Id.*

After the Chairs of the County Boards of Elections verify signatures on the petition sheets and return them to the group of voters seeking party recognition, the petitioners "must file their petitions with the State Board of Elections before 12:00 noon on the first day of June preceding the day on which is to be held the first general State election in which the new political party desires to participate." *Id.* § 163-96(a)(2). The Board "shall forthwith determine the sufficiency of

petitions filed with it and shall immediately communicate its determination to the State chair of the proposed new political party." *Id.*

## II. NCSBE Staff's ongoing investigation into fraudulent petitions submitted as part of the NCGP's flawed petition drive.

The NCGP's process for obtaining the necessary petition signatures was flawed from the start, resulting in the submission of numerous clearly deficient and fraudulent petition sheets. Indeed, before the Proposed Intervenors ever contacted the NCSBE, "several [County Boards of Election] alerted the NCSBE of irregularities identified during review of petitions" and NCSBE "opened an investigation" into the petitions on its own initiative. MTI Ex. B at 11.[7]

The NCSBE's investigation revealed that the NCGP employed several outside vendors to collect signatures. The NCGP's complaint acknowledges that among these paid circulators were LaCourtney "A.C.E." Griffin and Joshua Mullins. *See* Compl., Ex. 3 at 7, ECF No. 1. The NCGP directly employed Griffin and Mullins in mid-May, shortly before their petitions were due with the County Boards of Election. *Id.* The NCSBE's investigation revealed that these two individuals are now "known to have submitted numerous fraudulent signatures." Exhibit B at 9 (July 14, 2022 Executive Director Report). Indeed, both Griffin and Mullins (who signed petition forms as "ACE" and "Josh M." or "Josh Mullins") forged signatures detectable to any layperson's eye given the identical penmanship, as this small sample shows:

---

[7] The exhibits cited in this motion are matters of public record that are directly referenced or cited in the Complaint, or incorporated by reference therein. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). Further still, these exhibits each relate to Democratic Party Intervenors' argument that the claims in this lawsuit are not ripe. In resolving a Rule 12(b)(1) motion, "the court may consider the evidence beyond the scope of the pleadings to resolve factual disputes concerning jurisdiction." *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995).

Josh M

PETITION TO CREATE A NEW POLITICAL PARTY (NCGS § 163-96 (a)(2))

THE UNDERSIGNED QUALIFIED REGISTERED VOTERS IN __WAKE__ COUNTY HEREBY PETITION FOR THE FORMATION OF A NEW POLITICAL PARTY

TO BE NAMED __NORTH CAROLINA GREEN PARTY__ AND WHOSE STATE CHAIRMAN IS __ANTHONY NDEGE__, RESIDING AT __1713 CHAPEL STREET, WINSTON-SALEM 27127__,

AND WHO CAN BE REACHED BY TELEPHONE AT __336-577-1421__.

IT IS ILLEGAL TO SIGN THE NAME OF ANOTHER PERSON TO A PETITION. (G. S. 163-221)

| BOE ONLY | Line No. | Print your name (must be printed legibly) | Residence Address and City/Town (no PO Box numbers) | ZIP code | Birth date (DD/MM/YYYY) | Signature |
|---|---|---|---|---|---|---|
| ✓ | 1 | Corinthia Evans | 2002 Manderleigh Dr | 27545 | | C. Evans |
| | 2 | | | | | |
| ✓ | 3 | Keyonte Cherry | 812 Terrastone Pl | 27519 | | Keye C |
| ✓ | 4 | Demonte Blue | 1663 Plexor Ln | 27545 | | |
| ✓ | 5 | Shaneeka Bell | 1151 Cannonball Run #301 | 27545 | | Shneka Bell |
| ✓ | 6 | Jacob Green | 2830 Manorcrest Ct #231 | 27609 | | Jacob Green |
| ✓ | 7 | Dondre Griffin | 5800 Peacenest Dr | 27610 | | Dondre Griffin |
| ✓ | 8 | Eboni Young | 506 Glenbrook Dr | 27610 | | Eboni Young |
| ✓ | 9 | Deosia Goodman | 5324 Baywood Forest Dr | 37545 | | Deosia Good |
| ✓ | 10 | Summer Hardin | 7837 Harps Mill Woods Run | 27615 | | Sum Hardin |
| ✓ | 11 | Karrin Kennard | 2513 Shepherd Valley St | 27610 | | Karrin Kennard |
| ✓ | 12 | Lofton Woods | 2301 Fox Ridge Manor Rd | 27610 | | L Woods |
| ✓ | 13 | Tajasia Pitts | 410 montview way | 27545 | | Tajasia Pitts |
| ✓ | 14 | Camryn Hunter | 404 Little Acres Dr | 27545 | | Camryn Hunter |
| ✓ | 15 | Nyjil Thomas | 2253 Ballston Pl | 27545 | | Nyjil Thomas |

SUBMIT COMPLETED FORMS TO THE OFFICE OF (COUNTY) BOARD OF ELECTIONS.

ACE

PETITION TO CREATE A NEW POLITICAL PARTY (NCGS § 163-96 (a)(2))

THE UNDERSIGNED QUALIFIED REGISTERED VOTERS IN __Nash__ COUNTY HEREBY PETITION FOR THE FORMATION OF A NEW POLITICAL PARTY

TO BE NAMED __NORTH CAROLINA GREEN PARTY__ AND WHOSE STATE CHAIRMAN IS __ANTHONY NDEGE__, RESIDING AT __1713 CHAPEL STREET, WINSTON-SALEM 27127__,

AND WHO CAN BE REACHED BY TELEPHONE AT __336-577-1421__.

IT IS ILLEGAL TO SIGN THE NAME OF ANOTHER PERSON TO A PETITION. (G. S. 163-221)

| BOE ONLY | Line No. | Print your name (must be printed legibly) | Residence Address and City/Town (no PO Box numbers) | ZIP code | Birth date (DD/MM/YYYY) | Signature |
|---|---|---|---|---|---|---|
| ✓ | 1 | Nadyette Waters | 60 Bromwell Dr | 27896 | | Nadia Waters |
| ✓ | 2 | Jasmine Williams | 508 Werstern Ave | 27896 | | Jasmine Williams |
| ✓ | 3 | Tanisha Davis | 2541 Campground RD | 27856 | | Tisha Davis |
| ✓ | 4 | Latrice Harris | 20 Richardson ct Nashville | 27856 | | Latrice H. |
| ✓ | 5 | Joshua White | 421 Paul St. | 27803 | | Joshua White |
| ✓ | 6 | Jesus Speight | 756 Regency Dr. | 27896 | | J Speight |
| ✓ | 7 | Tracey McClary | 760 Regency | 27896 | | Tracy McClary |
| ✓ | 8 | Curtis Stokin | 323 Aviation Ave | 27856 | | Curtis Stokin |
| ✓ | 9 | Elaine Richardson | 3992 Wiggins RD Spring Hope | 27882 | | |
| ✓ | 10 | Maurice Speight | 901 Banks Dr #A | 27896 | | Maurice Speight |
| ✓ | 11 | Sieda Vick | 613 Jackson way | 27896 | | Sieda Vick |
| ✓ | 12 | Tayla Hart | 123 Circle Dr. | 27896 | | Tayla Hart |
| | 13 | | | | | |
| | 14 | | | | | |
| | 15 | | | | | |

SUBMIT COMPLETED FORMS TO THE OFFICE OF (COUNTY) BOARD OF ELECTIONS.

Board of Elections use only
Page __17__ of __29__ pages     Batch No __5__          Date received ___/___/___

7

Josh M

THE UNDERSIGNED QUALIFIED REGISTERED VOTERS IN **NASH** _____ COUNTY HEREBY PETITION FOR THE FORMATION OF A NEW POLITICAL PARTY

TO BE NAMED **NORTH CAROLINA GREEN PARTY** AND WHOSE STATE CHAIRMAN IS **ANTHONY NDEGE**, RESIDING AT **1713 CHAPEL STREET, WINSTON-SALEM 27127**,

AND WHO CAN BE REACHED BY TELEPHONE AT **336-577-1421**.

IT IS ILLEGAL TO SIGN THE NAME OF ANOTHER PERSON TO A PETITION. (G. S. 163-221)

| BOE ONLY | Line No. | Print your name (must be printed legibly) | Residence Address and City/Town (no PO Box numbers) | ZIP code | Birth date (DD/MM/YYYY) | Signature |
|---|---|---|---|---|---|---|
| | 1 | Alexia Abrahams | 3546 Elmwood Rd | 27804 | ▓ | Alexia Abrahams |
| | 2 | Dorius Spragley | 414 Ward St | 27856 | ▓ | D. Spragley |
| | 3 | Ceyanna Harrison | 3725 middleton dr | 27804 | ▓ | Ceyanna Harrison |
| | 4 | Chelsea Cotton | 3899 Flat Rock Dr | 27809 | ▓ | Chelsea Cotton |
| | 5 | Christina Whitley | 5008 Kristie Ln | 27856 | ▓ | Christina Whitley |
| | 6 | Elijah Cole | 166 Jeffries Cv | 27804 | ▓ | elijahcole |
| | 7 | Nora Casillas | 1531 Overton Dr | 27804 | ▓ | Nora Casillas |
| | 8 | Jalen White | 101 Laurel Springs Dr | 27858 | ▓ | Jalenwhite |
| | 9 | Jahquaya Silver | 2436 Quail Haven Rd | 27804 | ▓ | Jahquaya Silver |
| | 10 | Jonathan Romero | 4017 Crosswinds Dr | 27803 | ▓ | Jonathan R. |
| | 11 | Kadaija Bryant | 1929 Jarrett Dr | 27803 | ▓ | Kadaija Bryant |
| | 12 | Devonte Bell | 124 Chesapeake Ct | 27804 | ▓ | Devonte Bell |
| | 13 | Kendall Moore | 5565 Joe Ellen Rd | 27809 | ▓ | Kendall Moore |
| | 14 | | | | | |
| | 15 | | | | | |

SUBMIT COMPLETED FORMS TO THE OFFICE OF (COUNTY) BOARD OF ELECTIONS.

---

Josh M

THE UNDERSIGNED QUALIFIED REGISTERED VOTERS IN **Pitt** _____ COUNTY HEREBY PETITION FOR THE FORMATION OF A NEW POLITICAL PARTY

TO BE NAMED **NORTH CAROLINA GREEN PARTY** AND WHOSE STATE CHAIRMAN IS **ANTHONY NDEGE**, RESIDING AT **1713 CHAPEL STREET, WINSTON-SALEM 27127**,

AND WHO CAN BE REACHED BY TELEPHONE AT **336-577-1421**.

IT IS ILLEGAL TO SIGN THE NAME OF ANOTHER PERSON TO A PETITION. (G. S. 163-221)

| BOE ONLY | Line No. | Print your name (must be printed legibly) | Residence Address and City/Town (no PO Box numbers) | ZIP code | Birth date (DD/MM/YYYY) | Signature |
|---|---|---|---|---|---|---|
| ✓ | 1 | Glynis Mullins | 100 Singletree Dr | 27834 | ▓ | |
| NR | 2 | Alice Stancil | 2001 Grayden Cir #B | 27834 | ▓ | |
| ✓ | 3 | Darlyn White | 107 E Catawba Rd | 27834 | ▓ | |
| ✓ | 4 | Beverly Wilkins | 4792 N NC 11 | 27812 | ▓ | |
| ✓ | 5 | Deborah Langley | 2541 Augustus St | 27828 | ▓ | |
| ✓ | 6 | Becky Walker | 3025 Taberna Dr | 27834 | ▓ | |
| ✓ | 7 | Angela Bevis | 104 Blackwater Dr | 27590 | ▓ | |
| ✓ | 8 | Maurice Carter | 3140 Boardwalk Ln #9 | 27834 | ▓ | |
| ✓ | 9 | Shanique Streeter | 600 Verdant Dr #04 | 27858 | ▓ | |
| | 10 | Daisha Foote | 573 W Hanrahan Rd | 28530 | ▓ | |
| ✓ | 11 | Tiffany Brown | 1183 Mulberry Ln #29A | 27858 | ▓ | |
| ✓ | 12 | Betty Cherry | 1000 Benjamin Dr | 27834 | ▓ | |
| ✓ | 13 | Dora Phillips | 3215 Summer Pl #12 | 27834 | ▓ | |
| ✓ | 14 | Melisa Everette | 529 Jonathan Pl | 27834 | ▓ | |
| ✓ | 15 | Frederick Givens | 224 Fairmont Ave | 27834 | ▓ | |

SUBMIT COMPLETED FORMS TO THE OFFICE OF (COUNTY) BOARD OF ELECTIONS.

RECEIVED
Date received ___/___/___
MAY 17 2022
BY: _____



These sheets reflect only a small sample of petitions submitted by Griffin and Mullins—and credited by various County Boards of Election—on behalf of the NCGP. *See* MTI Ex. D, at Ex. B.

The NCSBE's preliminary investigation has shown that the number of "known questionable signatures exceeds the 2,088-signature threshold" and that determining the sufficiency of the petitions would "[r]equire further investigation, including subject interviews." MTI Ex. B at 17. NCSBE investigators have endeavored to speak with Griffin and Mullins but have been unsuccessful in contacting them. MTI Ex. A at 10. While these circulators signed many of the petition sheets submitted by NCGP—containing well over 1,000 signatures—it is unknown "if all of their collected sheets identify them as being the collector" and the scope of their involvement remains unknown. *Id.*

The NCGP developed a relationship with Griffin and Mullins through Arkansas-based Evans Political Consulting, which the party likewise engaged to collect signatures. Compl., Ex. 3

at 6-7. The entity's owner, Lee Evans, has "refused to comply with the State Board's subpoena or [to] speak with investigators." MTI Ex. A at 10. Indeed, he acknowledged to reporters that he is "refusing to cooperate with state investigators probing the authenticity of signatures that were collected." Bryan Anderson, *Green Party Consultant, Dodging NC Investigators, Says He Didn't Do Anything Wrong*, WRAL (July 15, 2022), https://www.wral.com/green-party-consultant-dodging-nc-investigators-says-he-didn-t-do-anything-wrong/20376864/. Mr. Evans explained that he was paid $10,000 to collect signatures, but that he "terminated the contract" due to low margins. *Id.* Nonetheless, "[p]leased with the work of Evans' collectors, Hoh's campaign decided to pay them as his own employees so that they could continue gathering signatures." *Id.* Those collectors included Griffin and Mullins. Compl., Ex. 3 at 7.

The NCSBE's investigation has also shown that the NCGP worked with Michigan-based First Choice Consulting, led by principal Shawn Wilmoth. Compl., Ex. 3 at 5; *see also* MTI Ex. A at 8. Both Mr. Wilmoth and First Choice Consulting were recently implicated in a massive petition-fraud scandal in Michigan that led to the disqualification of numerous Republican candidates, including the party's leading choice for Governor. *See, e.g.*, *How One Firm In A 'Wild West' Industry Upended the Michigan GOP Governor Race*, Bridge Michigan (June 16, 2022), https://www.bridgemi.com/michigan-government/how-one-firm-wild-west-industry-upended-michigan-gop-governor-race. First Choice Consulting collected only 109 signatures for the NCGP before the party terminated its contract, but the party submitted all 109 signatures to a County Board of Election even though it had previously found "that roughly half the small batch of signatures the firm did collect were incorrectly done." Compl., Ex. 3 at 5.

Further investigation by the NCSBE has confirmed that many signatures on the petition sheets that were counted in the NCGP's favor by County Boards of Election were fraudulent,

indicating "an organized effort to falsify petition signatures." MTI Ex. A at 7. For example, 38 individuals contacted one County Board of Election to report that they did not in fact sign a petition sheet. *Id.* The NCSBE also contacted a sample of voters on a petition sheet submitted by either Mullins or Griffin and found that of those contacted: 28 voters stated that they *did not sign the petition*; 15 voters were not sure or could not remember; 8 voters stated that they did sign; and 4 voters thought that they were signing something other than NCGP ballot access papers. *Id.*

There is no dispute between the parties at this point that the NCGP's petition sheets included many fraudulent signatures. The NCGP's preferred candidate for U.S. Senate, Matthew Hoh, acknowledged the Board's investigation "found some issues that were of concern" including signatures "where it does look like there was some fraud,"[8] because paid circulators "doctored up" some signatures to "get more money."[9] The NCSBE's investigation remains ongoing and the Board continues to try to make contact with individuals who have thus far refused to speak with investigators. MTI Ex. A at 10.

## III.    NCSBE Staff was unable to determine the sufficiency of NCGP's petitions and advised the Board not to certify pending further investigation.

Much of the foregoing information was known by the NCSBE when it met to consider the sufficiency of the NCGP's petitions on June 30, though its investigation has yielded additional problematic information in the interim. But as a presentation compiled by NCSBE staff shows, the Board at that time had already been "alerted" to "irregularities" by various County Boards; opened its own investigation; detected "obvious signs of fraud or irregularities;" and identified Mullins and Griffin as individuals who submitted fraudulent signatures on a wide scale. *See* MTI Ex. B at 10-16.

---

[8] *See* https://www.youtube.com/watch?v=vQ20m3BKf-k&t=1s at 2:15.
[9] *Id.* at 3:05

The NCGP's counsel was given the first word when the NCSBE took up the issue at its meeting.[10] He stated "the facts are clear," noting the County Boards of Election had certified a signature count over the threshold, but did not address any of the problems with the NCGP's petitions. *See* June 30 Hr'g Video at 1:05:15. NCSBE staff presented the preliminary results of their investigation and recommended that the Board "[t]able consideration" of the NCGP's petition to a "future date." *Id.* at 1:07:45; *see generally* MTI Ex. A. As NCSBE staff explained, they "don't have the information at this point to make a decision on the sufficiency of the petitions." June 30 Hr'g Video at 1:28:55.

The Board then discussed the NCGP's petitions. Chairman Damon Circosta explained his hope that the Green Party "would be on the ballot," but explained the State Board's job is "to get it right, not necessarily fast." *Id.* at 1:30:30-54. He stated he would not be comfortable certifying the NCGP "today" but expressed a desire to give NCSBE staff time to complete their work and to potentially certify the party at a later date. *Id.* at 1:30:54-31:16. He further explained "[t]here's enough questions, including a criminal investigation, into the signature petition gathering process" and thus in "good conscience" he could not vote to certify that day in view of the statutory requirement "to verify these signatures." *Id.* at 1:36:20-40. In response to a question from NCGP's counsel, the Chairman explained he "had questions" about signatures "sufficient in number" to not be able to confirm the adequacy of the petitions. *Id.* at 1:37:30-40.

Stacy "Four" Eggers IV, a Republican member, also stated he had a "significant number of questions as to whether the threshold was actually met based upon the [current] status" and

_____

[10] Video of the NCSBE's June 30 meeting is available here: https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2022-06-30/State%20Board%20of%20Elections%20Meeting-20220630%201301-1.mp4 ("June 30 Hr'g Video"). The Board takes up the issue at the roughly 1:00:00 mark.

"those questions at this point remain unanswered." *Id.* at 1:39:20; *see also id.* at 1:40:10 (expressing further "concerns as to whether, are all these signatures properly valid"). He nonetheless "reluctantly" indicated a desire to certify the party due to the possible prejudice of delay. *Id.* at 1:40:40.

Consistent with Staff's recommendation, the Chairman suggested the Board "take no action" on the petitions so that the Board could consider the issue after further investigation. *Id.* at 1:41:15-30. Republican member Tommy Tucker nonetheless made a motion to take a vote on the NCGP's petition, which Mr. Egger's seconded. The Board then voted 3-2 not to certify the NCGP concluding "the petitions were not yet shown to be sufficient under the law" but that "investigation is ongoing." *See* NCSBE, *Amid Investigation, State Board Turns Down Green Party Recognition* (June 30, 2022), https://www.ncsbe.gov/news/press-releases/2022/06/30/amid-investigation-state-board-turns-down-green-party-recognition.

## IV.    The NCGP's lawsuit and allegations involving Proposed Intervenors.

Despite the NCSBE's ongoing investigation into the sufficiency of the NCGP's petitions under state law, the NCGP has now filed a lawsuit asking this federal court to declare that the NCSBE has unconstitutionally refused to certify the NCGP and "directing NCSBE to certify as a new political party" under state law. Compl. ¶ 87, ECF No. 1. While the NCGP acknowledges that the North Carolina legislature has assigned the State Board the duty "to determine the sufficient of a new party's petitions," *id.* ¶ 17 (quoting N.C. Gen. Stat. § 163-96(a)(2)), it now asks this Court to substitute its own judgment on the matter, all while the NCSBE continues its investigation into widespread fraud in the NCGP's petitions.

**LEGAL STANDARD**

The Proposed Intervenors move to dismiss NCGP's complaint for lack of subject-matter jurisdiction under Federal Rules of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6).

"When, as here, a defendant challenges the existence of subject matter jurisdiction in fact, the plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence." *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009). On a factual challenge to subject matter jurisdiction, the district court may "go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings, such as affidavits." *Id.*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint -must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. "To contain sufficient factual matter to make a claim plausible, the factual content must allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Nadendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022) (internal quotation marks omitted).

**ARGUMENT**

This Court should decline NCGP's invitation to short-circuit the NCSBE's ongoing investigation into the sufficiency of NCGP's petitions. Federal courts do not stand as appellate tribunals for review of state agency determinations—particularly where the state agency's review has not yet concluded. NCGP's complaint raises an issue of the proper application of North Carolina state law—not a constitutional question. Well-settled principles of federalism and limits on federal court jurisdiction prohibit this court from overriding the NCSBE's application of North

14

Carolina law. For three independent reasons, NCGP's complaint should be dismissed in its entirety: (1) this Court lacks jurisdiction because NCGP's claims are not ripe for adjudication; (2) principles of federalism require this Court to abstain from reaching the merits of NCGP's claims while state proceedings are ongoing; and (3) even if the Court could reach the merits of NCGP's claims, NCGP has failed to allege a constitutional violation.

## I.    Plaintiffs' claims are not ripe for adjudication

This Court lacks subject matter jurisdiction because this matter is not yet ripe for adjudication. *Sansotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013) ("Ripeness is a question of subject matter jurisdiction." (internal quotation marks omitted)). "Like other justiciability doctrines, ripeness derives from Article III." *Deal v. Mercer Cnty. Bd. Of Educ.*, 911 F.3d 183, 190 (4th Cir. 2018). "As with standing, the party bringing the suit bears the burden of proving ripeness." *Doe v. Va. Dept. of State Police*, 713 F.3d 745, 758 (4th Cir. 2013). "A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact remains wholly speculative." *Doe*, 713 F.3d at 758. "Where an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe as the subject of decision in a federal court." *Id.*; *see also Franks v. Ross*, 313 F.3d 184, 195 (4th Cir. 2002) (where county and state agency had "interwoven involvement" in a permitting process, controversy was not ripe until the completion of the final step of the process); *Charter Fed. Sav. Bank v. Off. of Thrift Supervision*, 976 F.2d 203, 208-09 (4th Cir. 1992) (where an agency was required to make multiple decisions and take several actions before an injury could occur, the issues at hand were not ripe for judicial decision).

Ripeness doctrine "addresses the appropriate timing of judicial intervention, and prevents judicial consideration of issues until a controversy is presented in clean-cut and concrete form." *Deal*, 911 F.3d at 190 (internal quotation marks and citations omitted). In reviewing a ripeness

claim, courts consider "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* at 191. "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). "The hardship prong is measured by the immediacy of the threat and the burden imposed on the plaintiffs who would be compelled to act under threat of enforcement of the challenged law." *Id.*

The NCSBE has not rendered a final decision on whether to certify NCGP as a new political party. NCGP therefore has not yet suffered a cognizable Article III injury. At the June 30 meeting, the Board simply concluded that, in light of its ongoing investigation into potential criminal fraud connected with NCGP's signature-gathering, it could not yet determine whether NCGP has satisfied the statutory prerequisites for certification. Indeed, Chairman Circosta expressed his hope that the Green Party "would be on the ballot," but explained the State Board's job is "to get it right, not necessarily fast." June 30 Hr'g Video at 1:30:30-54. He stated he would not be comfortable certifying the NCGP "today" but left open the possibility of certifying the NCGP once the NCBSE staff had completed their work. *Id.* at 1:30:54-31:16. The NCSBE Staff's June 30 presentation explained that "[i]investigations staff and others at NCSBE are continuing to review" the petitions but recommended NCSBE "[t]able consideration for a future date" as Staff "[r]equires further investigation, including subject interviews." *Id.* at 1:07:45; MTI Ex. B at 13, 17. The press release the Board issued after voting 3-2 to decline certification noted only that "the petitions were not *yet* shown to be sufficient under the law." https://www.ncsbe.gov/news/press-releases/2022/06/30/amid-investigation-state-board-turns-down-green-party-recognition. The NCSBE Executive Director's July 14 report confirms the same, noting that Staff's "[i]nvestigation continues." MTI Ex. A at 10. It is therefore "wholly speculative" whether NCGP will be certified

and whether its candidates will be placed on the ballot for the 2022 general election. *Doe*, 713 F.3d at 758. Until a final decision is reached, NCGP has not yet suffered a cognizable injury and this Court lacks Article III jurisdiction.

Further, until NCBE's investigation is complete and its action is "final," the issues will not be "presented in clean-cut and concrete form." *Deal*, 911 F.3d at 190. In determining whether an agency action is ripe for review, courts consider "whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). Although NCGP speculates that "NCSBE is presently improperly invalidating signatures that county boards of elections properly validated," it remains to be seen (1) how many signatures, if any, will be invalidated, or (2) the grounds for invalidating those signatures. *See Johnson v. Lamone*, 401 F. Supp. 3d 598, 607 (D. Md. 2019) (challenge to signature match requirement was not ripe where "it is unknown just how many signatures would be invalidated on the Party's hypothetical future petition and for what reason."), *aff'd,* 801 F. App'x 116 (4th Cir. 2020). Even if enough signatures are ultimately invalidated and NCSBE declines to certify NCGP as a party, resolution of NCGP's claims will require the Court to inquire into NCSBE's reasons for invalidating signatures. And the Court cannot perform that inquiry without knowing which signatures the NCSBE has deemed invalid and why. On the other hand, the NCSBE may yet conclude the NCGP *has* submitted a sufficient number of qualified signatures and proceed to recognize the party, mooting this case entirely. "Given the contingencies remaining in this case, the [dispute] would be better litigated if and when there are concrete signature invalidations in the record." *Lamone*, 401 F. Supp. 3d at 608. "Federal courts must tread lightly to avoid premature adjudication, and prudential doctrines of judicial restraint counsel particular caution in the face of factually underdeveloped constitutional questions." *Id.* "Because the [NCSBE] has yet to issue a

final decision regarding" whether NCGP has exceeded the necessary signature threshold, "plaintiffs' challenges . . . are not ripe." *Sansotta v. Town of Nags Head*, No. 2:11-CV-3-D, 2012 WL 2919895, at *4 (E.D.N.C. July 17, 2012) (dismissing for lack of subject matter jurisdiction).

"Because substantial uncertainties bear on the controversy at issue here," the "Court need not reach the issue of hardship to the parties because . . . the case fails to meet the first prong of the ripeness test." *Simonton Bldg. Prod., Inc. v. Johnson*, 553 F. Supp. 2d 642, 650 (N.D.W. Va. 2008) (citing *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006)); *see also Arc of VA, Inc. v. Kaine*, No. 3:09CV686, 2009 WL 4884533, at *9 (E.D. Va. Dec. 17, 2009) (suggesting considering hardship may be unnecessary when case is not fit for review). "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Miller*, 462 F.3d at 319. The Court therefore need not consider the hardship prong of the ripeness standard.

Even if the Court does consider that issue, it does not weigh in favor of jurisdiction. While the NCGP is understandably concerned about the NCSBE's deadline for printing ballots, any relief available to it in this matter realistically rests before NCSBE and not this Court. No determination about the sufficiency of NCGP's petitions—by this Court, NCSBE, or anyone else—can realistically be made until NCSBE completes its investigation, the results of which will substantially bear on whether NCGP can obtain ballot access. Continuing litigation in this Court therefore will not appreciably accelerate the resolution of this matter. Even if the results or manner of that investigation aggrieves NCGP, judicial review remains available in state court, which is the more appropriate forum for this state law issue. *See infra* §§ II-III.

## II.     This Court should abstain while NCSBE's investigation continues.

Rather than await the results of the NCSBE's investigation and its final decision on NCGP's petition, NCGP has opted to circumvent North Carolina's statutorily mandated process

by pressing constitutional claims before this Court. Abstention doctrines counsel against this type of federal intervention in ongoing state agency proceedings. "Although that doctrine has many different forks and prongs, its central idea has always been one of simple comity." *Johnson v. Collins Ent, Co., Inc.*, 199 F.3d 710, 718-19 (4th Cir. 1999). The Court should abstain because "[t]he exercise of federal equitable discretion in this case [would] supplant[] the legislative, administrative, and judicial processes of [North] Carolina and [seek] to arbitrate matters of state law and regulatory policy that are best left to resolution by state bodies." *Id.* at 719-20.

### A. The Court should abstain under *Burford*.

The court should apply the *Burford* doctrine to abstain from deciding this issue while NCBSE proceedings are ongoing. The Supreme Court has summarized this doctrine as follows:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) where there are difficult questions of state law bearing on policy problems of substantial import whose importance transcends the result in the case at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Public Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (internal quotation marks omitted).

Both criteria are met here. Standards for certification of political parties are unquestionably a "policy problem of substantial import" and "a matter of substantial public concern." *Id.* And NCGP's claims turn on "difficult questions of state law." *Id.* Most notably, NCGP's claims turn on § 163-96's command that the NCSBE "forthwith determine the sufficiency of petitions filed with it." That is a question of state law, committed to the discretion of a state agency, and ultimately reviewable in a state court. The North Carolina legislature has tasked NCSBE with

determining the "sufficiency" of petition papers, a duty the Board and its staff continue to undertake.

Although NCGP attempts to reframe its state law arguments as constitutional claims, it is really asking this Court to resolve complicated and fact-dependent questions of North Carolina law that are committed to

NCSBE's discretion. Courts should abstain under *Burford* where, "[a]lthough the plaintiffs contend that their claim raises federal issues . . . a careful review of their allegations discloses a claim that is, at bottom, a collateral attack on [a state agency's] decisions." *Jamison v. Longview Power, LLC*, 49 F. Supp. 2d 786, 787 (N.D.W. Va. 2007); *see also Palumbo v. Waste Techs. Indus.*, 989 F.2d 156, 160 (4th Cir. 1993) (Applying *Burford* where "[a] count-by-count examination of the substance of plaintiffs' complaint confirms that it is at root a collateral attack on the permitting decisions of the federal and Ohio EPAs.").

For example, in *Pomponio v. Fauquier County Board of Supervisors*, 21 F.3d 1319 (4th Cir. 1994) (en banc), the Fourth Circuit held that abstention was appropriate where federal constitutional claims asserted by a real estate developer against a county boiled down to questions of state land use laws. In that case, the developer had alleged that the misconduct of county officials in rejecting his subdivision plan constituted violations of federal due process and equal protection guarantees. But, as the Fourth Circuit summarized in a later case, "the dispute was essentially about '[w]hether the zoning ordinance was incorrectly construed.'" *Johnson*, 199 F.3d at 721 (quoting *Pomponio*, 21 F.3d at 1322). The court "thus observed that '[t]he federal claims [were] really state law claims' because local zoning laws and decisions were the basis of the federal claims." *Id.* (quoting *Pomponio*, 21 F.3d at 1326). "Many of [the Fourth Circuit's] decisions applying abstention rest on this same 'state law in federal clothing' rationale." *Id.*

The Court should not disrupt the NCSBE's efforts to conduct a fulsome investigation and resolve the validity of NCGP's petitions in accordance with state law. NCSBE, as the agency charged with administering §163-96, is best situated (1) determine its proper application and (2) adjudicate whether NCGP's petitions meet the statutory criteria. And, should NCGP be dissatisfied with the agency's resolution of these difficult questions of state law, it has several avenues of judicial review available to it in the state courts. For example, it could seek relief under North Carolina's Declaratory Judgment Act, *see, e.g.*, *Sharpe v. Park Newspapers of Lumberton, Inc.*, 347 S.E.2d 25, 31-32 (N.C. 1986); *Asheville Lakeview Properties, LLC v. Lake View Park Comm'n, Inc.*, 803 S.E.2d 632, 636 (N.C. App. 2017); seek a "declaratory ruling" under North Carolina's Administrative Procedure Act and then obtain Superior Court review of that ruling, *see, e.g.*, N.C. Gen. Stat. § 150B-43; *Yili Tseng v. Martin*, 786 S.E.2d 433 (N.C. App. 2016) ("The Administrative Procedure Act (APA), as codified in N.C. Gen. Stat. § 150B, establishes administrative remedies by which persons who are aggrieved by agency action can seek redress."); or, of course, file similar constitutional claims under the North Carolina Constitution, *see, e.g.*, N.C. Const., Art. I §§ 1 12, 14, 18.

**B.    The Court should abstain under the *Colorado River* doctrine.**

Alternatively, the Court should abstain under the *Colorado River* doctrine. "The *Colorado River* doctrine permits federal courts to abstain from exercising subject-matter jurisdiction when a federal action duplicates pending state proceedings and when 'wise judicial administration, giving regard to the conservation of judicial resources and comprehensive disposition of litigation' clearly favors abstention." *Garrett v. Clarke*, 553 S. Fupp. 3d 539, 550 (E.D. Va. 2021) (quoting *Chase Brexton Health Servs., Inc. v. Maryland*, 411 F.3d 457, 463 (4th Cir. 2005)). That is precisely what the NCGP has sought here—to task both this Court and NCSBE with determining in parallel the sufficiency of their petitions under state law. Two conditions must be satisfied for a federal court

to abstain under the *Colorado River* doctrine: (1) there must be parallel proceedings in state and federal court, and (2) "exceptional circumstances" warranting abstention must exist. *Gannet Co., Inc. v. Clark Const. Grp., Inc.*, 286 F.3d 737, 741 (4th Cir. 2002). Both conditions are satisfied here.

First, the NCSBE is conducting a parallel proceeding. For the purpose of determining whether there are parallel state and federal proceedings, "administrative proceedings, when adjudicative in nature, are considered state suits." *Chase Brexton Health Servs., Inc. v. Maryland*, 411 F.3d 457, 463 n.2 (4th Cir. 2005). Proceedings are "parallel" where "substantially the same parties litigate substantially the same issues in different forums." *vonRosenberg v. Lawrence*, 849 F.3d 163, 168 (4th Cir. 2017) (internal quotation marks omitted). A court may abstain where the parallel state proceeding "will be an adequate vehicle for the complete and prompt resolution of the issues between the parties." *Id.* (internal quotation marks omitted). Here, NCGP seeks to litigate substantially the same issue in this court as is currently pending before the NCSBE—namely, whether it has collected enough valid signatures to be certified as a political party under N.C. Gen. Stat. § 163-96. Apparently unhappy with the course the NCSBE's investigation of that issue has taken, NCGP has attempted to transmute this state-law question into a constitutional claim. But at the end of the day, the issues are the same and both proceedings will turn on the same facts, which continue to develop as the NCSBE's investigation unfolds. NCGP seeks the same relief from this court that it does before the NCBSOE—certification as a political party and placement on the ballot in the November 2022 general election. And the appropriateness of that relief turns on (1) construction of North Carolina's statutory criteria for party certification and (2) review of the over 15,000 signatures NCSBE received from NCGP to determine whether they satisfy the statutory criteria.

*Colorado River* requires the court to balance several factors to determine whether "exceptional circumstances' exist:

> (1) whether the subject matter of the litigation involves property where the first court may assume *in rem* jurisdiction to the exclusion of others; (2) whether the federal forum is an inconvenient one; (3) the desirability of avoiding piecemeal litigation; (4) the relevant order in which the courts obtained jurisdiction and the progress achieved in each action; (5) whether state law or federal law provides the rule of decision on the merits; and (6) the adequacy of the state proceeding to protect the parties' rights.

*Chase Brexton Health Servs.*, 411 F.3d at 463-64. The second, third, fourth, fifth, and sixth factors all favor abstention here, tipping the balance sharply in favor of abstention.[11] First, federal courts are not a convenient forum for adjudicating what is essentially a state law question turning on the results of an investigation by state authorities. NCGP should not be allowed to hale the NCSBE's investigators into federal court to report on the status of an ongoing criminal investigation. Second, this litigation is "particularly ill suited for resolution in duplicate forums." *Gannett Co.*, 286 F.3d at 746. Should this Court grant relief to NCGP before the NCSBE's investigation is complete, it risks effectively nullifying the state's efforts to ensure the integrity of its ballots without allowing those efforts to run their course. Moreover, any relief this Court grants could subsequently be undercut by still-emerging evidence showing that the NCGP did not in fact meet the necessary signature threshold under state law. Third, the NCSBE has a significant head start in adjudicating these issues. It has been investigating NCGP's petition-gathering process for months, and requiring its investigators to report on the results of their investigation to a federal court will only cause further delay. Fourth, although NCGP purports to raise constitutional claims, its claims ultimately turn on an interpretation of state law. And finally, the NCSBE has provided an adequate forum to protect NCGP's rights. NCGP has been made aware of NCSBE's investigation and allowed to

---

[11] Because this matter does not involve jurisdiction over a *res*, the first factor does not apply.

present written and oral responses about its petition gathering. And, should NCGP ultimately be dissatisfied with the results of the NCSBE process, it has avenues available for judicial review in North Carolina state courts.

Whether characterized as *Burford* or *Colorado River* abstention, well-settled principles of federalism should compel this Court to abstain from adjudicating this matter while NCSBE's investigation and administrative proceedings are ongoing. "The various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases. Rather, they reflect a complex of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 11 n.9 (1987). "These considerations counsel abstention especially where, as here, state actors are charged with resolving state law issues that intimately affect state regulation of a core state concern." *Johnson*, 199 F.3d at 729.

### III. Plaintiffs fail to state a claim.

NCGP does not allege that § 163-96 is unconstitutional, either facially or as applied. It does not argue that these requirements impose a burden, severe or otherwise, upon its First or Fourteenth Amendment rights.[12] NCGP's claims therefore do not fit within the *Anderson-Burdick* framework for evaluating alleged burdens on the right to associate as a political party, which appears to form the basis for NCGP's first cause of action. *See Buscemi*, 964 F.3d at 262-63. "In *Anderson*, *Burdick*, and their progeny, courts have considered the constitutionality of state statutes, regulations, or policies that burden the right to vote." *Lecky v. Va. State Bd. of Elections*, 285 F. Supp. 3d 908, 919 (E.D. Va. 2018). This is not such a case. NCGP has not identified a statute, regulation, or policy that burdens its right to vote. Instead, NCGP alleges that it did comply with

---

[12] The Fourth Circuit has already rejected a similar claim. *Pisano v. Strach*, 743 F.3d 927 (4th Cir. 2014).

all applicable state law requirements, and NCSBE declined to certify it anyway. *E.g.* Compl. ¶¶ 80, 85.

At bottom, NCGP's claims turn on a state law dispute: the meaning and import of the North Carolina legislature's command that "the State Board of Elections shall forthwith determine the sufficiency of petitions filed with it and shall immediately communicate its determination to the State chair of the proposed new political party." N.C. Gen. Stat. § 163-96(a)(2). NCGP believes that it has satisfied the requirements for party certification and that its petitions are "sufficient." NCSBE Staff and Investigators, after reviewing NCGP's petitions and mounting evidence of fraud, could not confidently make that determination and advised the Board to await further investigation—a recommendation a majority of the Board adopted, and that even one dissenting Board member recognized as valid given the "significant number of questions as to whether the threshold was actually met based upon the [current] status;" questions that "at this point remain unanswered." June 30 Hr'g Video at 1:39:20 (Statement of Member Eggers); *see also id.* at 1:40:10 (expressing further "concerns as to whether, are all these signatures properly valid"). That decision was well within NCSBE's discretion. *See Hedgepeth v. N.C. Div. of Servs. for the Blind*, 571 S.E.2d 262, 269 (N.C. App. 2002) (North Carolina courts cannot "override decisions within agency discretion when that discretion is exercised in good faith and in accordance with law."). NCGP now asks this court to intervene and override the NCSBE's considered application of North Carolina law. But federal district courts do not serve as appellate tribunals to second-guess state agency applications of state law.

Even if NCGP's state-law arguments were somehow cognizable as constitutional claims, NCGP misreads the relevant North Carolina statutes. NCGP apparently believes that § 163-96's requirement that NCSBE determine the sufficiency of petitions "forthwith" divests the NCSBE of

any authority to investigate the positions and requires it to simply rubber-stamp the determinations of the county boards. Compl. ¶¶ 58, 67, 72. But that is not what the statute says. Section 163-96, in mandatory terms, requires that the NCSBE "shall . . . determine the sufficiency of the petitions filed with it." N.C. Gen Stat. § 163-96(a)(2). That is exactly what NCBSE is doing. To "determine" means "to fix conclusively or authoritatively," "to settle or decide by choice of alternatives or possibilities, or "to find out or come to a decision about by investigation, reasoning, or calculation." Determine, Merriam-Webster, https://www.merriam-webster.com/dictionary/determine (last accessed July 17, 2022).[13]

To be sure, the statute requires that NCSBE act expeditiously. *See* Forthwith, Merriam-Webster, https://www.merriam-webster.com/dictionary/forthwith (last accessed July 17, 2022) (defining "forthwith" as "without any delay"); Forthwith, Black's Law Dictionary (11th ed. 2019) ("Immediately; without delay" or "Directly; promptly; within a reasonable time under the circumstances; with all convenient dispatch."). But the Board's Staff has made clear it is moving as quickly as possible to resolve its investigation. As Chairman Circosta explained, NCSBE's statutory duty is "to get it right, not necessarily fast." June 30 Hr'g Video at 1:30:30-54.

Even if NCSBE's failure to certify NCGP on June 30 was improper under North Carolina law—and it clearly was not—NCGP has alleged only a violation of state law, not a violation of its constitutional rights. It is well-established that "a mere error of state law, if one occurred," is not "a denial of due process." *Gryger v. Burke*, 334 U.S. 728, 731 (1948). "Mere violation of a state statute does not infringe the federal Constitution." *Snowden v. Hughes*, 321 U.S. 1, 11 (1944). And in this context, "mere violation of a state statute by an election official will not give rise to a

---

[13] "In the absence of a contextual definition, courts may look to dictionaries to determine the ordinary meaning of words within a statute." *Dickson v. Rucho*, 737 S.E.2d 362, 370 (N.C. 2013) (internal quotation marks omitted).

constitutional claim." *Lecky*, 285 F. Supp. 3d at 919 (quoting *Hennings v. Grafton*, 523 F.2d 861, 864 (7th Cir. 1975)) (alterations omitted). As the Fourth Circuit has explained, "not every election irregularity gives rise to a constitutional claim. Whether the irregularity amounts to a constitutional claim depends on its severity, whether it was intentional or more of a negligent failure to carry out properly the state election procedures, and whether it erodes the democratic process." *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182 (4th Cir. 1983). "The election system itself must be fundamentally unfair to implicate the Due Process Clause." *Burke v. Pasquotank Cnty. Bd. of Elections*, No. 2:08-CV-22-FL, 2010 WL 883017, at *1 (E.D.N.C. Mar. 8, 2010).

NCGP has not alleged that NCSBE's failure to certify it on June 30 was "fundamentally unfair" or "erodes the democratic process." There is nothing "fundamentally unfair" about a state agency carrying out its statutorily mandated duty to investigate and "determine the sufficiency" of petition signatures in the face of mounting evidence of fraud. *See* N.C. Gen. Stat. § 163-96(a)(2). And until NCSBE has completed its investigation and made a final determination of the sufficiency of NCGP's petitions, it is impossible for this Court, or any court, to evaluate whether any signatures were invalidated that should not have been under North Carolina law—let alone whether any potential misapplication of North Carolina law rendered the election system "fundamentally unfair."

Finally, even if NCGP's First Amendment or Due Process rights are implicated by NCBSE's application of § 163-96, North Carolina "certainly ha[s] an interest in protecting the integrity, fairness, and efficiency of [its] ballots and election processes as a means for electing public officials." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 364 (1997); *see also Democracy N.C. v. N.C. State Bd. of Elections*, 476 F. Supp. 3d 158, 206 (M.D.N.C. 2020) ("[P]reventing voter fraud and preserving election integrity are important state interests."). That

interest is "weighty," *Timmons*, 520 U.S. at 369, and, in light of the mounting evidence of fraud identified by NCSBE, significantly outweighs the minimal burden on NCGP's rights imposed by delaying certification. Should NCSBE's investigation ultimately reveal that NCGP has not submitted the number of valid, non-fraudulent signatures required for certification, North Carolina's interest in ballot integrity will certainly outweigh any burden on NCGP's First and Fourteenth Amendment rights. *See Pisano*, 743 F.3d at 937 (upholding an earlier version of § 163-96 that imposed an even higher signature threshold of 2 percent of votes cast in the preceding election).

NCGP's remedy, if any, is with the NCSBE and the North Carolina courts, not with this Court. Nothing in the federal constitution or North Carolina law empowers this Court to override the considered determination of the NCSBE—particularly where that determination turns on facts that are still subject to an ongoing investigation. And nothing in the constitution or in North Carolina law compels the NCSBE to certify NCGP as a party without first determining whether it has submitted the requisite number of valid, non-fraudulent signatures. NCGP's complaint should be dismissed.

## CONCLUSION

For the reasons above, Intervenors respectfully request the Court dismiss the complaint.


Dated: _____, 2022                    Respectfully submitted,

                                        /s/ Narendra K. Ghosh
                                        Narendra K. Ghosh, NC Bar No. 37649
                                        PATTERSON HARKAVY LLP
                                        100 Europa Drive, Suite 420
                                        Chapel Hill, NC 27517
                                        Telephone: 919.942.5200
                                        nghosh@pathlaw.com

28

Aria C. Branch*
Christopher D. Dodge*
Christina A. Ford*
Daniel J. Cohen*
Richard A. Medina*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
abranch@elias.law
cdodge@elias.law
cford@elias.law
dcohen@elias.law
rmedina@elias.law

*Counsel for Intervenors*

*Notice of Special Appearance Forthcoming

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I caused the foregoing document to be filed and served on all counsel of record by operation of the CM/ECF system for the United States District Court for the Western District of North Carolina.

DATED: _____

/s/ Narendra K. Ghosh
Narendra K. Ghosh, NC Bar No. 37649
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27517
Telephone: 919.942.5200
nghosh@pathlaw.com

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Memorandum of Law in Support of Motion to Intervene as Defendants contains 8,095 words, based on the word count of the word processing system used to prepare this brief, and thereby complies with the Local Civil Rule 7.2(f).


DATED: _____          /s/ Narendra K. Ghosh
                          Narendra K. Ghosh, NC Bar No. 37649
                          PATTERSON HARKAVY LLP
                          100 Europa Drive, Suite 420
                          Chapel Hill, NC 27517
                          Telephone: 919.942.5200
                          nghosh@pathlaw.com