**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| NORTH CAROLINA GREEN PARTY, ANTHONY NDEGE, MICHAEL TRUDEAU, MATTHEW HOH, SAMANTHA WORRELL, SAMANTHA SPENCE, K. RYAN PARKER AND AARON MOHAMMED,<br><br>               Plaintiffs,<br><br>   v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS.<br><br>               Defendant. | **Case No. 4:22-cv-00078-D-BM** |

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**MOTION TO INTERVENE AS DEFENDANTS**</u>

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 3

   I.   North Carolina's requirements for party recognition.......................................... 3

   II.  NCSBE Staff's ongoing investigation into fraudulent petitions submitted as part of the NCGP's flawed petition drive ....................................................................... 6

   III. The Proposed Intervenors became aware of additional problems with the NCGP petition review process, including that their members were misled into signing. ......................... 11

   IV. NCSBE Staff was unable to determine the sufficiency of NCGP's petitions and advised the Board not to certify pending further investigation. .................................... 14

   V.  The NCGP's lawsuit and allegations involving Proposed Intervenors............................. 15

ARGUMENT ............................................................................................................. 16

   I.   The Proposed Intervenors are entitled to intervene as a matter of right under Rule 24(a)(2). ............................................................................................................. 16

      A.  The motion to intervene is timely. ........................................................... 17

      B.  Proposed Intervenors have significant protectable interests in this litigation. .......... 18

      C.  Denying intervention will impair the Proposed Intervenors' ability to protect their interests. ............................................................................................................. 21

      D.  The Proposed Intervenors' interests are not adequately represented by NCSBE...... 22

   II.  The Proposed Intervenors are also entitled to permissive intervention. ........................... 25

CONCLUSION............................................................................................................. 26

## INTRODUCTION

In this lawsuit, the North Carolina Green Party ("NCGP") asks this Court to order the North Carolina State Board of Elections ("NCSBE") to declare the NCGP a recognized political party in North Carolina. But the NCGP's request ignores a fundamental problem. Staff and investigators for the NCSBE—the body tasked by the North Carolina legislature with assessing the sufficiency of a new party's petition papers—have found that several NCGP signature gatherers engaged in "an organized effort to falsify petition signatures."[1] This fraud was significant—evidence uncovered to date suggests the number of "known questionable signatures exceeds the 2,088-signature threshold" in petition signatures submitted by NCGP, according to staff.[2] For that reason, the staff of the NCSBE advised the Board at its June 30, 2022, meeting to "[t]able consideration" of the NCGP's petition to a "future date."[3] As NCSBE staff explained, they "don't have the information at this point to make a decision on the sufficiency of the petitions."[4] The Board adopted this recommendation by a 3-2 vote, and even one member who voted to certify acknowledged he had a "significant number of questions as to whether the threshold was actually met based upon the [current] status" and "those questions at this point do remain unanswered."[5]

The NCSBE did not reach this conclusion because of so-called "operatives" of the Democratic Party. In fact, "several [County Boards of Election] alerted the NCSBE of irregularities identified during review of the petitions" and NCSBE "opened an investigation" on

---

[1] July 14, 2022 Executive Director Report, attached herein as Exhibit A, at 7.

[2] June 30, 2022 Consideration of Recognition of the North Carolina Green Party, attached herein as Exhibit B, at 18.

[3] Video of the NCSBE's June 30 meeting is available here: https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2022-06-30/State%20Board%20of%20Elections%20Meeting-20220630%201300-1.mp4 ("June 30 Hr'g Video"). The Board takes up the issue at the roughly 1:00:00 mark, and the quoted excerpts appear on a presentation slide at 1:20:40.

[4] *Id.* at 1:28:53-59.

[5] *Id.* at 1:39:10-40.

1

its own initiative.[6] That investigation has revealed potential criminal wrongdoing, and the subjects of that investigation have refused to provide evidence in response to NCSBE subpoenas.[7] The NCSBE's investigation remains ongoing, as does its review of the NCGP's petitions to see if they pass the required threshold set by state law.

Alerted to these issues, the DSCC and North Carolina Democratic Party ("Proposed Intervenors") conducted their own review of NCGP's petitions and uncovered yet *more* problems with their signature-gathering process. It quickly became apparent that many signatories were misled into signing petitions by, for example, being told they were petitions to legalize marijuana.[8] The Proposed Intervenors contacted hundreds of signatories who indicated a desire to revoke their signatures from the NCGP's petitions, many of whom claimed they were misled into signing the petitions or had not signed the petitions at all.

The NCGP's complaint elides these critical—and still developing—facts in the hope that this Court will short-circuit ongoing proceedings and investigations before the NCSBE. Because this lawsuit, and the ongoing proceedings before the NCSBE, implicate critical interests to the Proposed Intervenors, they now seek to intervene in this lawsuit to ensure a fair competitive playing field for their candidates; to conserve their party resources; to protect their own members from misleading petition schemes; to ensure North Carolina's election laws are applied competently and fairly; and to defend against inaccurate accusations levied at them by Plaintiffs. The Proposed Intervenors satisfy the requirements to intervene as of right and on a permissive basis—their motion is unquestionably timely, made just days after the case was filed; as listed above, they have significant protectable interests at issue; their ability to protect those interests

---

[6] Ex. B at 11.
[7] Ex. A at 10.
[8] Declaration of Carlton P. Jones, Ex. C, at ¶ 4.

2

Case 5:22-cv-00276-D-BM   Document 16   Filed 07/17/22   Page 4 of 30

will be impaired if this Court short-circuits ongoing proceedings before the NCSBE and grants injunctive relief here; and their interests are not adequately protected by NCSBE which, as the Supreme Court just recognized, serves distinct public, rather than private or partisan, interests.

## BACKGROUND

### I.      North Carolina's requirements for party recognition.

North Carolina law prescribes three ways for a political party to obtain recognition. *See generally* N.C. Gen. Stat. § 163-96(a).[9] As relevant here, a group of voters may obtain recognition for a new political party by filing with the North Carolina State Board of Elections ("NCSBE") "petitions for the formulation of a new political party which are signed by registered and qualified voters in [North Carolina] equal in number to one-quarter of one percent (0.25%) of the total number of voters who voted in the most recent general election for Governor." *Id.* § 163-96(a)(2).

The North Carolina Green Party previously "cease[d] to be a political party" under North Carolina law because "at the last preceding general State election," its "candidate for Governor, or for presidential electors" failed to obtain "at least two percent (2%) of the entire vote cast in the State for Governor for presidential electors." N.C. Gen. Stat. § 163-97 (incorporating N.C. Gen. Stat. § 163-96(a)(1)). Based on the number of votes in the 2020 gubernatorial election, it was required to obtain 13,865 valid signatures from qualified and registered voters.

---

[9] A party also may obtain recognition when "at the last preceding general State election," a group of voters "polled for its candidate for Governor, or for presidential electors, at least two percent (2%) of the entire vote cast in the State for Governor or for presidential electors." *Id.* § 163-96(a)(1). It also may file documentation with the Board showing that "the group of voters had a candidate nominated by that group on the general election ballot of at least seventy percent (70%) of the states in the prior Presidential election." *Id.* § 163-96(a)(3). The NCDP, for example, qualifies under either of these provisions because its gubernatorial candidate, Governor Roy Cooper, obtained 51.5 percent of the vote during the last State general election and its presidential candidate, Joseph R. Biden, was on the ballot in all fifty states and the District of Columbia.

Voters seeking to obtain recognition of a new political party must comply with several statutory requirements in obtaining petition signatures. For example, "[p]etitions for the creation of a new political party *shall* contain on the heading of each page of the petition in bold print or all in capital letters the words:

'THE UNDERSIGNED REGISTERED VOTERS IN _____ COUNTY HEREBY PETITION FOR THE FORMATION OF A NEW POLITICAL PARTY TO BE NAMED _____ AND WHOSE STATE CHAIRMAN IS _____, RESIDING AT _____ AND WHO CAN BE REACHED BY TELEPHONE AT _____.'"

N.C. Gen. Stat. § 163-96(b). Consistent with this language, the petitions "must specify the name selected for the proposed political party." *Id.* And they likewise "must state the name and address of the State chairman of the proposed new political party." *Id.*

North Carolina law also requires that, "[i]n addition to the form of the petition, the organizers and petition circulators shall inform the signers of the general purpose and intent of the new party." *Id.* The Fourth Circuit has also recently affirmed the importance of this disclosure requirement in obtaining recognition for a new political party, in part because it entitles the group of voters seeking recognition a *lower* signature threshold than unaffiliated candidates. In return for this lower signature threshold, "a group of voters seeking recognition as a new political party must satisfy additional requirements to attain and retain such recognition." *Buscemi v. Bell*, 964 F.3d 252, 265 (4th Cir. 2020) (citing N.C. Gen. Stat. § 163-96). This includes the requirement that "new political parties must 'inform the signers of the general purpose and intent of the new party.'" *Id.* (quoting N.C. Gen. Stat. § 163-96(b)). The disclosure requirement is therefore not an idle command—it explains "why new political parties have an initial signature requirement lower than the signature requirement for an unaffiliated candidate." *Id.*

Finally, state law also sets out the procedures by which a potential new party's petition sheets are reviewed, beginning with the County Boards of Election. *See generally* N.C. Gen. Stat. § 163-96(c). First, the "group of petitioners shall submit the petitions to the chairman of the county board of elections in the county in which the signatures were obtained no later than 5:00 P.M. on the fifteenth day preceding the date the petitions are due to be filed with the State Board of Elections as provided in subsection [subdivision] (a)(2) of this section." *Id.* The North Carolina Green Party's petitions therefore were required to be filed with the relevant County Boards of Election by 5:00 p.m. on May 17, 2022.

The prospective new party's petitions "shall be presented to the chairman of the board of elections of the county in which the signatures were obtained." *Id.* It "shall [then] be the chairman's duty" to:

1) To *examine the signatures on the petition* and place a check mark on the petition by the name of *each signer* who is *qualified and registered to vote* in his county.

2) To attach to the petition his signed certificate: (a) Stating that *the signatures on the petition have been checked against the registration records* and (b) Indicating the number found *qualified and registered* to vote in his county.

3) To return each petition, together with the certificate required by the preceding subdivision, to the person who presented it to him for checking.

*See* N.C. Gen. Stat. § 163-96(c) (emphases added). "Provided the petitions are timely submitted, the chairman of the county board of elections shall proceed to examine and verify the signatures under the provisions of this subsection" and "[v]erification shall be completed within two weeks from the date such petitions are presented." *Id.*

After the Chairs of the County Boards of Elections verify signatures on the petition sheets and return them to the group of voters seeking party recognition, the petitioners "must file their petitions with the State Board of Elections before 12:00 noon on the first day of June preceding

5

the day on which is to be held the first general State election in which the new political party desires to participate." *Id.* § 163-96(a)(2). The Board "shall forthwith determine the sufficiency of petitions filed with it and shall immediately communicate its determination to the State chair of the proposed political party." *Id.*

## II.     NCSBE Staff's ongoing investigation into fraudulent petitions submitted as part of the NCGP's flawed petition drive

The NCGP's process for obtaining the necessary petition signatures was flawed from the start, resulting in the submission of numerous clearly deficient and fraudulent petition sheets. Indeed, before the Proposed Intervenors ever contacted the NCSBE, "several [County Boards of Election] alerted the NCSBE of irregularities identified during review of petitions" and NCSBE "opened an investigation" into the petitions on its own initiative. Ex. B at 11.

The NCSBE's investigation revealed that the NCGP employed several outside vendors to collect signatures. The NCGP's complaint acknowledges that among these paid circulators were LaCourtney "A.C.E." Griffin and Joshua Mullins. *See* Compl., Ex. 3 at 7, ECF No. 1. The NCGP directly employed Griffin and Mullins in mid-May, shortly before their petitions were due with the County Boards of Election. *Id.* The NCSBE's investigation revealed that these two individuals are now "known to have submitted numerous fraudulent signatures." Ex. A at 9. Indeed, both Griffin and Mullins (who signed petition forms as "ACE" and "Josh M." or "Josh Mullins") forged signatures detectable to any layperson's eye given the identical penmanship, as this small sample shows:

Josh M

PETITION TO CREATE A NEW POLITICAL PARTY (NCGS § 163-96 (a)(2))

THE UNDERSIGNED QUALIFIED REGISTERED VOTERS IN ___WAYNE___ COUNTY HEREBY PETITION FOR THE FORMATION OF A NEW POLITICAL PARTY

TO BE NAMED NORTH CAROLINA GREEN PARTY AND WHOSE STATE CHAIRMAN IS ANTHONY NDEGE, RESIDING AT 1713 CHAPEL STREET, WINSTON-SALEM 27127,

AND WHO CAN BE REACHED BY TELEPHONE AT 336-577-1421.

IT IS ILLEGAL TO SIGN THE NAME OF ANOTHER PERSON TO A PETITION. (G. S. 163-221)

| BOE ONLY | Line No. | Print your name (must be printed legibly) | Residence Address and City/Town (no PO Box numbers) | ZIP code | Birth date (DD/MM/YYYY) | Signature |
|---|---|---|---|---|---|---|
| ✓ | 1 | Corinthia Evans | 2002 Manderleigh Dr | 27545 | | C. Evans |
| | 2 | | | | | |
| ✓ | 3 | Keyonte Cherry | 812 Terrastone Pl | 27519 | | Keyote Ch |
| ✓ | 4 | Demonte Blue | 1663 Plexor Ln | 27545 | | |
| ✓ | 5 | Shaneeka Bell | 1151 Cannonball Run #301 | 27545 | | Shineka Bell |
| ✓ | 6 | Jacob Green | 2830 Manorcrest Ct #231 | 27609 | | Jacob Green |
| ✓ | 7 | Dondre Griffin | 5960 Peacenest Dr | 27610 | | Dondre Griffin |
| ✓ | 8 | Eboni Young | 506 Glenbrook Dr | 27610 | | Eboni Young |
| ✓ | 9 | Deosia Goodman | 5324 Boywood Forest Dr | 37545 | | Deosia Goodman |
| ✓ | 10 | Summer Hardin | 7837 Harps Mill Woods Run | 27615 | | Sum Hardin |
| ✓ | 11 | Karrin Kennard | 2513 Shepherd Valley St | 27610 | | Karrin Kennard |
| ✓ | 12 | Lofton Woods | 2361 Fox Ridge Manor Rd | 27610 | | Lofton Woods |
| ✓ | 13 | Tajasia Pitts | 410 montview way | 27545 | | Tajasia Pitts |
| ✓ | 14 | Camryn Hunter | 404 Little Acres Dr | 27545 | | Camryn Hunter |
| ✓ | 15 | Nyjil Thomas | 2253 Ballston Pl | 27545 | | Nyjil Thomas |

SUBMIT COMPLETED FORMS TO THE OFFICE OF (COUNTY) BOARD OF ELECTIONS.

ACE

PETITION TO CREATE A NEW POLITICAL PARTY (NCGS § 163-96 (a)(2))

THE UNDERSIGNED QUALIFIED REGISTERED VOTERS IN ___Nash___ COUNTY HEREBY PETITION FOR THE FORMATION OF A NEW POLITICAL PARTY

TO BE NAMED NORTH CAROLINA GREEN PARTY AND WHOSE STATE CHAIRMAN IS ANTHONY NDEGE, RESIDING AT 1713 CHAPEL STREET, WINSTON-SALEM 27127,

AND WHO CAN BE REACHED BY TELEPHONE AT 336-577-1421.

IT IS ILLEGAL TO SIGN THE NAME OF ANOTHER PERSON TO A PETITION. (G. S. 163-221)

| BOE ONLY | Line No. | Print your name (must be printed legibly) | Residence Address and City/Town (no PO Box numbers) | ZIP code | Birth date (DD/MM/YYYY) | Signature |
|---|---|---|---|---|---|---|
| ✓ | 1 | Rodgette Waters | 621 Bronwood Dr | 27896 | | Sandra Oldson |
| ✓ | 2 | Jasmine Williams | 508 Western Ave | 27856 | | Jasmine Williams |
| ✓ | 3 | Tanasha Davis | 2541 Campground RD | 27856 | | Tasha Davis |
| ✓ | 4 | Latoya Harris | 50 Richardson ct Nashville | 27856 | | Latoya H. |
| ✓ | 5 | Joshua White | 421 Paul St. | 27803 | | Joshua White |
| ✓ | 6 | Jesus Speight | 246 Regency Dr. | 27896 | | |
| ✓ | 7 | Tracey McClary | 240 Regency | 27896 | | Tracy McCry |
| ✓ | 8 | Curtis Slokin | 323 Aviation Ave | 27856 | | Curtis Slokin |
| ✓ | 9 | Elaine Richardson | 3892 Wiggins RD Spring Hope | 27882 | | |
| ✓ | 10 | Maurice Speight | 901 Banke DT #A | 27856 | | Maurice Speight |
| ✓ | 11 | Sieda Vick | 613 Jackson way | 27896 | | Sieda Vick |
| ✓ | 12 | Tayla Hart | 123 Circle Dr. | 27896 | | Tayla Hart |
| | 13 | | | | | |
| | 14 | | | | | |
| | 15 | | | | | |

SUBMIT COMPLETED FORMS TO THE OFFICE OF (COUNTY) BOARD OF ELECTIONS.

Board of Elections use only
Page _17_ of _29_ pages       Batch No. _5_                          Date received __/__/__

7

Josh M

THE UNDERSIGNED QUALIFIED REGISTERED VOTERS IN **NASH** COUNTY HEREBY PETITION FOR THE FORMATION OF A NEW POLITICAL PARTY

TO BE NAMED **NORTH CAROLINA GREEN PARTY** AND WHOSE STATE CHAIRMAN IS **ANTHONY NDEGE**, RESIDING AT **1713 CHAPEL STREET, WINSTON-SALEM 27127**,

AND WHO CAN BE REACHED BY TELEPHONE AT **336-577-1421**.

IT IS ILLEGAL TO SIGN THE NAME OF ANOTHER PERSON TO A PETITION. (G. S. 163-221)

| BOE ONLY | Line No. | Print your name (must be printed legibly) | Residence Address and City/Town (no PO box numbers) | ZIP code | Birth date | Signature |
|---|---|---|---|---|---|---|
| | 1 | Alexia Abrahams | 3546 Elmwood Rd | 27804 | | Alexia Abrahams |
| | 2 | Dorius Spragley | 414 Ward St | 27856 | | D. Spragley |
| | 3 | Coyanna Harrison | 3725 middleton dr | 27804 | | Coyanna Harrison |
| | 4 | Chelsea Cotton | 3899 Flat Rock Dr | 27809 | | Chelsea Cotton |
| | 5 | Christina Whitley | 5008 Kristie Ln | 27856 | | Christina Whitley |
| | 6 | Elijah Cole | 166 Jeffries Cv | 27804 | | elijahcole |
| | 7 | Nora Casillas | 1531 Overton Dr | 27804 | | Nora Casillas |
| | 8 | Jalen White | 101 Laurel Springs Dr | 27858 | | Jalen White |
| | 9 | Jahquaya Silver | 2436 Quail Haven Rd | 27804 | | Jahquaya Silver |
| | 10 | Jonathan Romero | 9017 Crosswinds Dr | 27803 | | Jonathan R. |
| | 11 | Kadaija Bryant | 1929 Jarrett Dr | 27803 | | Kadaija Bryant |
| | 12 | Devonte Bell | 124 Chesapeake Ct | 27804 | | Devonte Bell |
| | 13 | Kendall Moore | 5365 Joe Ellen Rd | 27809 | | Kendall Moore |
| | 14 | | | | | |
| | 15 | | | | | |

SUBMIT COMPLETED FORMS TO THE OFFICE OF (COUNTY) BOARD OF ELECTIONS.

Board of Elections use only
Page 25 of 27 pages        Batch No. 5                    Date received ___/___/___

---

Josh M

THE UNDERSIGNED QUALIFIED REGISTERED VOTERS IN **Pitt** COUNTY HEREBY PETITION FOR THE FORMATION OF A NEW POLITICAL PARTY

TO BE NAMED **NORTH CAROLINA GREEN PARTY** AND WHOSE STATE CHAIRMAN IS **ANTHONY NDEGE**, RESIDING AT **1713 CHAPEL STREET, WINSTON-SALEM 27127**,

AND WHO CAN BE REACHED BY TELEPHONE AT **336-577-1421**.

IT IS ILLEGAL TO SIGN THE NAME OF ANOTHER PERSON TO A PETITION. (G. S. 163-221)

| BOE ONLY | Line No. | Print your name (must be printed legibly) | Residence Address and City/Town (no PO box numbers) | ZIP code | Birth date | Signature |
|---|---|---|---|---|---|---|
| ✓ | 1 | Glynis Mullins | 100 Singletree Dr | 27834 | | |
| NR | 2 | Alice Stancil | 2001 Croyden Cir #B | 27834 | | |
| ✓ | 3 | Darlyn White | 107 E Catawba Rd | 27834 | | |
| ✓ | 4 | Beverly Wilkins | 4792 N NC 11 | 27812 | | |
| ✓ | 5 | Deborah Langley | 2541 Augustus St | 27828 | | |
| ✓ | 6 | Becky Walker | 3025 Taberna Dr | 27834 | | |
| ✓ | 7 | Angela Bevis | 104 Blackwater Dr | 27890 | | |
| ✓ | 8 | Maurice Carter | 3140 Boardwalk Ln #9 | 27834 | | |
| ✓ | 9 | Shenique Streeter | 600 Verdant Dr #04 | 27858 | | Shenique Streeter |
| | 10 | Daisha Foote | 573 W Hanrahan Rd | 28530 | | Daisha Foote |
| ✓ | 11 | Tiffany BROWN | 1183 Mulberry Ln #29A | 27858 | | |
| ✓ | 12 | Betty Cherry | 1000 Benjamin Dr | 27834 | | |
| ✓ | 13 | Dora Phillips | 3215 Summer Pl #12 | 27834 | | |
| ✓ | 14 | Melisa Everette | 529 Jonathan Pl | 27834 | | MZ |
| ✓ | 15 | Frederick Givens | 224 Fairmont Ave | 27834 | | |

SUBMIT COMPLETED FORMS TO THE OFFICE OF (COUNTY) BOARD OF ELECTIONS.

Board of Elections use only
Page 6 of 32 pages        Batch No. 7

RECEIVED
Date received ___/___/___
MAY 17 2022
BY:_____



These sheets reflect only a small sample of petitions submitted by Griffin and Mullins—and credited by various County Boards of Election—on behalf of the NCGP. *See* June 29, 2022 Abucewicz Letter to NCSBE, attached herein as Exhibit D, at Ex. B.

The NCSBE's preliminary investigation has shown that the number of "known questionable signatures exceeds the 2,088-signature threshold" and that determining the sufficiency of the petitions would "[r]equire[] further investigation, including subject interviews." Ex. B at 17. NCSBE investigators have endeavored to speak with Griffin and Mullins but have been unsuccessful in contacting them. Ex. A at 10. While these circulators signed many of the petition sheets submitted by NCGP—containing well over 1,000 signatures—it is unknown "if all of their collected sheets identify them as being the collector" and the scope of their involvement remains unknown. *Id.*

The NCGP developed a relationship with Griffin and Mullins through Arkansas-based Evans Political Consulting, which the party likewise engaged to collect signatures. Compl., Ex. 3 at 6-7, ECF No. 1. The entity's owner, Lee Evans, has "refused to comply with the State Board's subpoena or [to] speak with investigators." Ex. A at 10. Indeed, he acknowledged to reporters that he is "refusing to cooperate with state investigators probing the authenticity of signatures that were collected." Bryan Anderson, *Green Party Consultant, Dodging NC Investigators, Says He Didn't Do Anything Wrong*, WRAL (July 15, 2022), https://www.wral.com/green-party-consultant-dodging-nc-investigators-says-he-didn-t-do-anything-wrong/20376864/ (last visited July 17, 2022). Mr. Evans explained that he was paid $10,000 to collect signatures, but that he "terminated the contract" due to low margins. *Id.* Nonetheless, "[p]leased with the work of Evans' collectors, Hoh's campaign decided to pay them as his own employees so that they could continue gathering signatures." *Id.* Those collectors included Griffin and Mullins. Compl., Ex. 3 at 7, ECF No. 1.

The NCSBE's investigation has also shown that the NCGP worked with Michigan-based First Choice Consulting, led by principal Shawn Wilmoth. Compl., Ex. 3 at 4, ECF No. 1; *see also* Ex. A at 8. Both Mr. Wilmoth and First Choice Consulting were recently implicated in a massive petition-fraud scandal in Michigan that led to the disqualification of numerous Republican candidates, including the party's leading choice for Governor. *See, e.g.*, *How One Firm In A 'Wild West' Industry Upended the Michigan GOP Governor Race*, Bridge Michigan (June 16, 2022), https://www.bridgemi.com/michigan-government/how-one-firm-wild-west-industry-upended-michigan-gop-governor-race (last visited July 17, 2022). First Choice Consulting collected only 109 signatures for the NCGP before the party terminated its contract, but the party submitted all 109 signatures to a County Board of Election even though it had previously found "that roughly

half the small batch of signatures the firm did collect were incorrectly done." Compl., Ex. 3 at 5, ECF No. 1.

Further investigation by the NCSBE has confirmed that many signatures on the petition sheets that were counted in the NCGP's favor by County Boards of Election were fraudulent, indicating "an organized effort to falsify petition signatures." Ex. A at 7. For example, "38 individuals contacted one county board of elections and stated they did not sign the petition[.]" *Id.* The NCSBE also contacted a sample of voters on a petition sheet submitted by either Mullins or Griffin and found that of those contacted: 28 voters stated that they *did not sign the petition*; 15 voters were not sure or could not remember; eight voters stated that they did sign; and four voters thought that they were signing something other than NCGP ballot access papers. *Id.*

There is no dispute between the parties at this point that the NCGP's petition sheets included many fraudulent signatures. The NCGP's preferred candidate for U.S. Senate, Matthew Hoh, acknowledged the Board's investigation "found some issues that were of concern" including signatures "where it does look like there was some fraud,"[10] because paid circulators "doctored up" some signatures to "get more money."[11] The NCSBE's investigation remains ongoing and the Board continues to try to make contact with individuals who have thus far refused to speak with investigators. Ex. A at 10.

## III. The Proposed Intervenors became aware of additional problems with the NCGP petition review process, including that their members were misled into signing.

The NCSBE Staff's investigation yielded another troubling discovery: "not all county boards compared the petition signatures with the signatures on file for the voter in the State Board's petition software." Ex. A at 6. That is not surprising—it is clear that many County Boards of

---

[10] *See* Shadowproof, *Democrats Unfairly Block Disabled Marine Veteran and US Senate Candidate From Ballot*, YouTube (June 30, 2022), https://www.youtube.com/watch?v=vQ20m3BKf-k&t=1s at 2:15.
[11] *Id.* at 3:05

Election conducted inadequate reviews of the petition sheets submitted by the NCGP, resulting in ineligible petition entries being credited towards the NCGP. For example, a review of the petition sheets shows that counties credited:

- Entries without any accompanying signature, in violation of N.C. Gen. Stat. § 163-96(c);

- Entries on behalf of individuals not registered to vote within their respective county, in violation of N.C. Gen. Stat. § 163-96(c)(1), (2)(b);

- Entries submitted on pages that fail to accurately state the name and address of the State chairman of the proposed political party, in violation of N.C. Gen. Stat. § 163-96(b); and

- Entries submitted to the respective County Board of Elections after the May 17, 2022, statutory deadline, in violation of N.C. Gen. Stat. § 163-96(c).

*See generally* Ex. D at Ex. A. These errors indicate that the chairs of several County Boards of Election failed to perform their "duty" to "examine the signatures" and to certify only those signers who are "qualified and registered to vote in his county." N.C. Gen. Stat. § 163-96(c)(1).

As the Proposed Intervenors became aware of these issues, they conducted their own investigation into problems with the NCGP's petitions, well after NCSBE had already commenced its investigation. The Proposed Intervenors' review of the petition sheets confirmed what NCSBE had already discovered—that the NCGP's petitions contained blatant fraud; that many voters were misled into signing the petitions; and that County Boards of Election did not sufficiently review the petitions.

Consistent with the NCSBE's findings, the Proposed Intervenors also learned that the NCGP's instructions to circulators—far from requiring them to "inform the signers of the general purpose and intent of the new party" N.C. Gen. Stat. § 163-96(b)—advised that they should obscure the party's NCGP's ideology and leadership.[12] For example, it included instructions like:

---

[12] N.C. Green Party, Tips, Instructions, and Script for Ballot Access Petitioning (Rev. Mar. 30, 2021), available for download at https://www.ncgreenparty.org/petition (last visited July 17, 2022).

- "Don't lead with [names of Green Party leaders] or Green ideology"

- "They do not have to support our party"

- "Don't lead with ideology"

- "[A]void ideology if possible"

- "[W]e don't have to say what exactly we have in mind"

- "[A]void specific ideology or policy if possible. Name positive things everyone agrees with."

The NCGP's circulators adhered to that advice, and many signatories later reported that they were misled by Green Party circulators. Carlton P. Jones, a Democratic Party member residing in Wake County, is among the many signatories who were misled. Mr. Jones was told he was signing a petition to legalize marijuana and was never told the petition had anything to do with the Green Party. *See generally* Ex. C at ¶¶ 3-4, 6.

Counsel for the Proposed Intervenors conveyed these concerns to the NCSBE in correspondence shortly before the Board's June 30 meeting, attaching declarations signed under penalty of perjury from over a hundred signatories seeking to revoke their signatures,[13] and dozens more who stated that they were misled into signing or never actually signed at all. A registered North Carolina Democratic Party member also filed several complaints with the NCSBE asking them to investigate these deficiencies given the Board's authority to "hear and act on complaints . . . on the failure or neglect of a county board of elections to comply with any part of the election laws imposing duties upon such a board." N.C. Gen. Stat. § 163-22(c).

---

[13] The right to revoke one's signature from a petition is well-established under North Carolina law. *See, e.g.*, *Conover v. Newton*, 256 S.E.2d 216, 223 (N.C. 1979); *Idol v. Hanes*, 14 S.E.2d 801, 802 (N.C. 1941); *Armstrong v. Beaman*, 105 S.E. 879, 880 (N.C. 1921).

**IV.    NCSBE Staff was unable to determine the sufficiency of NCGP's petitions and advised the Board not to certify pending further investigation.**

Much of the foregoing information was known by the NCSBE when it met to consider the sufficiency of the NCGP's petitions on June 30, though its investigation has yielded additional problematic information in the interim. But as a presentation compiled by NCSBE staff shows, the Board at that time had already been "alerted" to "irregularities" by various County Boards; opened its own investigation; detected "obvious signs of fraud or irregularities;" and identified Mullins and Griffin as individuals who submitted fraudulent signatures on a wide scale. *See* Ex. B at 11-17.

The NCGP's counsel was given the first word when the NCSBE took up the issue at its June 30, 2022, meeting. He stated "the facts are clear," noting the County Boards of Election had certified a signature count over the threshold, but did not address any of the problems with the NCGP's petitions. *See* June 30 Hr'g Video at 1:05:15. NCSBE staff presented the preliminary results of their investigation and recommended that the Board "[t]able consideration" of the NCGP's petition to a "future date." *Id.* at 1:07:45; *see generally* Ex. A. As NCSBE staff explained, they "don't have the information at this point to make a decision on the sufficiency of the petitions." June 30 Hr'g Video at 1:28:52.

The Board then discussed the NCGP's petitions. Chairman Damon Circosta explained his hope that the Green Party "would be on the ballot," but explained the State Board's job is "to get it right, not necessarily fast." *Id.* at 1:30:30-54. He stated he would not be comfortable certifying the NCGP "today" but expressed a desire to give NCSBE staff time to complete their work and to potentially certify the party at a later date. *Id.* at 1:30:54-31:16. He further explained "[t]here's enough questions, including a criminal investigation, into the signature petition gathering process" and thus in "good conscience" he could not vote to certify that day in view of the statutory

14

requirement "to verify these signatures." *Id.* at 1:36:20-40. In response to a question from NCGP's counsel, the Chairman explained he "ha[d] questions" about signatures "sufficient in number" to not be able to confirm the adequacy of the petitions. *Id.* at 1:37:30-40.

Stacy "Four" Eggers IV, a Republican member, also stated he had a "significant number of questions as to whether the threshold was actually met based upon the [current] status" and "those questions at this point remain unanswered." *Id.* at 1:39:20; *see also id.* at 1:40:10 (expressing further "concerns as to whether, are these signatures all properly valid"). He nonetheless "reluctantly" indicated a desire to certify the party due to the possible prejudice of delay. *Id.* at 1:40:30.

Consistent with Staff's recommendation, the Chairman suggested the Board "take no action" on the petitions so that the Board could consider the issue after further investigation. *Id.* at 1:41:15-30. Republican member Tommy Tucker nonetheless made a motion to take a vote on the NCGP's petition, which Mr. Eggers seconded. The Board then voted 3-2 not to certify the NCGP concluding "the petitions were not yet shown to be sufficient under the law" but that "investigation is ongoing." *See* NCSBE, *Amid Investigation, State Board Turns Down Green Party Recognition* (June 30, 2022), https://www.ncsbe.gov/news/press-releases/2022/06/30/amid-investigation-state-board-turns-down-green-party-recognition.

## V. The NCGP's lawsuit and allegations involving Proposed Intervenors.

Despite the NCSBE's ongoing investigation into the sufficiency of the NCGP's petitions under state law, the NCGP has now filed a lawsuit asking this federal court to declare that the NCSBE has unconstitutionally refused to certify the NCGP and "directing NCSBE to certify as a new political party" under state law. Compl. ¶ 87, ECF No. 1. While the NCGP acknowledges that the North Carolina legislature has assigned the State Board the duty "to determine the sufficiency of a new party's petitions," *id.* ¶¶ 79, 84 (quoting N.C. Gen. Stat. § 163-96(a)(2)), it now asks this

Court to substitute its own judgment on the matter, all while the NCSBE continues its investigation into widespread fraud in the NCGP's petitions.

The Complaint makes clear that the Proposed Intervenors are integral to this lawsuit. Indeed, the Complaint references the DSCC at least four times, *see* Compl. ¶¶ 32-33, 37, 61, ECF No. 1, and cryptically alleges that the Democratic Party's "operatives" involved themselves before the NCSBE, *id.* ¶¶ 29-50. The complaint repeatedly alleges that actions taken by the Proposed Intervenors played some nefarious role in the NCSBE's decision. *Id.* That is not correct—as explained above, County Boards of Election notified the NCSBE of problems with the NCGP's petitions, and the NCSBE launched an investigation into those irregularities, well before the Proposed Intervenors ever reached out to NCSBE to share similar concerns. Proposed Intervenors' concerns were reasonable, as the NCSBE's own criminal investigation has revealed. But NCGP's allegations nonetheless make clear that involvement of Proposed Intervenors in this lawsuit is necessary to resolve Plaintiffs' claims.

**ARGUMENT**

I.      **The Proposed Intervenors are entitled to intervene as a matter of right under Rule 24(a)(2).**

The Proposed Intervenors are entitled to intervene in this action as of right. First, their motion is timely. Second, the Proposed Intervenors have strong interests in: ensuring a fair electoral playing field by ensuring that ineligible candidates representing opposing political parties are not permitted to gain access to the general election ballot; protecting their campaign resources; protecting their members from being misled into signing petitions for political parties and candidates they do not support; ensuring that North Carolina enforces its laws prohibiting petition signature fraud; and defending themselves against unsupported accusations of malfeasance made by the NCGP. Third, the denial of their motion would impair or impede the Proposed Intervenors'

16

ability to protect these interests. Finally, their interests are not adequately represented by the NCSBE, which is required to represent the public interest, not partisan interests. Fed. R. Civ. P. 24(a)(2); *Teague v. Bakker*, 931 F.2d 259, 260-261 (4th Cir. 1991). In the Fourth Circuit, "liberal intervention is desirable to dispose of as much of a controversy involving as many apparently concerned persons as is compatible with efficiency and due process." *Feller v. Brock*, 802 F.2d 722, 729 (4th Cir. 1986) (internal quotation marks omitted). Political parties are routinely granted intervention in cases concerning election rules and procedures.[14] This case is no different from the many that have come before it. The Proposed Intervenors should be permitted to intervene as of right to protect their unique interest as active participants in North Carolina's election landscape.

### A. The motion to intervene is timely.

There is no question the Proposed Intervenors' motion is timely, filed just days after the Complaint in this action and before any responsive pleadings or substantive motions have been filed. Indeed, the Proposed Intervenors seek to intervene at the earliest possible stage of the lawsuit—it is not even clear that the Defendants have been served with the Complaint at this juncture. No prejudice will accrue to Plaintiffs or Defendant if the Proposed Intervenors are permitted to join at this stage. Because there has been no delay at all, the Proposed Intervenors clearly meet this requirement. *See generally Alt v. U.S. E.P.A.*, 758 F.3d 588, 591 (4th Cir. 2014)

---

[14] *See, e.g.*, *Thomas v. Andino*, 335 F.R.D. 364, 370 (D.S.C. 2020); *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 304 (5th Cir. 2022); *Black Voters Matter Fund v. Raffensperger*, Doc. 42, No. 1:20-cv-4869 (N.D. Ga. Dec. 9, 2020); *Alliance for Retired American's v. Dunlap*, No. CV-20-95 (Me. Super. Ct. Aug. 21, 2020); *Mi Familia Vota v. Hobbs*, Doc. 25, No. 2:20-cv-1903 (D. Ariz. June 26, 2020); *Ariz. Democratic Party v. Hobbs*, Doc. 60, No. 2:20-cv-1143 (D. Ariz. June 26, 2020); *Swenson v. Bostelmann*, Doc. 38, No. 20-cv-459 (W.D. Wis. June 23, 2020) ; *Edwards v. Vos*, Doc. 27, No. 20-cv-340 (W.D. Wis. June 23, 2020); *League of Women Voters of Minn. Ed. Fund v. Simon*, Doc. 52, No. 20-cv-1205 (D. Minn. June 23, 2020); *Priorities USA v. Nessel*, 2020 WL 2615504, at *5 (E.D. Mich. May 22, 2020); *Thomas v. Andino*, 2020 WL 2306615, at *4 (D.S.C. May 8, 2020); *Corona v. Cegavske*, Order Granting Mot. to Intervene, No. CV 20-OC-644-1B (Nev. 1st Jud. Dist. Ct. Apr. 30, 2020); *League of Women Voters of Va. v. Va. State Bd. of Elections*, Doc. 57, No. 6:20-cv-24-NKM (W.D. Va. Apr. 29, 2020); *Democratic Nat'l Comm. v. Bostelmann*, 2020 WL 1505640, at *5 (W.D. Wis. Mar. 28, 2020).

(setting forth factors to consider under this element). Proposed Intervenors recognize the time-sensitive nature of the underlying Complaint and are prepared to comply with any schedule the Court may set.

### B. Proposed Intervenors have significant protectable interests in this litigation.

To intervene as of right, a movant must have "a significantly protectable interest" in the outcome of the lawsuit. *Teague*, 931 F.2d at 261-62 (quoting *Donaldson v. United States*, 400 U.S. 517, 531 (1971)). In other words, the movant should "stand to gain or lose" from the "legal operation" of the judgment of that action. *Id.* While intervenor-defendants are not required to establish the heightened Article III standing requirement to intervene, the Fourth Circuit has explained that "standing case[s]" "inform[] our analysis of whether [] Proposed Intervenors have a sufficient interest under Rule 24(a)(2)." *N.C. State Conf. of NAACP v. Berger*, 970 F.3d 489, 503 (4th Cir. 2020), *aff'd on reh'g en banc*, 999 F.3d 915 (4th Cir. 2021), *rev'd on other grounds sub nom. Berger v. N.C. State Conf. of the NAACP*, 142 S. Ct. 2191 (2022); *see also Ruiz v. Estelle*, 161 F.3d 814, 832 (5th Cir. 1998) (explaining the relationship between standing and Rule 24(a) intervention but holding that intervenors need not meet the heightened standard).

Here, the Proposed Intervenors have significant protectable interests in (1) ensuring a fair competitive playing field for their candidates; (2) conserving their party resources; (3) protecting their own voters from misleading petition schemes; (4) seeing North Carolina's election laws applied competently and fairly; and (5) in defending against accusations levied at them by Plaintiffs.

First, courts have routinely found that political parties have an interest in a rival party's potential inclusion on the ballot. *See, e.g.*, *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006) (holding that the Texas Democratic Party had legal interest based on "harm to its election prospects" in response to the Republican Party's attempt to replace its candidate on the

18

ballot); *Schulz v. Williams*, 44 F.3d 48, 53 (2d Cir. 1994) (holding that a representative of a political party had interest in injury that would result from "competition on the ballot from candidates" who did not comply with that state's elections laws); *Fulani v. Hogsett*, 917 F.2d 1028, 1030 (7th Cir. 1990) (holding that a political party had interest in the allegedly improper placement of the other candidates on the ballot, which resulted in an injury of "increased competition" that required "additional campaigning and outlays of funds" and resulted in lost opportunities to win the election); *see also N.C. State Conf. of NAACP v. McCrory*, 997 F. Supp. 2d 322, 342 (M.D.N.C. 2014) (recognizing political parties have a "direct, particularized interest in the outcome of an election"), *aff'd in part, rev'd in part on other grounds, League of Women Voters of N.C.*, 769 F.3d 224 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 1735 (2015).

That interest is particularly acute where, as here, a rival party has not yet shown its right to ballot access. As one court aptly summarized this caselaw, "courts have held that a candidate or his political party has standing to challenge the inclusion of an allegedly ineligible rival on the ballot, on the theory that doing so hurts the candidate's or party's own chances of prevailing in the election." *Hollander v. McCain*, 566 F. Supp. 2d 63, 68 (D.N.H. 2008). The improper inclusion of the Green Party on North Carolina's general election ballot would harm the Proposed Intervenors, as the Plaintiffs all but acknowledge in their complaint. *See* Compl. ¶ 43 (noting a voter contacted the NCGP to have his name removed because he was concerned having the Green Party on the ballot "would split democratic votes[] from the Democratic party and would lead to the Republican Party[] gaining an edge").

Second, should the Green Party succeed in gaining access to the general election ballot, the Proposed Intervenors will be forced to expend additional funds and resources in North Carolina's elections in response, and their organizational purpose in electing their candidates will be

frustrated. That would separately be sufficient for Article III standing to challenge the Green Party's inclusion on the general election ballot. *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.*, 843 F. App'x 493, 496 (4th Cir. 2021) ("[T]his court has reaffirmed that a plaintiff has suffered an organizational injury if the challenged policy or practice frustrated both its purpose and caused a drain on its resources."); *Disability Rights N.C. v. N.C. State Bd. of Elections*, No. 5:21-CV-361-BO, 2022 WL 2678884, at *3 (E.D.N.C. July 11, 2022) ("Where an organization experiences a 'perceptible' diversion of resources and frustration of purpose, it may seek redress in its own right through organizational standing."). Courts regularly recognize a drain of campaign resources as a cognizable legal interest of political parties. *See, e.g.*, *Tex. Democratic Party*, 459 F.3d at 586 (holding the state party had legal interest in the case because the party "would need to raise and expend additional funds and resources to prepare a new and different campaign in a short time frame" if an opposing candidate was replaced on the ballot); *Lee v. Va. State Bd. of Elections*, 188 F. Supp. 3d 577, 584 (E.D. Va. 2016) (finding the Democratic Party of Virginia "has shown sufficient injury primarily in the form of diversion of time, talent, and resources" in response to challenged practice), *aff'd*, 843 F.3d 592 (4th Cir. 2016).

Third, the Proposed Intervenors have an interest in protecting their members from being misled into signing petitions and helping candidates they do not in fact support, as happened with the North Carolina Green Party's petition activities. *See supra* at 13; *see also* Ex. C (registered Democratic voter describing experience signing petition he was told was in support of legalizing marijuana when it was in fact in support of certifying the North Carolina Green Party as a political party).

Fourth, the Proposed Intervenors have an interest in ensuring that North Carolina's election apparatus is accurately enforcing its petitioning requirements, given that its prior failure to do so

required a registered North Carolina Democratic Party member to file complaints against several County Board of Elections in this matter after they certified plainly fraudulent petition signatures submitted by the North Carolina Green Party. *See supra* p. 13; *Shays v. FEC*, 414 F.3d 76, 91 (D.C. Cir. 2005) (recognizing candidates' and parties' substantive interest in competing on fair grounds).

Fifth, and finally, the Proposed Intervenors have an interest in defending against accusations levied at them by Plaintiffs. As described in more detail, *supra* at 16, the North Carolina Green Party dedicates pages of its complaint to alleging that Democratic Party "operatives" played some nefarious role in the NCSBE's decision not to certify the North Carolina Green Party—a decision the NCSBE reached on the recommendation of professional staff, not the Democratic Party. Compl., ¶¶ 29-50, ECF No. 1. In any event, because the Green Party blames the Democratic Party for its failure to be certified, rather than the natural and indeed, correct result of the Green Party's deficient and fraudulent petition sheets, the Proposed Intervenors have a significant interest in defending against such accusations. *See, e.g*., *Meese v. Keene*, 481 U.S. 465, 480 (1987) (recognizing risk of reputational harm as concrete legal interest).

### C.    Denying intervention will impair the Proposed Intervenors' ability to protect their interests.

Similarly, the Proposed Intervenors meet the third factor for intervention as of right because the disposition of the NCGP's lawsuit may, "as a practical matter," impair or impede the Proposed Intervenors' ability to protect its interests. Fed. R. Civ. P. 24(a)(2).

There can be no doubt that disposition of this matter has the potential to impair the Proposed Intervenors' ability to protect their interests. The NCGP's unripe claim in this Court seeks to foreclose ongoing state proceedings; should the NCGP prevail here, Proposed Intervenors will lose the ability to protect their interests before the NCSBE, imperiling their protectable

interests above. These issues are at the core of the Proposed Intervenors' motion to dismiss which, among other things, explains that this lawsuit is not ripe and should anyways be dismissed or stayed under several abstention doctrines while state proceedings continue.

Ballot access restrictions like the ones the Green Party seeks to evade are also designed to serve "the integrity of [the] election process" and the "orderly administration" of elections. *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). An adverse decision permitting the Green Party access to the general election ballot despite widespread fraud in their petition gathering process would not only subvert democratically enacted laws that protect voters and candidates (including the Proposed Intervenors' own members), but it would also change the "structur[e] of th[e] competitive environment" and "fundamentally alter the environment in which [Intervenors] defend their concrete interests (e.g. their interest in … winning [election or] reelection)." *Shays v. FEC*, 414 F.3d 76, 85-86 (D.C. Cir. 2005) (further noting that "accounting for additional rivals constitutes injury in fact").

### D. The Proposed Intervenors' interests are not adequately represented by NCSBE.

The Proposed Intervenors' interests are not adequately represented by NCSBE, the existing defendant in this case. Demonstrating the NCSBE's inadequacy to represent the Proposed Intervenors' interests "present[s] [the] proposed intervenors with only a minimal challenge." *Berger v. N.C. State Conf. of the NAACP*, 142 S. Ct. 2191, 2203 (2022); *see also Teague*, 931 F.2d at 262 (explaining that the burden of "demonstrating a lack of adequate representation" is "minimal"). To meet this requirement, intervenors need only show that "representation of [their] interest *may* be inadequate," *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972), either because they do not share the same objectives as other litigants in the case, or because their interests are adverse. *See Commonwealth of Va. v. Westinghouse Elec. Corp.*, 542

F.2d 214, 216 (4th.Cir. 1976). It is not enough that the proposed intervenors may have "related" interests with an existing party. *Berger*, 142 S. Ct. at 2204. And a court need only find "sufficient doubt about the adequacy of representation to warrant intervention." *Trbovich*, 404 U.S. at 538.

The Supreme Court's recent decision in *Berger* explains why NCSBE cannot fully represent the Proposed Intervenors' interests here. That case, like this one, involved the NCSBE as a defendant. *Berger*, 142 S. Ct. at 2198. Several civil rights groups sued NCSBE to challenge a voter-identification law adopted by the legislature and adopted over the Governor's veto. *Id.* Although the NCSBE was represented by the Attorney General, several state legislators sought to intervene alongside the NCSBE to defend the law. *Id.* The Fourth Circuit concluded *en banc* that the legislators could not intervene because their interests were adequately represented by the NCSBE and Attorney General's office. *Id.* at 2200. But the Supreme Court reversed. It explained that while state agents may pursue "related" interests to political actors, those interests are not "identical." *Id.* at 2204 (quoting *Trbovich*, 404 U.S. at 538). In particular, the Court noted that state agencies like the NCSBE must "bear in mind broader public-policy implications" than those with more partisan interests. *Id.*; *see also Feller*, 802 F.2d at 730 (explaining for purpose of Rule 24(a)(2) that the "the government's position is defined by the public interest").

The Proposed Intervenors' interests here rest in ensuring a fair competitive playing field for its candidates; conserving its party resources; protecting its own voters from misleading petition schemes; and in seeing North Carolina's election laws applied competently and fairly. Though these interests may "relate" to the interests pursued by the Board in this case, they are not "identical." *See, e.g.*, *Democratic Party of Va. v. Brink*, No. 3:21-cv-756-HEH, 2022 WL 330183, at *2 (E.D. Va. Feb. 3, 2022) ("[The State's] interests are to defend [the State's] voting laws no matter the political repercussions while [the state political party's] interest is to defend the voting

23

laws when doing so would benefit its candidates and voters."). Indeed, it is entirely possible the Proposed Intervenors will become adverse to the NCSBE as this litigation progresses. The NCSBE's investigation into the NCGP's petitions is ongoing, but it could determine at a later date that they are sufficient for party certification. The Proposed Intervenors are likely to disagree with such a determination in view of their independent concerns with the NCGP's petition gathering process.[15] Indeed, a Democratic Party member filed administrative complaints against four County Boards of Election with NCSBE. The NCSBE will be required to neutrally investigate and adjudicate those complaints, potentially to the detriment of the Proposed Intervenors, who are concerned that many County Boards of Election failed to perform their statutory duties. The Proposed Intervenors therefore have "interests" that "diverge from the putative representative's interests in a manner germane to the case." *Texas v. United States*, 805 F.3d 653, 662 (5th Cir. 2015) (further discussing why an intervenor's interests may not be protected by a "governmental party").

Similarly, the Proposed Intervenors have concerns about NCGP's petitions that are related, but not the same, as those raised in the NCSBE's investigation, including NCGP's use of circulator instructions that advised petition gatherers not to disclose the Green Party's purpose and intent. *See supra* p. 13. The NCSBE does not share the Proposed Intervenors' same interest in protecting the rights and interests of its members. *See generally* Ex. C.

---

[15] For the same reasons, there can be no presumption that the NCSBE will represent the Proposed Intervenors' interests because "the party seeking intervention" does *not* have "the same ultimate objective as a party to the suit." *NAACP v. Cooper*, 332 F.R.D. 161, 168 (M.D.N.C. 2019) (quoting *Westinghouse*, 542 F.2d at 216). While the Proposed Intervenors and NCSBE may have related interests, they do not share the same ultimate objective and may yet become adverse in these proceedings.

## II. The Proposed Intervenors are also entitled to permissive intervention.

Even if the Proposed Intervenors were not entitled to intervene as of right, permissive intervention would be warranted under Rule 24(b). "On timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). "Permissive intervention [under Rule 24(b)] is left to the broad discretion of the Court and should be construed liberally in favor of intervention." *Thomas v. Andino*, 335 F.R.D. 364, 369; *accord Feller*, 802 F.2d at 729 (noting the Fourth Circuit's preference for "liberal intervention"). In exercising its discretion, the court must consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

For the reasons set forth above, the motion is timely, intervention will not unduly delay or prejudice the adjudication of the rights of the original parties, and the Proposed Intervenors are not adequately represented by the existing defendants. The Proposed Intervenors will undoubtedly raise common questions of law and fact in defending this lawsuit—Plaintiffs spend a significant portion of their complaint levying inaccurate allegations against Proposed Intervenors, their members, and their supporters. Compl. ¶¶ 29-31, 47-51, 65. Plaintiffs therefore already concede the Proposed Intervenors have a stake in this case.

The proposed motion to dismiss the Proposed Intervenors file alongside this motion as a pleading likewise demonstrates their intention to raise common questions of law in fact. That motion to dismiss notes the NCGP's claims are not ripe; that their lawsuit interferes in ongoing state agency proceedings; and that, for many reasons, they have failed to state a constitutional claim by merely disagreeing with how NCSBE has thus far exercised its discretion under state law.

Beyond that, the Proposed Intervenors' interests implicate some of the most fundamental rights protected by both the federal and North Carolina constitutions—the right to fair elections

contested on lawful terms and to the associational rights of Proposed Intervenors' members not to be misled into supporting political causes they in fact do not support. This federal suit directly threatens the Proposed Intervenors' rights, and the Proposed Intervenors therefore should be permitted to intervene in this case.

## CONCLUSION

For the reasons stated above, the Proposed Intervenors respectfully request that the Court grant their motion to intervene as a matter of right under Federal Rule of Civil Procedure 24(a)(2) or, in the alternative, permit them to intervene under Rule 24(b).

Dated: July 17, 2022

Respectfully submitted,

/s/ Narendra K. Ghosh
Narendra K. Ghosh, NC Bar No. 37649
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27517
Telephone: 919.942.5200
nghosh@pathlaw.com

Aria C. Branch*
Christopher D. Dodge*
Christina A. Ford*
Richard Medina*
Daniel Cohen*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
Facsimile: (202) 968-4498
abranch@elias.law
cdodge@elias.law
cford@elias.law
rmedina@elias.law
dcohen@elias.law

*Counsel for Proposed Intervenor-Defendants DSCC and North Carolina Democratic Party*

*Notice of Special Appearance Forthcoming

26

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I caused the foregoing document to be filed and served on all counsel of record by operation of the CM/ECF system for the United States District Court for the Eastern District of North Carolina.


DATED: July 17, 2022            /s/ Narendra K. Ghosh

Narendra K. Ghosh, NC Bar No. 37649
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27517
Telephone: 919.942.5200
nghosh@pathlaw.com

27

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Memorandum of Law in Support of Motion to Intervene as Defendants contains 7,407 words, based on the word count of the word processing system used to prepare this brief, and thereby complies with the Local Civil Rule 7.2(f).


DATED: July 17, 2022

/s/ Narendra K. Ghosh
Narendra K. Ghosh, NC Bar No. 37649
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27517
Telephone: 919.942.5200
nghosh@pathlaw.com

28