IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Case No. 5:22-CV-276-D-BM

| | |
|---|---|
| NORTH CAROLINA GREEN PARTY, ANTHONY NDEGE, MICHAEL TRUDEAU, MATTHEW HOH, SAMANTHA WORRELL, SAMANTHA SPENCE, K. RYAN PARKER and AARON MOHAMMED,<br><br>                Plaintiffs<br><br>v.<br><br>NORTH CAROLINA STATE BOARD OF ELECTIONS and DAMON CIRCOSTA, STELLA ANDERSON, JEFF CARMON, STACY EGGERS IV, TOMMY TUCKER, and KAREN BRINSON BELL, in their official capacities as members or employees of the North Carolina State Board of Elections,<br><br>                Defendants. | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

Introduction and Factual Background………………………………………………... 1

Legal Standard……………………………………………………………………….... 7

Argument……………………………………………………………………………… 7

    I.    The *Anderson-Burdick* Framework Governs Analysis of the Constitutionality of State Election Laws…………………………………… 7

    II.    Plaintiffs Are Entitled to the Requested Relief Because They Satisfy All Four Elements of the Preliminary Injunction Test…………………………. 8

        A.  Plaintiffs Are Likely to Prevail on the Merits Because the Challenged Provisions, as Applied, Cannot Withstand *Anderson-Burdick* Scrutiny.. 9

            1.  NCSBE's Enforcement of the Challenged Provisions Severely Burdens Plaintiffs' First Amendment Rights………………………. 9

            2.  The Challenged Provisions, as Applied, Are Not Narrowly Tailored to Further Any Legitimate State Interest…………………. 12

        B.  Plaintiffs Are Likely to Prevail on the Merits Because NCSBE's Enforcement of the Challenged Provisions Violates Plaintiffs' Right to Due Process of Law………………………………………………. 13

        C.  Plaintiffs Satisfy the Remaining Elements of the Preliminary Injunction Test…………………………………………………………. 15

Conclusion………………………………………………………………………….. 16

Certificate of Service

Certificate of Compliance

## Introduction and Factual Background

This case arises from an extraordinary set of facts. At all times relevant to this matter, there has been no genuine dispute between the parties that Plaintiff North Carolina Green Party ("NCGP") has timely complied with all applicable state law requirements to qualify as a new political party under N.C. GEN. STAT. § 163-96(a)(2) and place its candidates on North Carolina's November 8, 2022 general election ballot pursuant to § 163-98.[1] Defendant North Carolina State Board of Elections ("NCSBE") nonetheless declined to certify NCGP as a new political party "forthwith" as it is required to do under § 163-96(a)(2). (Amended Complaint (ECF No. 27) ("Am. Compl.") ¶ 74.) NCSBE took this action on June 30, 2022 – 30 days after NCGP timely submitted its petitions – thus ensuring that NCGP could not comply with the July 1, 2022 deadline for certifying its candidates under § 163-98. (Am. Compl. ¶¶ 62-63.)

NCSBE has cited no legal authority for its failure to certify NCGP as a new political party. NCSBE has cited no applicable statutory provision, regulation or other legal requirement with which NCGP failed to comply. On the contrary, NCSBE concedes that when it voted not to certify NCGP, county boards of elections had validated 15,953 signatures on NCGP's petitions – 2,088 more than the 13,865 valid signatures required under state law. (Am. Compl. ¶ 66.) Thus far, the only explanation NCSBE has given for its failure to certify NCGP comes from its Chair, Defendant Circosta, who stated that he had too many "questions" to vote in favor of certification, because NCSBE staff claim to be investigating "irregularities" in the NCGP petitions. (*Id.* ¶¶ 66, 73.)

NCSBE has never produced evidence of any "irregularities" in NCGP's petitions to NCGP, nor has it provided NCGP with any opportunity to defend the validity of the signatures on its petitions or the integrity of its petitioning process. (*Id.* ¶ 76.) Yet NCSBE appears to have

---

[1] Hereinafter, all statutory citations are to the General Statutes of North Carolina unless otherwise indicated.

1

undertaken a wide-ranging investigation into NCGP's petitions, pursuant to which a team of NCSBE investigators has contacted NCGP's petition circulators by telephone and email to request information about virtually every aspect of their petitioning efforts. (*Id.* ¶ 77.) NCGP has fully and voluntarily cooperated with NCSBE, promptly providing all information and every record requested by NCSBE's investigators. (*Id.* ¶¶ 57-61, 77.) Further, NCGP has repeatedly requested the opportunity to meet with NCSBE to review its petitions and resolve any questions regarding particular signatures, but NCSBE has rebuffed NCGP each time. (*Id.* ¶¶ 28, 59, 77.)

Meanwhile, NCSBE continues to invalidate NCGP petition signatures that county boards of elections validated. (*Id.* at ¶ 78.) Of the 15,953 county board-validated signatures on the NCGP petitions as of June 30, 2022, NCSBE now credits NCGP with just 15,826. *See* North Carolina State Board of Elections, Petition Search (North Carolina Green Party), *available at* https://vt.ncsbe.gov/PetLkup/PetitionResult/?CountyID=0&PetitionName=NORTH%20CAROLINA%20GREEN%20PARTY (accessed July 21, 2022). That number continues to drop each day.

At NCSBE's June 30, 2022 meeting, Defendant Circosta announced that he "would like" to see NCGP on North Carolina's ballot, but he thought it important to allow NCSBE staff time to conduct their investigation. (*Id.* ¶ 63.) Upon adjourning that meeting, however, NCSBE issued a press release announcing that it had denied certification of NCGP as a new political party because it had found "evidence of fraud and other irregularities" in NCGP's petitions. (*Id.* ¶ 81.) This announcement has been widely reported in the news media, causing NCGP and its candidates immeasurable harm at the height of what should be their campaign for election.

Many of the so-called "irregularities" cited in NCSBE's press release are not irregularities at all – there is nothing whatsoever improper about them – and they provide no legal basis for NCSBE to invalidate signatures on NCGP's petitions. (*Id.* ¶ 82.) To cite just one example,

2

NCSBE announced that NCGP's petitions had been signed by a "deceased" voter, as if that were proof positive of fraud, but Plaintiffs have personal knowledge that at least one petition signer – an NCGP member's mother – died after signing an NCGP petition. (*Id.*) This is the sort of discrepancy that could have been easily resolved if NCSBE had allowed NCGP any opportunity to address the purported "irregularities" it claims to be investigating.

NCSBE does not speak with a single voice, of course. Its vote not to certify NCGP broke on party lines, with the three Democrats voting against certification, while the two Republicans voted in favor of certification. (*Id.* ¶ 74.) The difference between the Democratic majority and the Republican minority is not mere partisanship, however: in this case, the Republican members seek to adhere to the requirements of North Carolina law and NCSBE's own prior practice, whereas the Democratic members have flouted them. Defendant Eggers, for instance, observed that contrary to the representations of NCSBE's staff, NCSBE's failure to certify NCGP on June 30, 2022 would indeed "prejudice" NCGP by preventing it from placing its candidates on North Carolina's 2022 general election ballot. (*Id.* ¶¶ 69-70.) Defendant Tucker was even more pointed. He observed that in the 2020 election cycle, NCSBE "did not check nary a signature, not one signature, verified by a county board of elections." (*Id.* ¶ 71.) Moreover, Defendant Tucker observed, NCSBE had received a complaint prepared by the Elias Law Group, "so there must be something advantageous for the Democratic Party not having the Green Party on the ballot." (*Id.*) "I don't understand why we don't certify this," Defendant Tucker concluded. (*Id.*)

The complaint referenced by Defendant Tucker was filed by Michael Vincent Abucewicz, (*Id.* ¶ 53), who appears to be a field operative of the North Carolina Democratic Party. (Ndege Decl. ¶ 35.) Of the tens of thousands of North Carolina voters who signed NCGP's petitions, and the tens of thousands more North Carolinians who were asked to sign NCGP's petitions, not one

3

appears to have filed a complaint with NCSBE or any county board of elections against NCGP. (*Id.* ¶ 34.) According to Mr. Abucewicz's complaint, "a growing number" of NCGP petition signers "now swear" that they were "misled" as to the purpose of NCGP's petitions. (Am. Compl. ¶ 53.)

The allegations in Mr. Abucewicz's complaint rely on selective, misleading quotations from the written instructions that NCGP provided to its petition signers, and which remain publicly available on NCGP's website. (Ndege Decl. ¶¶ 10, 30.) Those written instructions refute Mr. Abucewicz's allegations and confirm that NCGP expressly directed petition circulators to "explain the purpose" of NCGP's petitions to each potential signer – "trying to get the Green Party on the ballot" – while they presented the petition to the potential signer. (*Id.* ¶ 31.) Other evidence confirms that NCGP petition circulators did so. (*Id.* ¶ 5; Seeman Decl. ¶¶ 2-3.)

Moreover, the "evidence" on which Mr. Abucewicz's complaint relies consists of a number of declarations, which are identical except for the declarant's name and contact information, and which indicate that they were signed electronically using the "DocuSign" platform. *See* NCSBE File (June 30, 2022 State Board Meeting), *available at* https://dl.ncsbe.gov/index.html?prefix=State_Board_Meeting_Docs/2022-06-30/Green%20Party%20Petition/ (providing link to Mr. Abucewicz's June 28, 2022 letter to NCSBE) (accessed July 21, 2022). It appears to be no coincidence that this "evidence" was submitted following a concerted campaign by Democratic Party operatives to contact NCGP petition signers and convince them to request that their names be removed from NCGP's petitions. (Am. Compl. ¶¶ 35-56.) For example, Clinton Ebadi received a text message requesting that he remove his name from NCGP's petitions, which provided the following link that would enable

4

him to do so: https://ncdems.fyi/Sign-To-Revoke-Signature. (Ebadi Decl. ¶ 5.) That link, hosted by the "ncdems.fyi" domain, redirects to a link on the "docusign.net" platform. (*Id.*)

Mr. Ebadi is just one of many NCGP petition signers who received text messages, phone calls and visits to their homes from unknown individuals who requested that they remove their names from the NCGP petitions in the weeks preceding the filing of Mr. Abucewicz's complaint. (Gilchrist Decl. ¶¶ 4-9; Hammerle Decl. ¶¶ 4-5; Harney Decl. ¶¶ 8-9; Hicks Decl. ¶ 4; Hoh Decl. ¶ 6; Mohammed Decl. ¶¶ 6-10; Nagel Decl. ¶¶ 4-9; Ndege Decl. ¶¶ 27-28; Parker Decl. ¶¶ 10-12; Selim Decl. ¶¶ 5-7; Trudeau Decl. ¶ 6.) These unknown individuals expressly stated that they were making the request because NCGP "takes votes" from Democrats – not due to any alleged impropriety in NCGP's petitioning effort. (*E.g.*, Gilchrist Decl., Ex. A; Harney Decl., Ex. A; Hoh Decl., Ex. A; Ndege Decl. ¶ 28.) In some instances, the unknown individuals identified themselves as Democratic Party operatives, (*e.g.*, Hicks Decl. ¶ 4; Mohammed Decl. ¶ 9; Parker Decl. ¶ 10; Selim Decl. ¶ 5; Trudeau Decl. ¶ 6), but in others, the unknown individuals falsely stated that they were representatives of NCGP itself or of NCSBE. (*E.g.*, Hammerle Decl. ¶ 5; Harney Decl. ¶ 9; Nagel Decl. ¶ 9; Ndege Decl. ¶ 28.) At least two NCGP petition signers were misled by such misrepresentations, and were fraudulently induced to request that their names be removed from NCGP's petitions. (Ndege Decl. ¶ 26 & Ex. C.)

Thus, there is documented evidence of fraud in this case – Plaintiffs have audio and video recordings proving it, which they are prepared to submit – but it was perpetrated by Democratic Party operatives seeking to gain political advantage in the 2022 general election, not by NCGP. Plaintiffs presented some of this evidence to NCSBE and requested confirmation of receipt, but they received no response. (Am. Compl., Ex. 1; Seeman Decl. ¶¶ 5-7.) To date, it does not appear that NCSBE has taken any action to investigate this evidence of fraud and harassment perpetrated

5

by Democratic Party operatives against NCGP petition signers. (Am. Compl. ¶ 56.) Instead, NCSBE has confirmed that its investigation of NCGP's petitions is prompted, at least in part, by the allegations in Mr. Abucewicz's complaint. (Am. Compl. ¶ 67.)

It has been 51 days, and counting, since NCGP timely filed its petitions with NCSBE, and NCSBE still has not certified NCGP as a new party, which it is required to do "forthwith" under § 163-96(a)(2). At present, NCSBE credits NCGP with 15,821 valid signatures, though that number continues to fall on a daily if not hourly basis. Plaintiffs have no notice of which signatures validated by county boards of elections are being invalidated, nor the grounds for their invalidation, and NCSBE has never allowed NCGP any opportunity to defend the signatures' validity. Nonetheless, 51 days after NCGP submitted its petitions, it is undisputed that those petitions contain nearly 2,000 more valid signatures than required by § 163-96(a)(2).

NCSBE's failure to certify NCGP as a new party despite NCGP's compliance with all applicable state law requirements is "unprecedented," as NCSBE's counsel conceded during this Court's July 18, 2022 status conference. Not only did NCSBE not invalidate a single county board-validated signature on any petition submitted in the 2020 election cycle, (Am. Compl. ¶ 71), but also, Brian Irving, the Executive Director and former Chair of the Libertarian Party of North Carolina ("LPNC") is unaware of any instance in which NCSBE invalidated a county-board validated signature during any of the nine successful petition drives that LPNC has conducted since 1976. (Irving Decl. ¶¶ 9, 14-16.) Mr. Irving was personally involved in and has direct knowledge about LPNC's two most recent petition drives, in 2002 and 2006. (*Id.* ¶¶ 8-14.)

Plaintiffs filed this action on July 14, 2022 (ECF No. 1) to vindicate rights guaranteed to them by the First and Fourteenth Amendments to the United States Constitution, including their rights to cast their votes effectively, to speak and associate for political purposes, to grow and

develop their political party, to petition, and their right to due process of law. (Am. Compl. ¶¶ 2, 84-92.) They file the instant emergency motion for preliminary injunctive relief to respectfully request that the Court enter an order that: (1) directs NCSBE to certify NCGP as a new party entitled to place its candidates on North Carolina's November 8, 2022 general election ballot pursuant to § 163-96(a)(2); (2) enjoins NCSBE from enforcing the July 1, 2022 deadline prescribed by § 163-98 against Plaintiffs; and (3) directs NCSBE to take any and all other action necessary to ensure the inclusion of NCGP's candidates, including Plaintiff Hoh and Plaintiff Trudeau, on North Carolina's November 8, 2022 general election ballot.

## LEGAL STANDARD

Plaintiffs seeking a preliminary injunction must establish that: "(1) they are likely to succeed on the merits of their claim, (2) they are likely to suffer irreparable harm without an injunction, (3) the balance of equities tilts in their favor, and (4) issuing an injunction is in the public interest." *NC State Conference of NAACP v. Raymond*, 981 F. 3d 295, 302 (4th Cir. 2020) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

### I. The *Anderson-Burdick* Framework Governs Analysis of the Constitutionality of State Election Laws

Challenges to the constitutionality of state election laws, including as-applied challenges to their manner of enforcement, are analyzed under the familiar "*Anderson-Burdick*" framework. *See Marcellus v. Virginia State Bd. of Elections*, 849 F.3d 169, 175 (4th Cir. 2017) (citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992)). Under that analysis:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as

7

> justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Id.* (quoting *Anderson*, 460 U.S. at 789).

*Burdick* refined the framework announced in *Anderson* by specifying that "the 'rigorousness' of the inquiry 'depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights.'" *Id.* (quoting *Burdick*, 504 U.S. at 434). Accordingly, state laws that impose "'reasonable, nondiscriminatory restrictions upon ... First and Fourteenth Amendment rights' are generally justified by 'the State's important regulatory interests.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788). By contrast, state laws that impose "'severe' restrictions must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). Moreover, the Supreme Court has emphasized that in every case, "[h]owever slight [the] burden may appear. . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191 (2008) (quoting *Norman*, 502 U.S. at 288-89).

## II. Plaintiffs Are Entitled to the Requested Relief Because They Satisfy All Four Elements of the Preliminary Injunction Test.

Plaintiffs are likely to prevail on the merits of their claims because § 163-96(a)(2) and § 163-98 (together, the "Challenged Provisions"), as applied by NCSBE here, cannot withstand scrutiny under the *Anderson-Burdick* analysis. NCSBE's enforcement of the Challenged Provisions to deny NCGP certification as a new party and exclude its candidates from North Carolina's general election ballot despite NCGP's and its candidates' full compliance with their substantive terms severely burdens Plaintiffs' core First Amendment rights and violates their right

to due process of law. Furthermore, NCSBE cannot assert any legitimate state interest that is served by its denial of ballot access a party and its candidates who fully complied with all applicable requirements under state law. Such denial has plainly caused Plaintiffs irreparable harm, and it continues to do so each day it is permitted to persist. The balance of equities and public interest also weigh decisively in favor of granting Plaintiffs the requested relief.

### A. Plaintiffs Are Likely to Prevail on the Merits Because the Challenged Provisions, as Applied, Cannot Withstand *Anderson-Burdick* Scrutiny.

Under the first step in the *Anderson-Burdick* analysis, the Court must address the "character and magnitude" of the burden on a plaintiff's First and Fourteenth Amendment rights. *Anderson*, 460 U.S. at 789. Here, there can be no doubt that the burden imposed is severe. NCSBE has denied Plaintiffs ballot access despite their full compliance with all applicable requirements under state law.

#### 1. NCSBE's Enforcement of the Challenged Provisions Severely Burdens Plaintiffs' First Amendment Rights.

The Challenged Provisions, as applied by NCSBE, harm Plaintiffs in three distinct but related ways: as voters, as candidates and as an aspiring political party. In each instance, the Challenged Provisions burden rights that are protected by the First and Fourteenth Amendments. With respect to the rights of voters, the Supreme Court has recognized that state laws restricting ballot access burden "two different, although overlapping, kinds of rights – the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968). "Both of these rights," the Court found, "rank among our most precious freedoms." *Id.*

The Court has not attached the same "fundamental status" to the rights of candidates, but it has recognized that candidates' rights and voters' rights "do not lend themselves to neat

9

separation," because "laws that affect candidates always have at least some theoretical, correlative effect on voters." *Bullock v. Carter*, 405 U.S. 134, 143 (1972). Of particular concern are laws "tending to limit the field of candidates from which voters might choose." *Id.* As the Court explained in *Anderson*, "the exclusion of candidates … burdens voters' freedom of association, because … a candidate serves as a rallying point for like-minded citizens." *Anderson*, 460 U.S. at 787-788.

Finally, the Court has recognized "the constitutional right of citizens to create and develop new political parties." *Norman*, 502 U.S. at 288. This right "derives from the First and Fourteenth Amendments, and advances the constitutional interest of likeminded voters to gather in pursuit of common political ends." *Id.* Further, this right is "an integral part of [the] basic constitutional freedom" to associate for the "advancement of political beliefs and ideas." *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973).

NCSBE's enforcement of the Challenged Provisions to deny NCGP and its candidates ballot access severely burdens each of the foregoing rights. As the Court has explained, "the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot." *Williams*, 393 U.S. at 31. Laws that exclude candidates from the ballot "burden[] voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for likeminded citizens." *Anderson*, 460 U.S. at 787-88. Such laws severely burden voters' right to cast their votes *effectively* – meaning for a candidate that represents their preferences. *See Williams*, 393 U.S. at 30; *see also Lubin v. Panish*, 415 U.S. 709, 716 (1974) ("It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues.")

Similarly, NCSBE's enforcement of the Challenged Provisions to exclude NCGP's candidates severely burdens the candidates' rights. They cannot serve "as a rallying point" for the NCGP voters with whom they wish to associate if they are unable to appear on the ballot. *Anderson*, 460 U.S. at 787-88; *see also Lubin*, 415 U.S. at 716; *cf. Dixon v. Md. State Bd. of Election Laws*, 878 F.2d 776, 782-83 (4th Cir. 1989) (finding state's failure to report votes cast for candidates who fail to pay filing fee "of great magnitude" because it is "in effect no different from refusing to allow them to cast their ballots in the first place.") (footnote omitted).

NCSBE's failure to certify NCGP as a new party and its exclusion of NCGP's candidates from the ballot also severely burdens Plaintiffs' right to create and develop their political party. *See Norman*, 502 U.S. at 288. "The right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes," the Court has concluded. *Williams*, 393 U.S. at 31. Indeed, "a basic function of a political party is to select the candidates for public office to be offered to the voters at general elections." *Kusper*, 414 U.S. at 58. By thwarting NCGP from fulfilling that basic function here, NCSBE has "substantially abridged" the associational rights of all voters who seek to support NCGP.

Relatedly, NCSBE's failure to certify NCGP as a new party severely burdens yet another right – that of the tens of thousands of voters who signed NCGP's petitions in an effort to qualify it for the ballot. The Court has found that the act of signing a petition to qualify a new party for the ballot is an "exercise [of] the political franchise." *American Party of Texas v. White*, 415 U.S. 767, 785 (1974) (citation omitted). It concluded that signing such a petition is tantamount to voting in a primary election. *See id.* By refusing to certify NCGP as a new party, NCSBE has thus disenfranchised the thousands of North Carolina voters who signed NCGP's petitions. *See id.*

11

### 2. The Challenged Provisions, as Applied, Are Not Narrowly Tailored to Further Any Legitimate State Interest.

Because the Challenged Provisions, as applied by NCSBE, impose severe burdens on Plaintiffs' First Amendment rights, they cannot withstand scrutiny under the *Anderson-Burdick* analysis unless NCSBE can show that they are "'narrowly drawn to advance a state interest of compelling importance.'" *Burdick*, 504 U.S. at 434 (quoting *Norman*, 502 U.S. at 289). NCSBE cannot make that showing. No court has recognized that states have a compelling or even legitimate interest in denying ballot access to candidates or parties who comply with the state's ballot access requirements. There is no such state interest.

Furthermore, even if NCSBE could identify a compelling state interest that is served by its failure to certify NCGP as a new party – and it cannot – NCSBE cannot show that the Challenged Provisions, as applied here, are narrowly drawn. On the contrary, as construed by NCSBE, the Challenged Provisions imbue it with unfettered discretion to deny certification to any party, despite the party's timely compliance with their requirements. The Challenged Provisions further permit NCSBE to do so based on nothing more than "questions" it raises about the party's compliance, without giving the party any notice or opportunity to address those questions and prove its compliance. In effect, the Challenged Provisions, as applied by NCSBE, grant it *carte blanche* – a blank check – to deny certification to any party at any time. So construed, the Challenged Provisions are not even remotely tailored to serve any state interest. They simply confer absolute and unlimited authority upon NCSBE to deny the certification of new parties.

The Challenged Provisions thus fail scrutiny under the *Anderson-Burdick* analysis. They are unconstitutional as applied by NCSBE.

B.  **Plaintiffs Are Likely to Prevail on the Merits Because NCSBE's Enforcement of the Challenged Provisions Violates Plaintiffs' Right to Due Process of Law.**

NCSBE's counsel correctly conceded that NCSBE's failure to certify NCGP as a new party, despite NCGP's compliance with all applicable requirements under state law, is "unprecedented." Plaintiffs are unaware of any other case in which a state has denied ballot access to a party that has done so. Yet the Supreme Court has long recognized that "it is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the liberty assured by the Due Process Clause of the Fourteenth Amendment…." *Anderson*, 460 U.S. at 787 (citation and quotation marks omitted).

Here, NCSBE has also violated Plaintiffs' right to *procedural* due process. "Procedural due process is simply a guarantee of fair procedures," *Mora v. City of Gaithersburg, Md.*, 519 F.3d 216, 230 (4th Cir. 2008) (citing *Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990), "—typically, notice and an opportunity to be heard." *Id.* (citing *Goss v. Lopez*, 419 U.S. 565, 579 (1975)). NCSBE has provided Plaintiffs with neither. It has not notified Plaintiffs of the evidence on which it is relying to invalidate any county board-validated signature on NCGP's petitions, much less has it produced that evidence, nor has it provided Plaintiffs with an opportunity to address the evidence or defend the validity of such signatures. Plaintiffs discover NCSBE's invalidation of the signatures on NCGP's petitions only by visiting NCSBE's website, where the total number of county-board validated signatures steadily continues to drop. *See* North Carolina Board of Elections, Petition Search (North Carolina Green Party), available at https://vt.ncsbe.gov/PetLkup/PetitionResult/?CountyID=0&PetitionName=NORTH%20CAROLINA%20GREEN%20PARTY. Moreover, Plaintiffs have repeatedly requested the opportunity to

13

be heard, and NCSBE has repeatedly rebuffed them. (Am. Compl. ¶¶ 28, 59, 64-65, 73.) NCSBE's actions are therefore inimical to the fundamental requirements of procedural due process.[2]

This case is closely analogous to *McCarthy v. Secretary of the Commonwealth*, 371 Mass. 667, 359 N.E. 2d 291 (Mass. Sup. Jud. Ct. 1977), in which Independent presidential candidate Eugene McCarthy had apparently complied with Massachusetts' ballot access requirements but was still excluded from the ballot. Under the Massachusetts statutory scheme, McCarthy had "the burden of proving error" in the denial of his certification. *McCarthy*, 371 Mass. at 681. McCarthy did not "challenge the constitutionality of the substantive requirements" of the state's ballot access laws, but rather he raised "serious questions with respect to the constitutionality of the extremely heavy burden placed on him to prove [that he had submitted a sufficient number of valid signatures] after having already met the statutory burden of gathering sufficient certifiable signatures on his nomination petitions." *Id.*, at 679-80.

The Court did not decide "the serious constitutional issues raised by McCarthy," because it construed Massachusetts' ballot access scheme "to afford full and adequate judicial review…." *Id.* at 680. It concluded:

> The Commonwealth has no interest in further burdening the route to the ballot by denying meaningful review of the certification process. The Commonwealth must provide a fair and reasonable avenue for ... an independent candidate to secure a place on the ballot. Our construction of the election law statutes to provide for full judicial review of the certification process without undue burden on the candidate who has made a showing of presumptive nomination means that we need not reach the substantial questions raised by McCarthy. However, we cannot say that the burden placed on McCarthy was either fair or reasonable.

*Id.* at 680 n.14 (internal citations and quotation marks omitted).

---

[2] To be sure, the "state courts are open" to Plaintiffs, *Mora*, 519 F.3d at 230, but here, unlike in *Mora*, Plaintiffs' First and Fourteenth Amendment rights have already been violated – they have been denied ballot access for North Carolina's November 8, 2022 general election – and Plaintiffs are entitled to seek redress for those violations in federal court. *See* 28 U.S.C. § 1331; 42 U.S.C. § 1983.

14

The burden that NCSBE has placed upon Plaintiffs here, despite their compliance with the Challenged Provisions, is even more unfair and more unreasonable than the burden that the Massachusetts statutory scheme placed on McCarthy. In McCarthy, the Court found that the candidate's burden of proving error in the denial of certification was "difficult in the extreme, if not impossible, under the review structure and time strictures imposed…." *Id.* at 681. But McCarthy, at least, was given an opportunity to defend the validity of the signatures on his petitions. NCSBE, by contrast, has totally denied Plaintiffs that opportunity. NCSBE has also denied NCGP and its candidates ballot access for the November 8, 2022 general election even though – unlike McCarthy – county boards of elections have confirmed their compliance with the Challenged Provisions' requirements. NCSBE thus violated Plaintiffs' due process rights.

### C. Plaintiffs Satisfy the Remaining Elements of the Preliminary Injunction Test.

The remaining elements of the preliminary injunction test – the irreparable injury to Plaintiffs in the absence of an injunction, the balance of the equities, and the public interest – all weigh decisively in Plaintiffs' favor. As to Plaintiffs' irreparable injury, the Supreme Court has long recognized that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Newsom ex rel. Newsom v. Albemarle County*, 354 F.3d 249, 261 (4th Cir. 2003) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976). As to the balance of the equities, NCSBE "is in no way harmed by issuance of a preliminary injunction which prevents it from enforcing a regulation, which, on this record, is likely to be found unconstitutional" as applied here. *Id.* Finally, "[s]urely, upholding constitutional rights serves the public interest." *Id.*

Plaintiffs thus satisfy all the elements necessary to warrant the issuance of a preliminary injunction. The evidence in the record amply supports that conclusion.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Emergency Motion for Preliminary Injunction should be granted. Further, the Court should enter an order that: (1) directs NCSBE to certify NCGP as a new party entitled to place its candidates on North Carolina's November 8, 2022 general election ballot pursuant to § 163-96(a)(2); (2) enjoins NCSBE from enforcing the July 1, 2022 deadline prescribed by § 163-98 against Plaintiffs; and (3) directs NCSBE to take any and all other action necessary to ensure the inclusion of NCGP's candidates, including Plaintiff Hoh and Plaintiff Trudeau, on North Carolina's November 8, 2022 general election ballot.

Dated: July 21, 2022

Respectfully submitted,

/s/*Oliver B. Hall*
Oliver B. Hall
CENTER FOR COMPETITIVE DEMOCRACY
P.O. Box 21090
Washington, DC 20009
202-248-9294
oliverhall@competitivedemocracy.org
D.C. Bar No. 976463

/s/Pooyan Ordoubadi
Pooyan Ordoubadi*
Lopez-Cobb and Ordoubadi, PLLC
134 Salem Towne Court
Apex, NC 27502
Tel: (919) 695-5569
Fax: (919) 882-9797
Email: pooyan@LCOLEGAL.com
N.C. Bar No. 49438

*Counsel for Plaintiffs*
**Local Civil Rule 83.1(d) Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2022 the foregoing document was filed using the Court's CM/ECF system, which will effect service upon all counsel of record.

/s/Oliver B. Hall
Oliver B. Hall

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Memorandum in Support of Plaintiffs' Emergency Motion for Preliminary Injunction contains 4,935 words, based on the word count of the word processing system used to prepare it, and that the Memorandum thus complies with the Local Civil Rule 7.2(f).

/s/Oliver B. Hall
Oliver B. Hall

*Counsel for Plaintiffs*