# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

| | |
|---|---|
| NORTH CAROLINA GREEN PARTY, ANTHONY NDEGE, MICHAEL TRUDEAU, MATTHEW HOH, SAMANTHA WORRELL, SAMANTHA SPENCE, K. RYAN PARKER, and AARON MOHAMMED,<br><br>*Plaintiffs,*<br><br>*vs.*<br><br>THE NORTH CAROLINA STATE BOARD OF ELECTIONS and DAMON CIRCOSTA, STELLA ANDERSON, JEFF CARMON III, STACY EGGERS IV, TOMMY TUCKER, and KAREN BRINSON BELL, in their official capacities as members or employees of the North Carolina State Board of Elections.<br><br>*Defendants.* | Civil Action No. 5:22-cv-276-D-BM |

**BRIEF OF *AMICUS CURIAE* NATIONAL REPUBLICAN SENATORIAL COMMITTEE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

The National Republican Senatorial Committee ("NRSC"), *amicus curiae* in the above-styled action, by and through its representatives, respectfully submits this brief in support of Plaintiffs' Emergency Motion for Preliminary Injunction (the "Motion"):

**I.      INTRODUCTION**

In this *amicus curiae* brief, the NRSC brings to the Court's attention additional legal authority and factual circumstances not included in Plaintiffs' Motion or Plaintiffs' supporting Memorandum and exhibits. This brief addresses legal arguments concerning: (1) the severity of the burden imposed on Plaintiffs' First Amendment rights, which establishes that strict scrutiny applies; (2) the failure of the North Carolina State Board of Elections (the "Board") to narrowly tailor its investigation into the North Carolina Green Party's (the "Green Party") petitions; (3) an

analysis of the *Anderson/Burdick* balancing test if strict scrutiny is not applied to the Board's action; and (4) Plaintiffs' procedural due process claims under the *Matthews* test. The NRSC's briefing on these issues will be beneficial to the Court, as Plaintiffs have not developed arguments addressing (3) or (4), and the NRSC has identified additional law supporting Plaintiffs' arguments on issues (1) and (2).

## II.     STATEMENT OF THE ARGUMENT

The Board's denial of certification to the Green Party involves serious infringements of constitutional rights by disenfranchising North Carolina voters, impeding the Green Party's associational rights, and marginalizing the due process requirements in N.C. Gen. Stat. § 163-96.

As Plaintiffs correctly contend, their First Amendment claims are likely to succeed. The burden imposed on Plaintiffs' First Amendment rights by the Board's decision is, in and of itself, severe, justifying strict scrutiny under the *Anderson/Burdick* balancing test. The Board's decision was also politically motivated, which is a separate basis for strict scrutiny review. Defendants' action here cannot survive strict scrutiny.

Alternatively, even if the burden imposed by the Board's decision were not severe (and it plainly is), the Board's application of N.C. Gen. Stat. § 163-96 would still not survive the *Anderson/Burdick* balancing test. The state interests advanced by the Board's cumbersome, unnecessary, and untimely investigation of signature verifications in response to unsubstantiated partisan complaints cannot justify disenfranchising thousands of North Carolina voters and denying a party's right to associate.

Plaintiffs' procedural due process claim should be analyzed under the *Matthews* test, and it is also likely to succeed. The Board has (1) adopted a timeline that ensures the Green Party will be excluded from the ballot, regardless of the merits of the ultimate decision on the sufficiency of

the Green Party's petitions, (2) initiated a re-review process that is not guided by any legally prescribed standards or criteria, (3) provided no evidentiary basis for its decisions, and (4) afforded the Green Party no opportunity to contest the decision. This is a far cry from an opportunity for the Green Party to be heard at a meaningful time in a meaningful manner.

Court action is required **<u>now</u>** to protect Plaintiffs' rights to vote, freedom to associate, and right to procedural due process. On June 30, 2022, Board Chair Circosta stated that he was "emphatically vot[ing] no" to the Green Party's certification as a new party.[1] When Board member Stacy Eggers IV, a Republican, asked that they hold the certification open pending the investigation, Chair Circosta denied the request and concluded that "we just voted not to certify them. ... The Board has spoken on this issue. I think anything else that comes on this will have to happen in another body."[2] Thus, the decision was a final determination (despite whatever action the Board is now taking at the direction of its general counsel).[3] Equally as important, the Board and its general counsel have acknowledged that the Board's vote to deny certification of the Green Party as a new party will require Court intervention for the Green Party to have its candidates printed on the ballots for the General Election.[4]

---

[1]     *See*     June     30,     2022     Board     meeting,     video     at     1:41:24–1:41:28,     available     at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2022-06-30/State Board of Elections Meeting-20220630 1300-1.mp4 (accessed July 23, 2022).

[2] *Id.* at 1:45:33– 1:46:08; *see also* June 30, 2022, Board Press Release, available at https://www.ncsbe.gov/news/press-releases/2022/06/30/amid-investigation-state-board-turns-down-green-party-recognition (accessed July 23, 2022) ("The State Board of Election on Thursday voted not to recognize the Green Party as an official political party in North Carolina . . .")..

[3] *See generally* July 14, 2022 Board meeting, video at 10:30–47:11 (providing "update" on Green Party petition investigation), available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2022-07-14/State Board of Elections Meeting-20220714 1332-1.mp4 (accessed July 23, 2022).

[4]  *See* June 30, 2022 Board meeting, video at 1:32:23–1:32:48 ("[T]he statute does not provide an option for the state board to extend [the July 1 deadline for new political parties to nominate candidates] . . . It may be possible for a Court .     .     .     to     allow     them     to     submit     after     that     time."),     available     at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2022-06-30/State Board of Elections Meeting-20220630 1300-1.mp4 (accessed June 23, 2022).

For the reasons stated in Plaintiffs' submissions and for the additional reasons discussed in this brief, the Court should grant Plaintiffs' Motion.

## III. ARGUMENT

As Plaintiffs' Memorandum details, the Board applied N.C. Gen. Stat. § 163-96 as if the North Carolina General Assembly vested the Board with absolute and unfettered discretion to re-review—and override—signature verifications by the county boards of elections with no time limitation. More specifically, this *amicus curiae* brief explains how the Board's denial of the Green Party's certification was not guided by the processes, timeline requirements, or criteria in § 163-96, and the constitutional harms occurred without justifiable explanation (in reliance on representations made by one Democratic complainant) and without any meaningful opportunity for the Green Party to timely respond to any issues raised by the Board's investigation. The Board's "continuing investigation" and re-review verification process at the county level will not cure the harm the Board created by denying the Green Party's petition on June 30, 2022. The Board's application of § 163-96 lacks statutory support and implicates serious First Amendment and procedural due process concerns.[5]

### A. The Board's arbitrary refusal to recognize the Green Party as a new political party violates Plaintiffs' First and Fourteenth Amendment right to vote and freedom of association.

There are few constitutional rights more precious than the right to vote and freedom to associate. "The First Amendment protects the right of citizens to associate and to form [a] political part[y] for the advancement of common political goals and ideas." *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 357 (1997). The Board's decision had the effect of "limit[ing] the

---

[5] The NRSC's *amicus curiae* brief only addresses Plaintiffs' likelihood to succeed on the merits. The NRSC does not address the other preliminary injunction factors (irreparable harm, balance of the equities, and public interest) because they are covered in Plaintiffs' Memorandum. *See* Doc. 29, Mem. Supp. Mot. Prelim. Inj. at 15.

4

field of candidates from which [North Carolina] voters might choose," and therefore implicates the fundamental constitutional right to vote and protected freedom of association. *Anderson v. Celebrezze*, 460 U.S. 780, 786 (1983).

As Plaintiffs demonstrate, the Court is to analyze constitutional deprivations of the right to vote and freedom to associate under the *Anderson/Burdick* balancing test.[6] Doc. 29 at pp. 7–8. While the NRSC agrees with Plaintiffs' general analysis of the *Anderson/Burdick* balancing test, the NRSC submits the following additional reasons that Plaintiffs' First Amendment claim is likely to succeed.

1. <u>The Board's application of N.C. Gen. Stat. § 163-96 has imposed severe burdens on Plaintiffs' First Amendment rights, triggering strict scrutiny.</u>

Due to the Board's actions, the Green Party, the Green Party's candidates, and potential Green Party voters have been left with no meaningful options to express their political choices in the November 8, 2022 election. "[T]he severity of the burden imposed by an electoral regulation is a context-dependent inquiry." *Fusaro v. Cogan*, 930 F.3d 241, 259 (4th Cir. 2019). The Board has burdened Plaintiffs by refusing to recognize the Green Party as a new political party in North Carolina, despite the Green Party's compliance with the statutory prerequisites[7] and the county chairmen's verification of 15,953 signatures. The Board did not have evidence, nor legal support,

---

[6] The *Anderson/Burdick* framework prescribes a two-tier test: "a court must first determine whether [the] protected [First Amendment] rights are severely burdened. If so, strict scrutiny applies. If not, the court must balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests. …" *Fusaro v. Cogan*, 930 F.3d 241, 257–58 (4th Cir. 2019) (citation omitted). In other words, "the severity of the burden imposed 'dictates the level of justification' required." *Johnston v. Lamone*, 801 F. App'x 116, 119 (4th Cir. 2020) (citation omitted).

[7] Under the N.C. Gen. Stat. § 163-96, the only requirements on the Green Party were that it (1) acquire more than 13,865 signatures, (2) submit those signatures to the respective county board of elections for verification by May 17, and (3) submit those validated signatures, meeting the requisite quantitative threshold, to the Board by June 1. *See* N.C. Gen. Stat. § 163-96. The Green Party met all those requirements, submitting 22,540 signatures to the county boards of elections on May 17, Doc. 27, Amend. Compl., ¶ 26, and then submitting 15,953 validated signatures to the Board on June 1, *id.*, ¶ 66. To the extent that the Board seeks to refute the Green Party's facial compliance with N.C. Gen. Stat. § 163-96, the burden should be on the Board to prove, with evidence, that the Green Party did not, in fact, meet the 13,865-signature threshold. The Board failed to make this evidentiary showing.

to invalidate more than 2,088 already-verified signatures prior to its decision not to certify the Green Party on June 30, 2022. The results of the Board's *ultra vires* actions plainly inflict a severe burden on First Amendment rights.

First, the Board's decision inhibits the Green Party's "'ability to perform its primary functions,' such as organizing, recruiting members, and choosing and promoting a candidate." *See Green Party of Tenn. v. Hargett*, 767 F.3d 533, 547 (6th Cir. 2014) (burden more likely to be severe where primary functions impacted). In addition to the burdens on the associational rights of voters, as Plaintiffs detail in their Memorandum, Doc. 29 at 11, the Green Party itself has been burdened as a party. The Board's action fails to recognize the Green Party's principal functions for this election cycle—it cannot appear on the ballot, it cannot broadcast its message through affiliated campaigns, and it cannot exercise its "right to choose its standard bearer in the form of a nominee." *Marcellus v. Va. State Bd. of Elections*, 849 F.3d 169, 175 (4th Cir. 2017) (cleaned up) (citation omitted).

Second, the Board's application of the statute, and the manner of imposing its decision, "impose[s] a severe burden [because] it left few alternate means of access to the ballot, restricting the availability of political opportunity." *Daunt v. Benson*, 999 F.3d 299, 311 (6th Cir. 2021) (cleaned up) (quoting *Anderson*, 460 U.S. at 793). The Board weaponized the statute's use of the undefined term "forthwith" and lack of a hard deadline to run out the clock on the Green Party. *See Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1271 (11th Cir. 2019) (Jill Pryor, J., concurring) (considering statutory command that absentee voters be informed of ballot rejection "promptly" to be illusory where "no time frame [was] specified" and voters might not receive notice until after election). Despite purportedly having knowledge of alleged issues as early as

April 2022,[8] the Board failed to conduct a complete investigation or request that the county boards re-review each signature in advance of denying the Green Party's certification at the June 30 hearing. At the July 14, 2022 board meeting, the Board detailed its decision to send the petitions back to each county for re-verification.[9] The Board's action is too late: the July 1, 2022 deadline for a new party to nominate candidates has passed, *id.* § 163-98, as has the May 17, 2022 deadline for an unaffiliated candidate to submit petitions to appear on the ballot, *id.* § 163-122(a).[10] Accordingly, when the Board's investigation ultimately determines that the Green Party met the statutory requirements, the harm to the Green Party, its candidates, and its potential voters will not be able to be undone because the Board has no statutory authority to retroactively place Green Party candidates on the November 8, 2022 general election ballot. *See, e.g.*, *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014) (noting that courts must consider "the *combined* effect of the state's ballot access regulations" (emphasis added)). Thus, the Board's unconstitutional application of N.C. Gen. Stat. § 163-96 leaves the Green Party and its candidates no "alternative means of access to the ballot." *See Bullock v. Carter*, 405 U.S. 134, 149 (1972).

Third, the Board's decision eliminating the Green Party's candidates from the November 8, 2022 ballot shores up national party dominance in North Carolina, to the detriment of both Green

---

[8] *See* July 14, 2022 Board meeting, video at 22:20–22:28, available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2022-07-14/State Board of Elections Meeting-20220714 1332-1.mp4 (accessed July 23, 2022).

[9] *See* July 14, 2022 Board meeting, video at 14:40–16:02, 43:43–43:57 available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2022-07-14/State Board of Elections Meeting-20220714 1332-1.mp4 (accessed July 23, 2022).

[10] The deadline to declare an intent to run as a write-in candidate, August 10 (*see id.* § 163-123(c)), has not passed, but running as a write-in candidate is not a sufficient alternative to running as a candidate affiliated with a political party or appearing on the ballot. *See Storer v. Brown*, 415 U.S. 724, 745 (1974) ("[T]he political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other."); *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1225 (4th Cir. 1995) ("[A] candidate who wishes to be a party candidate should not be compelled to adopt independent status in order to participate in the electoral process." (citation omitted)).

Party supporters and the electorate generally. "[T]he primary values protected by the First Amendment … are served when election campaigns are not monopolized by the existing political parties." *Anderson*, 460 U.S. at 794. Thus, "[t]he right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot.'" *Id.* at 787 (quoting *Lubin v. Panish*, 415 U.S. 709, 716 (1974); *Williams v. Rhodes*, 393 U.S. 23, 31 (1968)). With respect to the Green Party, "[t]he right to form a party for the advancement of political goals means little if a party can be kept off the election ballot." *Williams*, 393 U.S. at 31. Empowering the Board, which is controlled by a majority of members from one of the major parties, with unfettered discretion to arbitrarily reject new parties unconstitutionally allows the Board to "freeze the political status quo," in service of its members own political gain. *See Jenness v. Fortson*, 403 U.S. 431, 438 (1971). The burden of this unbounded discretion, manifested in the Board's decision not to certify the Green Party, is severe because it both "restrict[s] the ability of the [party] and its members to endorse, support, or vote for anyone they like" and it "directly limit[s] the party's access to the ballot." *See Timmons*, 520 U.S. at 363 (listing these as factors indicating severe burden).

Fourth, the Board's decision was politically, rather than legally, motivated. "[P]olitical neutrality [is] important to determining whether a state election provision severely burden[s] First Amendment rights"—"[i]n other words, an election regulation that plausibly burdens First Amendment rights on the basis of viewpoint, political affiliation, or class should be subject to strict scrutiny." *Fusaro*, 930 F.3d at 261. The Democratic Party has acknowledged that it would benefit politically if the Green Party does not appear on the ballot in North Carolina – the Green Party presents a separate option for left-leaning voters in the General Election.[11] Thus, it is not surprising

---

[11] *See e.g.*, Doc. 28-2, July 18, 2022 Decl. of Michael Trudeau, ¶ 6 ("[A]n individual who identified himself as 'with the North Carolina Democrats' . . . claimed that the Green Party would 'create a disadvantage to the . . . Democratic

that the Board's vote on whether to certify the Green Party was directly split 3-2 along party lines. As detailed in Plaintiffs' briefing and pleadings, the political undertones of the Board's decision are myriad: (1) the catalyst for the Board's investigation was requests for information followed by complaints from a Democratic field operative, all of which were filed by the Elias Law Group,[12] a firm closely affiliated with the Democratic Party,[13] (2) the Board appears to have credited at least some of the allegations levied by the Elias Law Group, without acknowledging a written response to those allegations submitted by the Green Party,[14] and (3) in parallel with the Board's investigation, Democratic operatives conducted a concerted phone and door campaign to convince signatories to remove their signatures from the Green Party's petitions.[15]

Indeed, this is not the first time the Board took an action heavily criticized as politically motivated. Just two years ago, on September 21, 2020, the Board, with Circosta acting as Chair and Karen Brinson Bell acting as Executive Director, entered into a "consent order" with the plaintiffs in *North Carolina Alliance for Retired Americans v. North Carolina State Board of Elections,* Case No. 20-CVS-8881 (Wake Cnty. Super. Ct.), and *Stringer v. State,* Case No. 20-CVS-5615 (Wake Cnty. Super. Ct.). That consent order modified portions of HB 1169 that the North Carolina General Assembly had passed three months earlier in June 2020, prior to a preliminary injunction hearing and without consulting Republican co-defendants Timothy K.

---

Party, dividing votes there and giving an advantage to the Republican Party'"); Doc. 28-4, July 21, 2022 Decl. of Rose Seeman, ¶¶ 5–6 (similar); Doc. 28-11, July 20, 2022 Decl. of Aaron Mohammed, ¶¶ 6–9 (similar); Doc. 28-13, July 21, 2022 Decl. of Ryan Parker, ¶¶ 10–11 (similar); Doc. 28-14, July 21, 2022 Decl. Ahmed Selim, ¶¶ 5–6 (similar).

[12] *See, e.g.*, Doc. 27, Amend. Compl., ¶¶ 35–37, 53–55, 57, 67, 71; Doc. 29, Mem. Supp. Prelim. Inj. at 4–6.

[13] The Elias Law Group is a self-described "mission-driven firm committed to helping Democrats win, citizens vote, and progressives make change." *See* Elias Law Group, *Elias Law Group Begins Operations*, available at https://www.elias.law/elias-law-group-begins-operations (accessed July 23, 2022).

[14] *See* Doc. 28-1, July 21, 2022 Decl. of Anthony Ndege, ¶¶ 32–33.

[15] *See, e.g.*, Doc. 28-2, July 18, 2022 Decl. of Michael Trudeau, ¶ 6 Doc. 27, Amend. Compl., ¶¶ 38–52.

Moore, Speaker of the North Carolina House of Representatives, and Philip E. Berger, President Pro Tempore of the North Carolina Senate. *See Wise v. N.C. State Bd. of Elections*, No. 5:20-cv-505 (M.D.N.C. 2020), Doc. 1 (Compl.).

A concerted and coordinated effort was necessary to keep the Green Party off the ballot – the Democratic members of the Board coalesced according to their own political motivations. This viewpoint discrimination is a severe burden on First Amendment rights, warranting strict scrutiny review. *Fusaro*, 930 F.3d at 261.

For these reasons, along with the fundamental arguments presented by Plaintiffs, the court should apply strict scrutiny to its review of the Board's state action.

> 2.  The Board's application of N.C. Gen. Stat. § 163-96 does not serve, and is not narrowly tailored to, a compelling state interest.

Both Plaintiffs and NRSC agree that under strict scrutiny, the Board cannot articulate a compelling state interest served by failing to certify the Green Party as a political party prior to the July 1, 2022 deadline for candidate nominations, and even if a compelling state interest were at play, the Board's unnecessary re-review process is not narrowly tailored to it. Doc. 29 at 12.

To provide more context on why the Board's actions are not narrowly tailored, the Court must analyze the statutory authority provided to the Board. N.C. Gen. Stat. § 163-96 authorizes the *county boards of elections* to determine the validity of signatures on a petition—the statute provides no authority for the Board, which is in a worse position to assess county voter rolls, to override verifications determined by county boards. *See* N.C. Gen. Stat. § 163-96(c)(1) ("[I]t shall be the [county board of elections] chairman's *duty* [t]o examine the signatures on the petition and place a check mark on the petition by the name of each signer who is qualified and registered to vote in his county." (emphasis added)). After the *county boards* verify the signatures, the petitioners submit the verified petitions to the state board, which merely "determine[s] the

sufficiency of [the] petitions" against certain numerical requirements, *i.e.*, the Board is only authorized to count the already validated signatures. *Id.* § 163-96(a)(2). The statute expressly assigns authority and procedures for the county boards to validate signatures, § 163-96(c), and does *not* authorize the Board to independently attempt to verify each signature; ask the counties to re-verify each signature; or categorically invalidate previously verified signatures based on unfounded third-party allegations. Thus, the Board's actions are not authorized by state law, and "the State has no interest in promoting an unlawful and unauthorized" election process. *League of Women Voters of S.C. v. Andino*, 497 F.Supp.3d 59, 76 (D.S.C. 2020) (enjoining signature-matching practice not provided for by law), *appeal dismissed and remanded for consideration of mootness issue*, 849 F. App'x 39 (4th Cir. 2021).

Moreover, the "re-review" process the Board is currently adopting and imposing on the Green Party is not narrowly tailored when "assessed in light of the totality of North Carolina's election laws." *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1223 (4th Cir. 1995). N.C. Gen. Stat. § 163-98 provides that a new political party must submit its candidates to the Board "no[] later than the first day of July prior to the general election" to be printed on the general election ballot. While § 163-96 does not expressly state that the Board's "forthwith" and "immediate" decision must occur prior to July 1, 2022, § 163-98 was enacted so that "[i]n the first general election following the date on which a new political party qualifies under the provisions of [N.C. Gen. Stat. §] 163-96, it shall be entitled to have the names of its candidates for national, State, congressional, and local offices printed on the official ballots." *Id.* § 163-98. Thus, for North Carolina citizens to have any practical ability to form a functional new party, as is provided for by statute, the Board must determine the sufficiency of the petitions *before* July 1. Narrow tailoring, at a minimum, would entail a process that ensures the Board reaches a decision prior to the July 1

party nomination deadline—not a process that takes so long that the Board's determination becomes practically meaningless.

Most importantly, whatever interest the Board may hold "in preventing voter fraud and upholding the integrity of elections" would be "demonstrably advance[d]—rather than hinder[ed]—" by allowing the Green Party an opportunity to discuss or defend signatures containing alleged irregularities. *Self Advocacy Sols. N.D. v. Jaeger*, 464 F.Supp.3d 1039, 1053 (D.N.D. 2020) (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 191–92 (2008)) (reaching same conclusion for "allowing voters to verify the validity of their [absentee] ballots"); *accord Saucedo v. Gardner*, 335 F.Supp.3d 202, 221 (D.N.H. 2018) (same for allowing election officials to reach out to voters to confirm absentee ballot signatures). A state's interest in eliminating voter fraud is not served by erroneously invalidating valid signatures. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1322 (11th Cir. 2019). The practical problem for the Board, to date, is that they have not, and cannot, identify over 2,088 verified signatures to be invalidated. Nevertheless, allowing the Green Party an opportunity to review and defend suspect signatures prior to the June 30 hearing would have, at a minimum, "further[ed] the State's interest in preventing voter fraud while ensuring that qualified voters are not wrongly disenfranchised." *Saucedo,* 335 F.Supp.3d at 220. "Likewise, improving the currently opaque, unreviewable process ... would only serve to enhance voter confidence in elections." *Id.* at 220–21. The closed-door, standardless, and post-hoc signature "re-review" process that the Board has adopted undermines, rather than serves, state interests.

3.        Even if the Board decision did not impose a severe burden, it would still fail under the *Anderson/Burdick* balancing test.

While Plaintiffs' Memorandum focuses on the severe nature of the burden imposed by the Board's decision, that decision is also unconstitutional under the *Anderson/Burdick* balancing test

even if this Court determined that the burden was not severe. Even where a burden imposed on First Amendment rights is not severe, the *Anderson/Burdick* balancing test still mandates that no matter how "slight th[e] burden may appear, the court must be satisfied that the burden is justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Fusaro v. Howard,* 19 F.4th 357, 368 (4th Cir. 2021) (cleaned up) (quoting *Crawford*, 553 U.S. at 191). Here, the burden on Plaintiffs' rights, if not severe, is at least "significant" or "serious" and is not justified by proportionately "weighty" state interests.

As alluded to in Plaintiffs' Memorandum, no state interest exists for denying ballot access to candidates and parties who comply with the state's ballot access requirements. Doc. 29 at 12. Alternatively, any administrative interest North Carolina has in protecting its ballot from being overrun with candidates is not compelling either – the Green Party, unlike any other potential new parties, has undertaken a significant and successful effort to comply with the statutory requirements and submitted over 22,000 signatures in advance of the November 8, 2022 general election. The window for any other new party to do so has closed. More importantly, if the Green Party fails to obtain two percent of the vote in the next gubernatorial or presidential election, the Green Party's status as a certified party will be automatically terminated for future elections. N.C. Gen. Stat. § 163-97. And, as mentioned above, the state's interest in upholding election integrity is undermined, rather than served, by the Board's re-review process. *See Anderson,* 460 U.S. at 789 ("[T]he Court must not only determine the legitimacy and strength of each of those [state] interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.").

Even if a compelling interest were present (which there is not), the Board's post-hoc re-review process is similar to the "standardless" and unconstitutional signature-matching regimes in

*Andino*, *Lee,* and *Detzner*. In *Andino*, a South Carolina district court enjoined a signature-matching procedure that was not authorized by state law, identifying a "significant burden" on voting rights where "absentee ballots, which meet all statutory requirements under South Carolina law, may nonetheless be disqualified on the basis of a subjective [signature-matching] judgment" made without objective criteria. 497 F.Supp.3d at 76. Similarly, in *Lee*, the Eleventh Circuit determined that Florida's signature matching regime posed "at least a serious burden on the right to vote" where Florida had established no "uniform standards" for implementing the signature-matching review and there were no official "qualifications or training [required] for those who engage in the job." 915 F.3d at 1319–21. In *Detzner*, a Florida district court reviewing the same signature-matching program enjoined it pursuant to the *Anderson/Burdick* test, reasoning that "[t]he only way such a scheme can be reasonable is if there are mechanisms in place to protect against arbitrary and unreasonable decisions." *Democratic Exec. Comm. of Fla. v. Detzner*, 347 F.Supp.3d 1017, 1030 (N.D. Fla. 2018).

The Board does not have clear statutory authorization to conduct a re-review process, let alone clearly articulated criteria by which the Board can determine when to invalidate signatures previously verified by the county boards. The Board's re-review is "standardless" (partly as a product of its lack of statutory authorization) and without "mechanisms in place to protect against arbitrary and unreasonable decisions." *See id.* The burden of such a standardless re-review is especially high when conducted by political actors, such as the members of the Board, who have time and again displayed their own political motivations in reaching Board decisions. *Cf. Anderson*, 460 U.S. at 793 n.16 ("[B]ecause the interests of minor parties and independent candidates are not well represented in state legislatures, the risk that the First Amendment rights of those groups will be ignored in legislative decisionmaking may warrant more careful judicial

scrutiny."); *Clingman v. Beaver*, 544 U.S. 581, 603 (2005) (O'Connor, J., concurring) ("[I]t must be recognized that [the State] is not a wholly independent or neutral arbiter. Rather, the state is itself controlled by the political party or parties in power, which presumably have an incentive to shape the rules of the electoral game to their own benefit."). For these reasons, even if the court determined no severe burden exists, Plaintiffs will still prevail under the *Anderson/Burdick* balancing test.

### B. The Board's refusal to recognize the Green Party also violates Plaintiffs' Fourteenth Amendment right to procedural due process.

Both Plaintiffs and the NRSC agree that the Board's arbitrary application of N.C. Gen. Stat. § 163-96 is violative of the Fourteenth Amendment's due process clause. Plaintiffs do not outline a specific standard for the analysis of procedural due process claims in their Memorandum. Doc. 29 at 13–15. Procedural due process claims are assessed against the standard articulated by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *See, e.g.*, *Democracy N.C. v. N.C. State Bd. of Elections,* 476 F.Supp.3d 158, 226 (M.D.N.C. 2020) (applying *Mathews* to procedural challenge to absentee voting system).[16]

Pursuant to the *Mathews* test:

> [A] plaintiff must demonstrate: (1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate. To assess the constitutional adequacy of an opportunity to be heard, courts consider (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of that interest given the procedures used, as well as the probable value, if any, of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal

---

[16] Numerous courts, including at least two recent decisions within the Fourth Circuit, have applied the *Mathews* standard when assessing due process challenges to voting regulations that have the effect of denying voters a voice on the basis of alleged ballot or signature irregularities. *See, e.g.*, *Andino*, 497 F.Supp.3d 59, 76–77; *Jaeger*, 464 F.Supp.3d at 1052–53; *Martin v. Kemp*, 341 F.Supp.3d 1326, 1338–39 (N.D. Ga. 2018); *Saucedo* 335 F.Supp.3d at 217; *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646, at *9 (N.D. Ill. Mar. 13, 2006).

and administrative burdens that the additional or substitute procedural requirement would entail."

*Id.* at 226 (cleaned up) (quoting, *inter alia*, *Mathews*, 424 U.S. at 335 (1976)) (citations omitted); *see also id.* at 226–29 (finding plaintiffs had demonstrated reasonable likelihood of success on due process challenge to absentee ballot regime that did not allow voters to cure defects in their ballots). Because Plaintiffs do not address the factors in *Mathews* specifically, the NRSC does so below.

      1.    <u>Plaintiffs have a cognizable liberty interest and have been denied that interest through state action.</u>

There is no question that Plaintiffs have been deprived of a cognizable liberty interest by the Board's state action in this case. "The right to vote is a constitutionally protected liberty interest," *id.* at 227 (collecting cases, including *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)), and "ballot-access restrictions," such as N.C. Gen. Stat. § 163-96, "implicate substantial voting, associational and expressive rights protected by the First and Fourteenth Amendments," *Pisano*, 743 F.3d at 932 (citation omitted). Plaintiffs were deprived of their First Amendment rights when the Board, a state actor, refused to recognize the Green Party as a new political party, despite the Green Party complying with the statutory requirements and the county boards verifying 15,953 signatures. *Cf., e.g.*, *Democracy N.C.*, 476 F.Supp.3d at 228 (finding deprivation of right where absentee ballot was rejected without notice to voter or opportunity to cure); *Jaeger*, 464 F.Supp.3d at 1051–52 (same). Indeed, the deprivation suffered by the individual signatories of the Green Party's petitions—deprivation of "the right of voters to associate and have candidates of their choice placed on the ballot," *Burdick*, 504 U.S. at 434—is essentially akin to disenfranchisement, *see Timmons*, 520 U.S. at 363 (underscoring that ballot-access restrictions must still allow a party "and its members to endorse, support, or vote for anyone they like").

Thus, the Court must proceed to inquire whether the process used to deprive Plaintiffs of their cognizable liberty interest was constitutionally adequate. The *Mathews* factors illustrate that it was not.

> 2. <u>The private interests at stake—the First Amendment right to vote and freedom to associate—are significant.</u>

The right to vote and freedom to associate are entitled to substantial weight under the *Mathews* test. Where a due process challenge implicates the fundamental right to vote, as is the case here, the private-interest-at-stake factor of the *Mathews* test is "entitled to substantial weight" favoring the plaintiff. *Martin v. Kemp*, 341 F.Supp.3d 1326, 1338 (N.D. Ga. 2018); *accord Saucedo,* 335 F.Supp.3d at 217; *Jaeger,* 464 F.Supp.3d at 1053. Such substantial weight is justified in this case given that "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion to cast their votes effectively ... rank among our most precious freedoms." *Williams*, 393 U.S. at 30.

> 3. <u>The risk of erroneous deprivation in the Board's standardless, uncontestable review process is high, and additional safeguards exist that would pose little or no cost to the state.</u>

The procedure chosen by the Board in its application of N.C. Gen. Stat. § 163-96 bears a high risk of erroneous deprivation for three reasons: (1) the lack of timing parameters and/or urgency to move "forthwith," (2) the lack of processes in place for the Board to review the verified signatures, and (3) the lack of criteria to invalidate verified signatures.

First, the Board's process ensures that the Green Party cannot have candidates placed on the November 8, 2022 ballot because of the July 1, 2022 deadline for new parties to nominate candidates. Due process requires that "notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (citation omitted). The Board knew of the July 1, 2022 deadline for a new party to nominate candidates, but

it failed to take any meaningful steps to determine the sufficiency of the petitions prior to the June 30, 2022 hearing.[17] The risk of erroneous deprivation is high in a process that guarantees the Green Party cannot meet the July 1 deadline to nominate new candidates, regardless of the ultimate results of the re-review process. *Cf. Jaeger*, 464 F.Supp.3d at 1052 (reasoning that "predeprivation process is [a] constitutional imperative" for absentee voters because "there is no way to vote after an election is over").

Second, N.C. Gen. Stat. § 163-96 is silent on the Board's review process to "determine the sufficiency of the petitions." Precedent would have the Board gather the petitions from each county and determine whether the verified signatures meet the numerical requirements for the Green Party to qualify as a new party and "immediately" inform the Green Party of its determination. The Executive Director of the Libertarian Party of North Carolina ("LPNC"), who was involved in the LPNC's 2002 and 2006 petition drives, stated under oath that:

> To the best of my recollection, the State Board of Elections certified LPNC's petitions within approximately two weeks in both 2002 and 2006. It certainly did not take a month or anywhere close to that. During that time, to the best of my knowledge, the State Board of Elections did not contact LPNC or any of our petition circulators or petition signers in an effort to confirm the validity of any signatures on our petitions. My understanding is that the State Board of Elections just checked the cover sheets that county boards of elections placed on our petitions after validating them, verified the totals, and certified the petitions.

Doc. 28-10, July 19, 2022 Decl. of Brian Irving, ¶ 14.

---

[17] The unnecessary nature of the time-delay entailed by the Board's re-review process is underscored by its results thus far. As Plaintiffs detail, as of July 21, 2022, 51 days after the petitions were submitted, 15,821 signatures were still listed on the Board's website as verified and valid (*i.e.*, the Board has invalidated a total of 127 signatures since June 1, 2022). *See* Doc. 29 at 6. That is approximately 2.5 signatures per day. These marginal invalidation numbers do not indicate problems so pervasive that the 2,000-signature margin between the number of verified signatures and the 13,865 threshold is seriously in question.

Due to apparent political motivations, the Board, under Director Circosta's guidance, conducted the process differently this time. Even if the Board had authority to do so, there are no guidelines for the process to determine the sufficiency of each signature on the petitions. The Board has decided it has unfettered authority to investigate an unfounded accusation, with no restraint on the use of significant taxpayer dollars and resources in the process. The process being employed now (*i.e.*, request that the county boards of elections re-verify every signature) was first announced by the Board to the public on July 14, 2021[18] – it was not in place at the time of the June 30 hearing. To the extent the plan was in place before July 14, and the Board has provided the counties more than 14 days to verify the petitions, such a request could conflict with § 163-96(c). The risk of erroneous deprivation is high where the Board adopts different procedures depending on the new party seeking access to the ballot, especially when the new "re-review" procedure adopted is not envisioned by the statute and lacks guiding standards. *Cf. Bush v. Gore*, 531 U.S. 98, 105–06 (2000) ("The recount mechanisms implemented ... do not satisfy the minimum requirement for nonarbitrary treatment of voters .... The problem inheres in the absence of specific standards to ensure its equal application.").

Third, N.C. Gen. Stat. § 163-96 provides no criteria by which the Board is to invalidate previously verified signatures. Unlike the criteria laid out for county boards of elections, § 163-96(a)(2) is silent on criteria for the Board to invalidate verified signatures. Based on representations at the July 14 hearing, it appears the Board is now providing instruction to county boards of elections on how to re-review the petitions; however, what exactly that instruction entails

---

[18] *See* July 14, 2022 Board meeting, video at 14:40–16:02, 43:43–43:57 available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2022-07-14/State_Board_of_Elections_Meeting-20220714_1332-1.mp4 (accessed July 23, 2022).

(outside of signature matching)[19] remains unclear. There is other evidence that the Board is relying on totally irrelevant criteria—the Board presented two slides at the June 30 meeting containing "examples" of suspect signatures that should be invalidated, and one of those examples was a signature sheet for which the county board of elections *had already invalidated all the signatures*.[20] Those already excluded signatures have no bearing on the 15,953 signatures that *were* validated.

Standardless review processes by which voters may be disenfranchised create a high risk of erroneous deprivation. *See Saucedo*, 335 F.Supp.3d at 217–18 ("[N]either state law nor any guidance from state agencies sets forth functional standards for comparing signatures and assessing variations .... The absence of functional standards is problematic, and the likelihood of error resulting therefrom is only compounded by the lack of meaningful review or oversight."); *Andino*, 497 F.Supp.3d at 76 ("Numerous cases have found that the process of untrained election officials conducting signature examinations without established standards and protocols carries a very high risk of error." (collecting cases)); *Martin*, 341 F.Supp.3d at 1339 (suggesting that entrusting single official with "unchecked discretion" contributes to risk of erroneous deprivation.). To date, the Board has provided almost no evidence on why any verified signatures may be invalid (much less more than 2,088 verified signatures), further compounding the risk of

---

[19] Ironically, at the very same hearing, the three Democratic Board members voted to issue a declaratory ruling prohibiting the use of signature-match verification for absentee ballots by county elections officials in advance of the November 8, 2022 general election. As part of the reasoning for issuing the declaratory ruling, ChairCircosta stated that signature matching "would introduce a level of uncertainty where some voters might be treated differently than other voters depending on how they vote." *See* July 14, 2022 Board meeting, video at 2:10:04–2:10:25, available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2022-07-14/State Board of Elections Meeting-20220714_1332-1.mp4 (accessed July 23, 2022). Board member Tommy Tucker noted that the county boards are essentially being asked by the Board to conduct the same signature matching process with respect to the Green Party's petition. *Id.* at 2:05:19–2:05:50. The use of signature-matching when it favors the Democrats, and the unequivocal rejection of it when it does not, underscores the political motivations of the Board's decision.

[20] *See* June 30, 2022 Board meeting, video at 1:18:27–1:18:50, available at https://s3.amazonaws.com/dl.ncsbe.gov/State_Board_Meeting_Docs/2022-06-30/State Board of Elections Meeting-20220630_1300-1.mp4 (accessed July 23, 2022)

20

erroneous deprivation. *See Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F.Supp. 1354, 1358 (D. Ariz. 1990) (finding lack of due process in absentee ballot rejection system that failed to advise the voter whose ballot was rejected "the reason therefore"). Without detailed criteria, the Green Party is left to "read the minds of [the Board's] election officials" to determine how to defend the submission of its petitions—indicating a system clearly lacking due process. *See Jaeger*, 464 F.Supp.3d at 1053.

Additional safeguards exist, at little or no cost to the Board, that would mitigate these high risks of erroneous deprivation. The Board could have deferred to the signature verifications made by the chairmen of the county boards of elections, in accordance with the statute and precedent. This would eliminate the risk of erroneous deprivation through the unnecessary time delay attendant to the arbitrary mechanisms implemented in the re-review process, while posing no cost to the Board. *Cf. Andino*, 497 F.Supp.3d at 76 (holding that discontinuance of an unauthorized practice costs the state nothing). This measure also would not imperil any state interest, as the county boards are better equipped to assess their own voter rolls than is the state board. Second, the Board could have allowed the Green Party the opportunity to defend suspect signatures in advance of the June 30 hearing. Multiple courts have ruled that allowing for a cure opportunity in the face of alleged ballot or signature defects is a valuable safeguard of the fundamental right to vote. *See Democracy N.C.*, 476 F.Supp.3d at 228; *Martin*, 341 F.Supp.3d at 1339; *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646, at *9 (N.D. Ill. Mar. 13, 2006). Alternatively, if a two-week time-limit, similar to the time limit imposed on county boards of elections to verify signatures, N.C. Gen. Stat. § 163-96(c), was enforced for the Board's "forthwith" determination of the petitions, the Board review would have been able to complete its review and immediately notify the Green Party of its findings in advance of the June 30 hearing.

In sum, Plaintiffs are experiencing erroneous deprivation, and additional safeguards were available to the Board.

        4.      <u>The Board's interests do not justify the blatant lack of due process in their decision.</u>

The government's interest should be to uphold the integrity of the elections. If that is the case, allowing the Green Party to list its candidates on the ballot, pursuant to § 163-96(a)(2), would serve a greater purpose than excluding them. The Board's interests should be tangential to Plaintiffs' fundamental right to vote and associate, and those interests are undermined, rather than served, by failing to provide Plaintiffs with proper due process. *Cf., e.g.*, *Jaeger*, 464 F.Supp.3d at 1053 ("To be sure, the state holds important interests in preventing voter fraud and upholding the integrity of elections. But allowing voters to verify the validity of their ballots demonstrably advances—rather than hinders—these goals." (citing *Crawford*, 553 U.S. at 191–92)); *Saucedo*, 335 F.Supp.3d at 220–21 ("[I]f anything, additional procedures further the State's interest in preventing voter fraud while ensuring that qualified voters are not wrongly disenfranchised ... Likewise, improving the currently opaque, unreviewable process ... would only serve to enhance voter confidence in elections."). Section 163-96 provides for the county boards of elections, not the Board, to verify the signatures. There are also existing procedures to remove the Green Party from the ballot in the future if it does not enjoy significant popular support. North Carolina decertifies political parties if a sufficient number of voters do not vote for their candidates in the next gubernatorial or presidential election. N.C. Gen. Stat. § 163-97. Thus, the Board's post-hoc investigation is creating a greater administrative burden than the General Assembly intended or would be required if the Board followed the statute by crediting the verifications made by county chairmen over one Democratic complainant.

## IV. CONCLUSION

For the reasons detailed throughout, in addition to the arguments presented by Plaintiffs, the Court should grant Plaintiffs' Motion and enter an order that: (1) directs the Board to certify the Green Party as a new party entitled to place its candidates on North Carolina's November 8, 2022 general election ballot pursuant to § 163-96(a)(2); (2) enjoins the Board from enforcing the July 1, 2022 deadline prescribed by § 163-98 against Plaintiffs; and (3) directs the Board to take any and all other action necessary to ensure the inclusion of the Green Party's candidates, including Plaintiff Hoh and Plaintiff Trudeau, on North Carolina's November 8, 2022 general election ballot.

Dated: July 26, 2022                     Respectfully submitted,

*/s/ C. Bailey King Jr.*
C. Bailey King Jr., N.C. Bar No. 34043
BRADLEY ARANT BOULT CUMMINGS LLP
214 North Tryon Street, Suite 3700
Charlotte, North Carolina 28202
Telephone: (704) 338-6027
Facsimile: (704) 332-8858
bking@bradley.com

*Local Civil Rule 83.1(d) Counsel for Proposed Amicus Curiae National Republican Senatorial Committee*

23

*/s/ Thomas Lee Oliver III*

Thomas Lee Oliver III, Ala. Bar No. 8256-W15L\*
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 488-6041
toliver@bradley.com

*Attorney for Proposed Amicus Curiae National Republican Senatorial Committee*

\*Notice of Special Appearance submitted

## CERTIFICATE OF SERVICE

I certify that on this 26th day of July 2022, I caused the foregoing document to be filed and served on all counsel of record by operation of the CM/ECF system for the United States District Court for the Eastern District of North Carolina.

/s/ C. Bailey King Jr.

C. Bailey King Jr., N.C. Bar No. 34043
BRADLEY ARANT BOULT CUMMINGS LLP
214 North Tryon Street, Suite 3700
Charlotte, North Carolina 28202
Telephone: (704) 338-6027
Facsimile: (704) 332-8858
bking@bradley.com