IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:22-CV-276-D

| | | |
|---|---|---|
| NORTH CAROLINA<br>GREEN PARTY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **ORDER** |
| v. | ) | |
| | ) | |
| NORTH CAROLINA STATE<br>BOARD OF ELECTIONS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

On July 21, 2022, the North Carolina Green Party ("Green Party"), Anthony Ndege, Michael Trudeau, Matthew Hoh, Samantha Worrell, Samantha Spence, K. Ryan Parker, and Aaron Mohammed (collectively, "plaintiffs") filed an amended complaint seeking declaratory and injunctive relief arising from their efforts to have the Green Party certified as a new political party and to have their candidates placed on the ballot ahead of the November 8, 2022 general election [D.E. 27]. Plaintiffs named the North Carolina State Board of Elections and all five Board of Elections members and the Board of Elections executive director, in their official capacities, as defendants (collectively, the "Board" or "defendants"). Plaintiffs seek (1) a declaratory judgment that defendants unconstitutionally applied N.C. Gen. Stat. § 163-96(a)(2) to the Green Party, (2) "an order directing [the Board] to certify [the Green Party] as a new political party entitled to place its candidates on North Carolina's November 8, 2022 general election ballot," and (3) an order "enjoining [the Board] from enforcing the July 1 filing deadline under § 163-98 as applied to Plaintiffs." Id. at 25.

The same day, plaintiffs moved for a preliminary injunction and filed a memorandum and

exhibits in support [D.E. 28, 30]. On July 29, 2022, defendants responded in opposition and filed exhibits in support [D.E. 51–53]. On August 2, 2022, plaintiffs replied [D.E. 58].

On July 17, 2022, before plaintiffs filed their amended complaint, the Democratic Senatorial Campaign Committee ("DSCC") and the North Carolina Democratic Party ("Democratic Party") (collectively, "intervenors") moved to intervene as defendants in this action and filed a memorandum in support [D.E. 15, 16]. On July 19, 2022, the intervenors moved to expedite the briefing for and consideration of their motion to intervene [D.E. 21]. On July 28, 2022, plaintiffs responded in opposition to the motion to intervene [D.E. 45]. Defendants have not responded. On July 29, 2022, the intervenors filed a proposed response and exhibits in opposition to plaintiffs' motion for a preliminary injunction [D.E. 50]. On August 2, 2022, the intervenors replied to plaintiffs' response in opposition to their motion to intervene [D.E. 57].

On July 26, 2022, the National Republican Senatorial Committee ("NRSC") moved for leave to file as amicus curiae and filed a proposed brief in support of plaintiffs' motion for a preliminary injunction [D.E. 42, 43]. Neither plaintiffs nor defendants oppose NRSC's participation as amicus curiae, see [D.E. 42] 2, and the court grants their motion for leave to file.

As explained below, the court grants the intervenors' motion to intervene and grants in part and denies in part plaintiffs' motion for a preliminary injunction. The court enjoins defendants in their official capacities from enforcing the July 1 candidate-filing deadline in N.C. Gen. Stat. § 163-98 against the Green Party and its candidates and orders defendants in their official capacities to place Green Party candidates Matthew Hoh and Michael Trudeau on North Carolina's November 8, 2022 general election ballot in accordance with this order.

I.

The North Carolina Green Party is the state affiliate of the Green Party of United States. See

2

Am. Compl. ¶ 6. The Green Party seeks to place Matthew Hoh ("Hoh") and Michael Trudeau ("Trudeau") on the ballot as candidates in North Carolina's November 8, 2022 general election. See id. ¶¶ 6, 8–9, 31–32. Although the Green Party was a recognized political party in North Carolina and had candidates on the 2020 general election ballot, the party failed to garner enough votes to automatically qualify as a political party entitled to place candidates on the 2022 general election ballot. See Cox Decl. [D.E. 52] ¶¶ 3–4. Thus, to re-certify as a political party and to place Hoh and Trudeau on the ballot as candidates in the 2022 general election, the Green Party had to comply with the statutory requirements in N.C. Gen. Stat. §§ 163-96 and 163-98. See id. ¶ 5; Am. Compl. ¶¶ 21–26; [D.E. 51] 5.

Under N.C. Gen. Stat. § 163-96(a)(2), a group of voters can qualify as a new political party if they file with the Board petitions "which are signed by registered and qualified voters . . . equal in number to one-quarter of one percent (0.25%) of the total number of voters who voted in the most recent general election for Governor. Also the petitions must be signed by at least 200 registered voters from each of three congressional districts in North Carolina." N.C. Gen. Stat. § 163-96(a)(2). Such petitions are due to the Board by 12:00 p.m. on the June 1 preceding the general election in which the putative political party desires to participate. See id.

Before a putative political party can submit its petitions to the Board, however, the party must submit its petitions "to the chairman of the board of elections of the county in which the signatures were obtained." Id. § 163-96(c). Upon receiving such petitions, the county chair must "examine the signatures on the petition and place a check mark on the petition by the name of each signer who is qualified and registered to vote in his county." Id. § 163-96(c)(1). After validating the signatures, the county chair then attaches a signed certificate to the petition "[s]tating that the signatures on the petition have been checked against the registration records and . . . [i]ndicating the number found

3

qualified and registered to vote in his county." Id. § 163-96(c)(2). The county chair then returns the petition and certificate to the party. See id. § 163-96(c)(3). Putative parties must submit their petitions to the county chairs "no later than 5:00 P.M. on the fifteenth day preceding the date the petitions are due to be filed with the State Board of Elections." Id. § 163-96(c). County boards of elections have two weeks to complete the verification process after the putative party submits its petitions. Id.

When petition signatures are presented to county boards of elections for validation, the boards' review is fairly limited. They "check and certify the signatures using the SEIMS Petition Checking module"[1] to confirm that: (1) they are able to find the voter, (2) the "[j]urisdiction/eligibility matches," (3) the signer's address matches the petition and is within the district, and (4) the signature bears a "reasonable resemblance" in light of the boards of elections not being "handwriting experts." [D.E. 52-9] 4; see Cox Decl. ¶ 26 (noting that these instructions have "[f]or many years" been the "the State Board's interpretation of N.C.G.S. § 163-96(c)"); [D.E. 52-10] (email from the Board's general counsel reiterating these requirements to the county boards of elections). "If verified, signature counts towards total." [D.E. 52-9] 4. "If not able to be verified, signature does not count." Id. Any evidence of fraud or forgery must be referred "to state board investigators." Id.

Once a putative party submits its verified petitions to the Board by the June 1 deadline, the Board "shall forthwith determine the sufficiency of petitions filed with it and shall immediately communicate its determination to the State chair of the proposed new political party." N.C. Gen.

---

[1] SEIMS stands for "State Election Information Management System" and is a software system and database that the Board and county boards use to validate signatures and track the progress of petitions. See Cox. Decl. ¶ 9 n.1; Martucci Decl. [D.E. 53] ¶ 24.

4

Stat. § 163-96(a)(2). If the Board certifies a new party, the party must then certify to the Board the candidates it seeks to place on the general election ballot. "For the first general election following the date on which it qualifies under G.S. 163-96, a new political party shall select its candidates by party convention." Id. § 163-98. A party must hold the convention and certify its candidates to the Board not later than the July 1 preceding the general election in which the party's candidates propose to run. See id.

To meet the statutory requirements for certification in N.C. Gen. Stat. § 163-96(a)(2), the Green Party needed to submit 13,865 valid signatures to the Board by June 1, 2022. See Am. Compl. ¶ 26; [D.E. 52-1] (Green Party petition request form).[2] The Green Party's petitions were due to the county boards of elections not later than 5:00 p.m. on May 17, 2022, so that the county boards of elections could validate the Green Party's petition signatures. See Cox Decl. ¶ 5; [D.E. 52-1].

In February 2021, the Green Party began a new petition drive to collect signatures to try to meet the May 17, 2022 deadline to submit signatures to the county boards of elections for validation. See Am. Compl. ¶ 25; Cox Decl. ¶ 5. Three issues emerged regarding the Green Party's petition drive. First, in October 2021, the Board received queries from county boards in roughly five counties because it appeared that the Green Party had submitted outdated petition sheets from prior petitions. See Cox Decl. ¶ 6. The Board was unable to address that issue with the Green Party at the time. See id. ¶¶ 7–8; [D.E. 52-2].

Second, in March 2022, the Green Party told the Board they did not intend to seek party recognition in 2022 but instead were starting their petition drive for 2024. See Cox. Decl. ¶ 9; [D.E.

---

[2] See also N.C. State Bd. of Elections, Petition for New Political Party Fact Sheet, at 4 (revised Jan. 13, 2022), https://s3.amazonaws.com/dl.ncsbe.gov/Candidate%20Filing/2022_Fact_Sheet_Petition_New_Political_Party.pdf (last visited Aug. 3, 2022).

52-4]. In response, the Board changed the deadline in the SEIMS Petition Module for the Green Party to submit petitions to county boards to May 17, 2024. See Cox Decl. ¶ 9. When the Green Party later decided to seek certification in 2022, the reversion back to the May 17, 2022 deadline caused confusion. Some county boards accidentally validated signatures submitted after the May 17, 2022 deadline, mistakenly believing they were timely under the May 17, 2024 deadline. See id.

Third, the process to validate petition signatures submitted by the Green Party to county boards of elections was hampered by alleged evidence of fraudulent signatures and county boards not properly reviewing submitted signatures. Beginning in April 2022, the Board received notice from some county boards of elections that some of the petitions the Green Party submitted contained evidence of fraud. See Martucci Decl. [D.E. 53] ¶ 4.[3] The Board continued to receive similar information in May and June from other counties. See id. ¶¶ 8–9. Based on this information, the Board began to investigate the fraud allegations concerning the Green Party's petitions. See id. ¶ 3. The Board's investigation found "what appeared to be noticeably fraudulent signatures, largely submitted from three counties, and bearing the signature marks of the same two individuals throughout." Id. ¶ 11. After meeting with Green Party leadership in June 2022, the Board narrowed their investigation to two persons of interest and possibly a third. See id. ¶ 19. These persons of interest appear to be connected to consulting firms or individuals the Green Party hired to assist with signature gathering. See id. ¶¶ 13, 17–20, 25.[4]

As part of its investigation, the Board determined "the entire universe of possibly fraudulent signatures was believed to be" 2,653 signatures based on 1,382 signatures collected by the three

---

[3] Matthew Martucci is the Board's lead investigator. See Martucci Decl. ¶ 2.

[4] At the July 18, 2022 status conference, counsel for the Board represented to the court that there is no allegation from the Board that the Green Party itself committed any fraud.

6

persons of interest and 1,271 signatures collected by a consulting firm. Id. ¶ 25. "Board staff examined roughly 3,560 submitted petition pages" to try to identify signatures that fell within the group of possibly fraudulent signatures. See id. ¶ 21. The Board ultimately identified 1,472 signatures gathered by persons of interest in the investigation. See id. ¶¶ 23, 25. Of those signatures, the Board accepted 624 signatures and rejected 848 signatures. See id. ¶ 23.

Board staff also contacted more than 200 voters to ask whether they signed the Green Party petition. See id. ¶ 24. Of those that responded, "28 individuals did not sign the petition, 12 did not remember whether they signed, 10 did sign it, and 4 thought they were signing a petition for something else." Id.[5]

The process to validate signatures submitted by the Green Party was also delayed by county boards of elections not validating the signature petitions within the two-week window specified in N.C. Gen. Stat. § 163-96(c) or not properly reviewing the petitions. As for not meeting the two-week deadline, the Board did not hold the delay against the Green Party so long as the Green Party had submitted the petitions to the relevant county board by 5:00 p.m. on May 17, 2022. See Cox Decl. ¶¶ 11–12. Thus, although the Green Party made a timely initial submission to the Board on June 1, the Green Party supplemented its petitions on June 8, June 17, and June 24 with additional signatures after the county boards validated them. See id. ¶ 14. Board staff reviewed the petitions as they received them. See id. ¶ 21. Moreover, in early July, the Board learned that some county boards of elections were not properly verifying petitions because they "did not check to see whether the signature itself resembled that of the voter." Id. ¶ 26. This oversight potentially affected "large

---

[5] The intervenors also conducted their own investigation into the Green Party's petition efforts. The court addresses the intervenors' investigation below.

volumes" of the Green Party's signatures. Id.[6] On July 11, 2022, the Board's general counsel instructed county boards to conduct proper signature comparisons by July 29, 2022, if they had not already done so. See id. ¶ 27; [D.E. 52-10].

The Green Party ultimately submitted 22,530 signatures to the county boards of elections for validation. See Am. Compl. ¶ 26. As discussed, the county boards of elections reviewed those signatures for (1) signatures on outdated petition pages; (2) signatures submitted after the May 17, 2022 deadline; (3) signatures showing alleged evidence of fraud; and (4) signatures otherwise not bearing a reasonable resemblance to the corresponding signature in the voter record. See Cox. Decl. ¶¶ 17–20.

On June 30, 2022, the Board met and voted 3 to 2 not to certify the Green Party as a new political party under N.C. Gen. Stat. § 163-96(a)(2) because of the Board's on-going investigation of alleged fraud. See Am. Compl. ¶¶ 63–74; [D.E. 52-8]; [D.E. 51] 3 & n.2.

The same day, notwithstanding the Board's vote, the Green Party held its nominating convention pursuant to N.C. Gen. Stat. § 163-98. See Am. Compl. ¶ 31. At the convention, the party selected Matthew Hoh as its candidate for the United States Senate and selected Michael Trudeau as its candidate for North Carolina Senate District 16. See id. On July 1, 2022, Hoh and Trudeau submitted their applications to change their party affiliation to the Green Party, and Anthony Ndege, the Green Party's chair, certified Hoh and Trudeau as the Green Party's candidates. See id. ¶ 32. Trudeau also submitted a notice of candidacy and his candidacy filing fee to the Wake County Board of Elections and the State Board. See id. On July 12, 2022, the Board's counsel sent Hoh and Trudeau forms for new party candidates. See id. ¶ 33. On July 13, 2022, Trudeau submitted the

---

[6] For example, three counties comprising approximately 40% of the Green Party's approved signatures had not conducted the proper signature review. See Cox. Decl. ¶ 27.

8

form to the Wake County Board of Elections. See id. The same day, Hoh submitted the form and the candidate filing fee to the Board. See id. The Board did not accept Hoh's submission. See id.

On July 14, 2022, plaintiffs filed this action against the Board. See [D.E. 1]. On July 18, 2022, this court held a status conference to discuss a schedule for discovery and resolution of the dispute. See [D.E. 5, 18]. On July 19, 2022, plaintiffs and defendants filed a proposed briefing schedule for the plaintiffs' motion for a preliminary injunction. See [D.E. 23]. On July 20, 2022, the Board noticed an August 1, 2022 meeting at which the Board anticipated reconsidering the Green Party's petition for certification as a political party. See N.C. State Bd. of Elections, State Board Meeting: August 1, 2022 (revised July 29, 2022).[7] The same day, the court accepted plaintiffs' and defendants' proposed briefing schedule and scheduled an August 8, 2022 hearing on plaintiffs' motion for a preliminary injunction. See [D.E. 26]. By scheduling the hearing on August 8, 2022, the court allowed the county boards to complete their review by the Board's July 29 deadline and allowed the Board to hold its August 1 meeting and to reconsider the sufficiency of the Green Party's petition for certification as a political party.

After completing their review, the county boards validated 15,472 signatures. See [D.E. 57-1] 11. Thus, as of July 29, 2022, the county boards of elections found that the Green Party submitted 1,607 more signatures than the statutory requirement of 13,865 signatures. See id. On August 1, 2022, the Board met and voted unanimously to certify the Green Party as a new political party. See [D.E. 54]. The Board also immediately informed the Green Party of its determination. See [D.E. 54-1]. The Board thus determined that the Green Party complied with the statutory requirements in N.C. Gen. Stat. § 163-96(a)(2) by timely submitting more than the required number of valid

---

[7] Available at https://www.ncsbe.gov/news/press-releases/2022/07/20/state-board-meeting -august-1-2022 (last visited Aug. 3, 2022).

9

signatures and certified the Green Party as a political party eligible to have its candidates on the November 2022 general election ballot.

After the Board certified the Green Party as a North Carolina political party, the court issued an order forecasting that plaintiffs' request that the court order the Board to certify the Green Party appeared to be moot. See [D.E. 55] 2. The court also noted that plaintiffs and defendants appeared to agree that if the Board certified the Green Party, injunctive relief to ensure the Green Party's candidates appeared on the ballot would be appropriate. See id. The court ordered plaintiffs and defendants to file a proposed consent order resolving that issue or to file competing proposed orders if they could not agree. See id. at 3. They did not agree, and each filed a proposed order on August 3, 2022. See [D.E. 61-1, 63].

## II.

This court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because plaintiffs bring their claims under 42 U.S.C. § 1983 and the First and Fourteenth Amendments. Defendants argue this case is not ripe (or alternatively, is moot), that defendants are entitled to immunity under the Eleventh Amendment, that this court should abstain under Burford v. Sun Oil Co., 319 U.S. 315, 333–34 (1943), and that the doctrine of constitutional avoidance counsels against exercising jurisdiction. See [D.E. 51] 14–21. The intervenors also argue this case is not ripe and that the court should abstain under Burford. See [D.E. 50] 18–23.

## A.

As for ripeness, when defendants and the intervenors filed their responses in opposition to plaintiffs' motion for a preliminary injunction, the Board had not yet certified the Green Party as a political party. Their arguments that plaintiffs' claims were not ripe rested on that fact "because the agency [was] not yet done reviewing the underlying question of certification, and there [would] be

10

an intervening agency ruling prior to this matter being heard by the Court." [D.E. 51] 15; see [D.E. 50] 21–23. The Board has finished investigating the sufficiency of the Green Party's petitions and certified the Green Party as a North Carolina political party. See [D.E. 54, 54-1]. Thus, the Board's decision to certify the Green Party obviates the defendants' and the intervenors' ripeness arguments. Cf. Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 807 (2003) (stating the ripeness standard); Abbott Lab'ys v. Gardner, 387 U.S. 136, 148–49 (1967) (same), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977); Edgar v. Haines, 2 F.4th 298, 311–312 (4th Cir. 2021), cert. denied, 142 S. Ct. 2737 (2022); Deal v. Mercer Cnty. Bd. of Educ., 911 F.3d 183, 190–91 (4th Cir. 2018) (same).

## B.

Defendants and the intervenors argue that the Board's decision to certify the Green Party moots at least part of the case. Before the Board certified the Green Party on August 1, 2022, defendants argued that the Board certifying the Green Party would moot "all of [the] claims, except for the relief related to the candidate filing deadline." [D.E. 51] 16. The intervenors argued that the Board certifying the Green Party would moot the case entirely. See [D.E. 50] 23.

"The doctrine of mootness constitutes a part of the constitutional limits of federal court jurisdiction, which extends only to actual cases or controversies." Fleet Feet, Inc. v. NIKE, Inc., 986 F.3d 458, 463 (4th Cir. 2021) (quotation omitted); see Porter v. Clarke, 852 F.3d 358, 363 (4th Cir. 2017). The mootness doctrine prevents a court from addressing issues that "are no longer 'live.'" Eden, LLC v. Justice, 36 F.4th 166, 169 (4th Cir. 2022) (quotation omitted); see Fleet Feet, 986 F.3d at 463. In short, a court "may only decide [issues] that matter in the real world" at the time the court decides them. Eden, 36 F.4th at 170 (quotation omitted); see Norfolk S. Ry. v. City of Alexandria, 608 F.3d 150, 161 (4th Cir. 2010).

11

In their motion for a preliminary injunction, plaintiffs sought, in part, an order from this court requiring the Board to certify the Green Party as a North Carolina political party. See [D.E. 28] 1. On August 1, 2022, the Board certified the Green Party as a political party under N.C. Gen. Stat. § 163-96(a)(2). See [D.E. 54]. The Board then sent a letter to the Green Party confirming "that the Green Party is now a recognized political party in North Carolina" and stating that "the State Board of Elections, by a vote of 4 to 0, determined that the North Carolina Green Party had submitted sufficient petitions and immediately recognized the Green Party as a new political party pursuant to G.S. § 163-96(a)(2)." [D.E. 54-1]. Thus, plaintiffs have received from the Board a portion of the relief they seek from this court, and that portion of plaintiffs' requested relief is moot. Accordingly, the court denies as moot plaintiffs' request for a preliminary injunction ordering the Board to certify the Green Party as a new North Carolina political party. However, plaintiffs' request that the court enjoin the application to it of the July 1 candidate-filing deadline under N.C. Gen. Stat. § 163-98 and order defendants to place Green Party candidates Matthew Hoh and Michael Trudeau on North Carolina's November 8, 2022 general election ballot is not moot.

## C.

Defendants argue the court lacks jurisdiction because defendants are entitled to immunity under the Eleventh Amendment. See [D.E. 51] 16–17. Under the Eleventh Amendment, an unconsenting state is immune from suit in federal court. See Berger v. N.C. State Conf. of NAACP, 142 S. Ct. 2191, 2197 (2022); Sossamon v. Texas, 563 U.S. 277, 284 (2011); Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54 (1996); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 104–06, 116–17 (1984); Jemsek v. Rhyne, 662 F. App'x 206, 210 & n.4 (4th Cir. 2016) (unpublished); Hutto v. S.C. Ret. Sys., 773 F.3d 536, 542 (4th Cir. 2014); Republic of Paraguay v. Allen, 134 F.3d 622, 627 (4th Cir. 1998). However, federal courts may exercise jurisdiction over

12

claims against state officials by plaintiffs "at risk of or suffering from violations by those officials of federally protected rights, if (1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective." Allen, 134 F.3d at 627; see Berger, 142 S. Ct. at 2197; Ex parte Young, 209 U.S. 123, 159–60 (1908); Jemsek, 662 F. App'x at 210–11. A federal court may not, however, enjoin state officials on the basis of state law. See Pennhurst, 465 U.S. at 124–25; Hengle v. Treppa, 19 F.4th 324, 347 (4th Cir. 2021).

Defendants argue that because plaintiffs base their claims on the Board's "alleged failure to follow state law to certify the Green Party," plaintiffs ask the court to determine whether the Board violated state law. [D.E. 51] 16–17. Again, the Board has certified the Green Party as a North Carolina political party. See [D.E. 54, 54-1]. Thus, this court need not address any request from plaintiffs to evaluate whether the Board violated state or federal law regarding its certification of the Green Party.

However, the question of whether the court should enjoin the candidate-filing deadline in N.C. Gen. Stat. § 163-98 as to the Green Party is not a state-law issue. Instead, it is a federal constitutional issue concerning whether applying the July 1 candidate-filing deadline in light of the timing of the Board's investigation and certification violates plaintiffs' rights under the First and Fourteenth Amendments. Any injunction concerning that issue would not enjoin state officials on the basis of state law but rather on the basis of the First and Fourteenth Amendments. And plaintiffs seek purely prospective, injunctive relief to remedy that violation of the United States Constitution.

The court has subject-matter jurisdiction over plaintiffs' remaining claim to relief under 28 U.S.C. § 1331, and the Eleventh Amendment does not bar this court from granting purely prospective, injunctive relief. Defendants implicitly recognized this reality in their response to plaintiffs' motion for a preliminary injunction when they expressly told the court that they "do[] not

13

dispute that if certification were to occur . . . relief from the Court allowing for the extension or temporarily enjoining of the candidate deadline would be appropriate to ensure access to the November general election ballot." [D.E. 51] 29. Thus, defendants' jurisdictional argument fails.

## D.

Defendants and the intervenors argue the court should abstain from exercising jurisdiction under Burford v. Sun Oil Co. See [D.E. 50] 18–21; [D.E. 51] 17–19. "Abstention doctrines constitute extraordinary and narrow exceptions to a federal court's duty to exercise the jurisdiction conferred on it." Martin v. Stewart, 499 F.3d 360, 363 (4th Cir. 2007) (cleaned up); see Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996). The exceptions are extraordinary and narrow because ordinarily, "federal courts have a virtually unflagging obligation to exercise their jurisdiction." Town of Nags Head v. Toloczko, 728 F.3d 391, 395 (4th Cir. 2013) (quotation omitted); see Deakins v. Monaghan, 484 U.S. 193, 203 (1988); MLC Auto., LLC v. Town of S. Pines, 532 F.3d 269, 280 (4th Cir. 2008). Thus, "abstention remains the exception, not the rule." Martin, 499 F.3d at 363 (quotation omitted); see New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 359 (1989) [hereinafter NOPSI]; Courthouse News Serv. v. Schaefer, 2 F.4th 318, 324 (4th Cir. 2021).

The Burford doctrine calls for abstention only in a "narrow range of circumstances." Quackenbush, 517 U.S. at 726; see Martin, 499 F.3d at 364. Under the Burford doctrine, "[w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) where there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with

14

respect to a matter of substantial public concern." NOPSI, 491 U.S. at 361; see Toloczko, 728 F.3d at 396; Martin, 499 F.3d at 364. "[A] federal court may abstain under Burford from its strict duty to exercise congressionally conferred jurisdiction only when the importance of difficult questions of state law or the state's interest in uniform regulations outweighs the federal interest in adjudicating the case at bar." Martin, 499 F.3d at 365 (cleaned up).

Timely and adequate state-court review is not available for plaintiffs. The ballot-printing deadline is August 12, 2022. See [D.E. 23] 2. Moreover, the other prerequisites for Burford abstention are absent from this case.

In opposition to these findings, defendants argue that both prongs of the Burford doctrine are satisfied because if the court intervened on the question of the sufficiency of the Green Party's petition for recognition under N.C. Gen. Stat. § 163-96(a)(2), this court's review would involve a difficult question of state law (i.e., what does it mean for the Board to "forthwith determine the sufficiency of petitions filed with it") and intervention could "disrupt the State's efforts in establishing a coherent public policy for how to evaluate the sufficiency of petitions." N.C. Gen. Stat. § 163-96(a)(2); [D.E. 51] 19. The intervenors make similar arguments. See [D.E. 50] 19–21.

Whatever the merits of those arguments, the Board's unanimous decision on August 1, 2022, to certify the Green Party as a political party nullifies those arguments. Moreover, neither defendants nor the intervenors argue that federal court intervention concerning plaintiffs' as-applied constitutional challenge to the candidate-filing deadline in N.C. Gen. Stat. § 163-98 meets either prong of the Burford standard. And for good reason. The remaining issue in this case is not a state-law issue but a federal constitutional issue under the First and Fourteenth Amendments. That constitutional issue does not involve a dispute about what the state statute means, and counsel for defendants represented to the court at the July 18, 2022 status conference that the Board lacks the

statutory authority to provide the Green Party and its candidates any relief from the candidate-filing deadline. Without the statutory authority to act, the Board cannot establish a uniform policy concerning relief from the candidate-filing deadline.

Cases and controversies arising under the United States Constitution are the paramount category of cases that this court has an "unflagging obligation" to decide. Toloczko, 728 F.3d at 395 (quotation omitted); see Deakins, 484 U.S. at 203. Thus, the court rejects defendants' and the intervenors' arguments that this court should abstain under Burford.

E.

Defendants argue that the doctrine of constitutional avoidance counsels the court to decline to exercise jurisdiction. See [D.E. 51] 19–21. Specifically, defendants argue that without knowing how the Board would ultimately vote on the Green Party's petitions, the court would be manufacturing a constitutional issue. See id. After all, "the state statute properly applied would not give rise to a constitutional violation." Id. at 20.

But the court now knows how the Board applied the statute as to certification because the Board unanimously voted to certify the Green Party on August 1, 2022. See [D.E. 54, 54-1]. The court respects the Board's certification decision. The remaining constitutional issue is whether a constitutional problem as-applied to the Green Party plaintiffs exists because the Board did not certify the Green Party until August 1, and N.C. Gen. Stat. § 163-98 specifies a July 1 candidate-filing deadline the Board is powerless to change or waive. Addressing that constitutional issue does not require the court to "interpret state statutes in a way that raises federal constitutional questions." Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 11 (1987). The application of the statute (i.e., N.C. Gen. Stat. § 163-98) to plaintiffs, not the meaning of the statute, is at issue. Thus, the court will honor its "heavy obligation to exercise jurisdiction." Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1,

16

11 (2004), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014).

## III.

The DSCC and the Democratic Party move to intervene as defendants in this action, arguing that they can intervene as a matter of right or, in the alternative, the court should grant them permissive intervention. See [D.E. 16] 18–28. Plaintiffs oppose the motion. See [D.E. 45].

Under Federal Rule of Civil Procedure 24(a), "[on] timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). Under Rule 24(a)(2), the court must permit the intervention of a party who "(1) on timely motion, (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, (3) unless existing parties adequately represent that interest." Berger, 142 S. Ct. at 2200–01; see Stuart v. Huff, 706 F.3d 345, 349 (4th Cir. 2013); Teague v. Bakker, 931 F.2d 259, 260–61 (4th Cir. 1991). As for the first element, the intervenors' motion was timely, filed just three days after plaintiffs filed their original complaint.

As for the second and third elements, the intervenors must demonstrate "a significantly protectable interest" in the litigation that the Board is not already adequately representing and that disposal of the action could impair or impede their ability to protect that interest. Teague, 931 F.2d at 261 (quotation omitted). The intervenors cite five interests they claim to have in this lawsuit: "(1) ensuring a fair competitive playing field for their candidates; (2) conserving their party resources; (3) protecting their own voters from misleading petition schemes; (4) seeing North Carolina's

17

election laws applied competently and fairly; and (5) in defending against accusations levied at them by Plaintiffs." [D.E. 16] 20.

The court rejects the intervenors' reliance on an interest in protecting their voters from misleading petitions and seeing North Carolina's election laws applied competently and fairly. These asserted interests are generalized public interests in the proper application and enforcement of North Carolina's election laws. Cf. Lujan v. Defenders of Wildlife, 504 U.S. 555, 573–74 (1992). And the North Carolina General Assembly has given the Board authority to administer North Carolina's election laws, to investigate wrongdoing, and to refer election law violations to the North Carolina Attorney General. See N.C. Gen. Stat. § 163-22; N.C. Right to Life, Inc. v. Leake, 525 F.3d 274, 301–02 (4th Cir. 2008) (describing the Board's investigative authority); cf. Berger, 142 S. Ct. at 2205 ("Normally, a State's chosen representative should be greeted in federal court with respect . . . ."). Thus, "it is the government's basic duty to represent the public interest." Stuart, 706 F.3d at 351. As the intervenors themselves concede, "North Carolina 'certainly ha[s] an interest in protecting the integrity, fairness, and efficiency of [its] ballots and election processes as a means for electing public officials.'" [D.E. 50] 25 (alterations in original) (quoting Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364 (1997)). When the government is already a party to a case and the putative intervenor seeks to intervene alongside the government to protect the public interest, "the putative intervenor must mount a strong showing of inadequacy." Stuart, 706 F.3d at 352; cf. Virginia v. Westinghouse Elec. Corp., 542 F.2d 214, 216 (4th Cir. 1976).[8] Given the extensive

---

[8] Although the Supreme Court recently invalidated this heightened burden when a government actor seeks to intervene alongside another government actor, the Court did "not decide whether a presumption of adequate representation might sometimes be appropriate when a private litigant seeks to defend a law alongside the government or in any other circumstance." Berger, 142 S. Ct. at 2204.

evidence in the record of the Board's careful consideration of and investigation into the sufficiency of the Green Party's petitions, the intervenors have not made a sufficiently strong showing of inadequacy.

However, the intervenors' other asserted interests are protectable interests. The intervenors' interests in a competitive playing field for their candidates and conserving party resources fall within the rubric of "competitive standing," which includes injuries suffered by an inability to compete on equal footing because of some advantage conferred on a competitor. See Nelson v. Warner, 472 F. Supp. 3d 297, 304–05 (S.D.W. Va. 2020) (collecting cases); Hollander v. McCain, 566 F. Supp. 2d 63, 68 (D.N.H. 2008) (collecting cases); Nat'l Law Party of U.S. v. FEC, 111 F. Supp. 2d 33, 44 (D.D.C. 2000) (collecting cases). Under this rubric, "courts have held that a candidate or his political party has standing to challenge the inclusion of an allegedly ineligible rival on the ballot, on the theory that doing so hurts the candidate's or party's own chances of prevailing in the election." Hollander, 566 F. Supp. 2d at 68. While the intervenors need not establish Article III standing to demonstrate they have a protectable interest in this action, an interest sufficient to demonstrate injury-in-fact for standing purposes likely suffices to show a protectable interest under Rule 24(a)(2). See N.C. State Conf. of NAACP v. Cooper, 332 F.R.D. 161, 165 (M.D.N.C. 2019). Additionally, the intervenors assert an interest in this action because of the numerous allegations in plaintiffs' amended complaint concerning the intervenors. See Am. Compl. ¶¶ 35–56. The court concludes the intervenors have demonstrated protectable interests in this action. Moreover, the court finds that a favorable decision for plaintiffs could impede or impair the intervenors' protectable interests.

Finally, the intervenors have demonstrated that the Board does not adequately represent their protectable interests. The adequacy prong "present[s] proposed intervenors with only a minimal

19

challenge." Berger, 142 S. Ct. at 2203. In Trbovich v. Mine Workers, the Supreme Court considered the proposed intervention of a union member alongside the Secretary of Labor, who had sued the union to set aside an election. See 404 U.S. 528, 529–30 (1972); see also Berger, 142 S. Ct. at 2203. Although the union member and the Secretary of Labor shared a closely aligned interest "[a]t a high level of abstraction," the Court determined they did not share identical interests because the private party sought only relief against the union, whereas the Secretary of Labor "also had to bear in mind broader public-policy implications." Berger, 142 S. Ct. at 2203–04 (describing Trbovich); see Trbovich, 404 U.S. at 538–39. Here, especially given that the Board has certified the Green Party as a political party, the intervenors and the Board do not share identical interests, and are likely adverse at this stage of the case. See [D.E. 57] 6–7. Accordingly, the intervenors have demonstrated a right to intervene under Rule 24(a)(2), and the court grants their motion to intervene.[9]

## IV.

Plaintiffs seek a preliminary injunction (1) ordering the Board to certify the Green Party as a political party under N.C. Gen. Stat. § 163-96(a)(2) and (2) enjoining the application to the Green Party and its candidates of N.C. Gen. Stat. § 163-98, which specifies the procedure and deadline for new parties to certify candidates to the Board for the first general election in which the new party's candidates will appear on the ballot. See [D.E. 28]. The intervenors oppose both forms of relief. See [D.E. 50, 57].

Defendants, however, oppose plaintiffs' first request for relief but have taken completely

---

[9] In light of this conclusion, the court need not address the intervenors' permissive intervention arguments under Rule 24(b). Cf. Cawthorn v. Amalfi, 35 F.4th 245, 253 (4th Cir. 2022); Stuart, 706 F.3d at 349; In re Sierra Club, 945 F.2d 776, 779 (4th Cir. 1991); Hill v. W. Elec. Co., 672 F.2d 381, 385–86 (4th Cir. 1982). Also in light of this conclusion, the court denies as moot the intervenors' motion to expedite. The court has considered the intervenors' response in opposition to plaintiffs' motion for a preliminary injunction and other filings in this case.

20

contradictory positions on plaintiffs' second request for relief. On July 29, 2022, before the Board convened on August 1, 2022, and certified the Green Party as a new political party, defendants told this court in their response in opposition to plaintiffs' motion for a preliminary injunction that they "ha[d] no objection to the [plaintiffs'] second [request for relief] should the Green Party be certified when the State Board takes up that issue on August 1, 2022." [D.E. 51] 1. They had no objection because they "d[id] not dispute that if certification were to occur on August 1, relief from the Court allowing for the extension or temporarily enjoining of the candidate deadline would be appropriate to ensure access to the November general election ballot." Id. at 29. On August 1, 2022, the Board certified the Green Party as a North Carolina political party. Nevertheless, in its August 3, 2022 status report to the court, defendants completely reversed course and stated: "The State Board opposes any order that concludes that this federal court has jurisdiction over this purely state law claim." [D.E. 62] ¶ 5.

As explained, this court has jurisdiction. Following their representations to this court on July 29, 2022, and the Board's unanimous decision to certify the Green Party as a political party on August 1, 2022, defendants' position in their August 3, 2022 status report to the court concerning jurisdiction is astonishing and reflects bad faith. See United States ex rel. Nicholson v. MedCom Carolinas, Inc., No. 21-1290, 2022 WL 2838813, at *10 (4th Cir. July 21, 2022) ("[M]isleading and inconsistent assertions sometimes reveal bad faith." (quotation omitted)). The court rejects defendants' and the intervenors' arguments that this court lacks jurisdiction over plaintiffs' as-applied federal constitutional challenge to N.C. Gen. Stat. § 163-98 under the First and Fourteenth Amendments.

As for plaintiffs' request for a preliminary injunction, "[t]he court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). The notice requirement

21

ensures the adverse party has "a fair opportunity to oppose the application and to prepare for such opposition." Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423, 433 n.7 (1974). Rule 65 does not expressly require an evidentiary hearing and oral argument. See Fundamental Admin. Servs., LLC v. Anderson, Civ. No. JKB-13-1708, 2015 WL 2340831, at *1 (D. Md. May 13, 2005) (unpublished). Although a hearing is generally preferred, it is not "an indispensable requirement when a court allows or refuses a preliminary injunction." Aoude v. Mobil Oil Corp., 862 F.2d 890, 893 (1st Cir. 1988); see Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 223 (1st Cir. 2003); GlaxoSmithKline, LLC v. Brooks, No. 8:22-cv-00364-PWG, 2022 WL 2916170, at *2 (D. Md. July 25, 2022) (unpublished). For instance, an evidentiary hearing may be unnecessary if "the evidence already in the district court's possession enable[s] it to conclude that the plaintiff ha[s] a reasonable likelihood of success on the merits." Syntex Ophthalmics, Inc. v. Tsuetaki, 701 F.2d 677, 682 (7th Cir. 1983). Similarly, a hearing may be unnecessary when the parties have had "ample opportunity to brief [their] position," "submit affidavits," or otherwise "make offers of proof." Town of Burlington v. Dep't of Educ. of Mass., 655 F.2d 428, 433 (1st Cir. 1981); see SEC v. Frank, 388 F.2d 486, 490 (2d Cir. 1968) (explaining a court need not hold an evidentiary hearing to issue a preliminary injunction when "[t]he taking of evidence would serve little purpose").

Plaintiffs, defendants, and the intervenors have all had notice of plaintiffs' motion for a preliminary injunction. Plaintiffs and defendants conferred and agreed upon a briefing scheduling for the motion. See [D.E. 23]. The court adopted their proposed schedule. See [D.E. 26]. Moreover, plaintiffs, defendants, and the intervenors have filed briefs and numerous exhibits concerning plaintiffs' motion for a preliminary injunction. The court finds that these filings have created an extensive factual record and present the parties' arguments in detail. Moreover, both plaintiffs and defendants have represented to the court that they believe a hearing is unnecessary.

22

See [D.E. 62] ¶¶ 2, 8. The current record suffices to resolve plaintiffs' motion for a preliminary injunction, and holding a hearing would serve little purpose.

To obtain a preliminary injunction, plaintiffs must establish that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. See <u>Winter v. Nat. Res. Def. Council</u>, 555 U.S. 7, 20 (2008); <u>Centro Tepeyac v. Montgomery Cnty.</u>, 722 F.3d 184, 188 (4th Cir. 2013) (en banc). The court separately addresses plaintiffs' two requests for relief.

### A.

Plaintiffs first ask the court to order the Board to certify the Green Party as a political party under N.C. Gen. Stat. § 163-96(a)(2). See [D.E. 28]. As explained, this request for relief is moot, and the court denies plaintiffs' motion for a preliminary injunction ordering the Board to certify the Green Party as a political party.

To the extent the intervenors argue that this issue is not moot because the Board improperly certified the Green Party, <u>see</u> [D.E. 57] 2, the court rejects the argument. The intervenors conducted their own investigation and made their fraud arguments to the Board before the Board certified the Green Party under N.C. Gen. Stat. § 163-96(a)(2). The intervenors then repackaged those arguments and brought them to this court. After reviewing the entire record, the court acknowledges the Board's decision to certify the Green Party and recognizes the validity of the Board's determination that the Green Party timely submitted more than the statutorily required number of signatures.

### B.

Plaintiffs also ask the court to issue a preliminary injunction enjoining the application of the candidate-filing deadline in N.C. Gen. Stat. § 163-98 to the Green Party and their candidates. <u>See</u> [D.E. 28] 1–2. The intervenors oppose such relief. <u>See</u> [D.E. 57] 2, 6. As discussed, on July 29,

23

2022, the Board expressly told this court that it did not oppose this request. See [D.E. 51] 2. The Board stated that "if certification were to occur on August 1," which it did, "relief from the Court allowing for the extension or temporarily enjoining of the candidate deadline would be appropriate to ensure access to the November general election ballot." [D.E. 51] 29. On August 3, 2022, the Board completely changed course and stated this court lacked jurisdiction to enter such relief. See [D.E. 62] ¶ 5 ("The State Board opposes any order that concludes that this federal court has jurisdiction over this purely state law claim."). As discussed, this court has jurisdiction over this federal constitutional claim.

Plaintiffs have demonstrated they are likely to succeed on the merits. See Winter, 555 U.S. at 20. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." Burdick v. Takushi, 504 U.S. 428, 441 (1992) (quotation omitted). The First and Fourteenth Amendments protect "the constitutional right of citizens to create and develop new political parties" to "advance[] the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences." Norman v. Reed, 502 U.S. 279, 288 (1992); see Kusper v. Pontikes, 414 U.S. 51, 56–57 (1973). To put it differently, "[t]he First Amendment, as incorporated against the states by the Fourteenth Amendment, protects the rights of individuals to associate for the advancement of political beliefs and ideas." S.C. Green Party v. S.C. State Election Comm'n, 612 F.3d 752, 755–56 (4th Cir. 2010). Importantly, not only do "[t]hese rights include the freedom for individuals to band together in political parties" but they also include the "right to choose their standard bearer in the form of a nominee." S.C. Green Party, 612 F.3d at 756 (quotations omitted); see Cal. Democratic Party v. Jones, 530 U.S. 567, 574 (2000); Eu v. San Francisco Cnty. Democratic Cent. Comm., 489 U.S. 214, 224 (1989).

24

In protecting those rights, "[i]t is well-settled that a court has equitable authority to order that a candidate's name be placed on an election ballot." Buscemi v. Bell, 964 F.3d 252, 261–62 (4th Cir. 2020); see McCarthy v. Briscoe, 429 U.S. 1317, 1322–23 (1976) (Powell, J., in chambers); Williams v. Rhodes, 393 U.S. 23, 34–35 (1968). "[T]he court has broad equitable authority to order such relief." Buscemi, 964 F.3d at 262.

"[I]n evaluating a challenge to a ballot-access law, courts must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiffs' rights." Id. (quotation omitted); see Burdick, 504 U.S. at 434; Anderson v. Celebrezze, 460 U.S. 780, 787–89 (1983). If an election law "impose[s] a severe burden on ballot access," the court applies strict scrutiny and will uphold the law only if it is "narrowly drawn to support a compelling state interest." Buscemi, 964 F.3d at 263 (quotation omitted); see Pisano v. Strach, 743 F.3d 927, 933 (4th Cir. 2014); S.C. Green Party, 612 F.3d at 756. If an election law imposes a modest burden, the court examines whether "the state can articulate its important regulatory interests" in that law. Buscemi, 964 F.3d at 263 (quotation omitted); see Pisano, 743 F.3d at 933; S.C. Green Party, 612 F.3d at 756. To decide whether a "filing deadline is unconstitutionally burdensome," the court "evaluate[s] the combined effect of the state's ballot-access regulations." Pisano, 743 F.3d at 933; see Wood v. Meadows, 207 F.3d 708, 711 (4th Cir. 2000).

In Pisano v. Strach, the Fourth Circuit held that the May 17 deadline to file petitions with the county boards of elections under N.C. Gen. Stat. § 163-96(c) to seek certification under N.C. Gen. Stat. § 163-96(a)(2) imposes only a modest burden because it gives parties "ample time and

25

opportunity to collect the reasonable number of required signatures." Pisano, 743 F.3d at 936. The parties have not cited, and this court has not found, any Fourth Circuit case deciding whether the July 1 candidate-filing deadline in N.C. Gen. Stat. § 163-98 imposes a modest or severe burden.

As applied in this case, N.C. Gen. Stat. § 163-98 imposes a severe burden on the Green Party's right to have candidates appear on the November general election ballot. The Green Party timely submitted its petitions by the May 17, 2022 deadline. The county boards were delayed in properly evaluating the validity of the signatures on the Green Party's petitions, such that the Green Party supplemented its filing with the Board with new signatures throughout the month of June. Given evidence of alleged fraud, the Board opened an investigation into the sufficiency of the Green Party's petitions. By the time the Board first considered whether to certify the Green Party on June 30, 2022, a favorable decision for the Green Party would have meant that the party had only a single day to comply with the candidate-filing requirements in N.C. Gen. Stat. § 163-98. However, the Board voted not to certify the Green Party in order to finish its investigation. After completing its investigation, the Board certified the Green Party as a political party on August 1—the July 1 deadline had long passed.

North Carolina has compelling interests in authorizing the Board to properly determine the sufficiency of petitions submitted to it and to authorize the Board to investigate petition fraud. See N.C. Gen. Stat. §§ 163-22(d), 163-96(a)(2). But once the Board has made a final decision to certify a party under N.C. Gen. Stat. § 163-96(a)(2), those interests become less compelling because the Board has determined the sufficiency of the petitions. Moreover, such a decision indicates that any further investigation into matters such as fraud is no longer connected to the Board's duty to determine the sufficiency of the petitions for purposes of party certification under N.C. Gen. Stat. § 163-96(a)(2). After all, the Board has made its decision. Thus, these interests are the most

26

compelling pre-certification.

Post-certification, North Carolina has an interest in requiring parties to cement their slate of candidates in plenty of time to ensure accurate ballot printing. That interest is a legitimate regulatory interest. The court assumes without deciding that the interest is compelling, but the more than one month buffer between the July 1 deadline and the mid-August ballot printing deadline (i.e., August 12, 2022, this election cycle) is likely not narrowly drawn. In fact, the Board's August 1, 2022 press release after certifying the Green Party as a political party states: "Ballot preparation begins in mid-August, so there still is time to add Green Party candidates to the ballot if the court extends the statutory deadline." N.C. State Bd. of Elections, State Board Recognizes Green Party as NC Political Party (Aug, 1, 2022).[10] Thus, the Board has publicly stated that even a 12-day turnaround would allow it to add candidates to the ballot. Cf. Fed. R. Evid. 201.

Moreover, this is not a situation where a party is certified after the deadline but has no candidates and must still hold a nominating convention. In such a case, North Carolina's interest in timely ballot preparation might be much stronger. But here, the Green Party held a convention on June 30, selected Matthew Hoh and Michael Trudeau as its candidates, and certified those candidates to the Board on July 1. See Am. Compl. ¶¶ 31–33. The Board rejected the candidates ostensibly because the party was not yet certified. Now that the party is certified, the Board claims the July 1 deadline poses an obstacle to the Green Party's candidates appearing on the ballot.

In any event, as applied here, N.C. Gen. Stat. § 163-98 is not narrowly tailored to any of these interests. The rigid inflexibility of the July 1 candidate-filing deadline in N.C. Gen. Stat. § 163-98 and the Board's inability to change or waive the deadline when a party does, in fact, timely meet the

_____

[10] Available at https://www.ncsbe.gov/news/press-releases/2022/08/01/state-board-recogniz es-green-party-nc-political-party (last visited Aug. 4, 2022).

27

requirements in N.C. Gen. Stat. § 163-96(a)(2), but is certified after the deadline, severely burdens ballot access. Taking the statutory scheme in its entirety, the relevant provisions allow the Board to undertake important investigative work to satisfy its duty to determine the sufficiency of the petitions. But then, North Carolina law provides the Board with no avenues to ensure ballot access if it finishes its work after the candidate-filing deadline but ultimately certifies the new party in time for ballot printing. Thus, if the Board determines after the July 1 deadline that a party's timely filed petitions are sufficient, it appears that nothing short of a court order or an act of the North Carolina General Assembly can provide relief to ensure the new party's candidates appear on the ballot.[11] That is a severe burden, indeed, and one not narrowly tailored to North Carolina's interests, especially because the strongest of those interests weaken post-certification. Thus, plaintiffs have demonstrated they are likely to succeed on their claim that applying the July 1 candidate-filing deadline in N.C. Gen. Stat. § 163-98 to the Green Party and its candidates for the November 2022 general election violates the First and Fourteenth Amendments of the United States Constitution.[12]

Plaintiffs have also demonstrated they are likely to suffer irreparable harm absent

---

[11] In the Board's press release after certifying the Green Party, the Board publicly stated: "Because the deadline in state law for submission of new political party nominees has already passed, it is unclear whether Green Party candidates will appear on the November 8 general election ballot. Litigation in federal court, filed by the Green Party, could extend the July 1 deadline for the Green Party to submit nominees." N.C. State Bd. of Elections, State Board Recognizes Green Party as NC Political Party. Thus, the Board itself has cited the necessity of a court order to give the Green Party any relief from the July 1 candidate-filing deadline in the same breath that it publicly announced the party's certification.

[12] Even if N.C. Gen. Stat. § 163-98 imposes only a modest burden on plaintiffs, defendants have not articulated an important regulatory interest served by keeping the Green Party and its candidates off the ballot. The Board has stated there is still time to put the Green Party's candidates on the ballot, and the Board has articulated no other important regulatory interest in applying N.C. Gen. Stat. § 163-98 to plaintiffs in light of the Board's certification of the Green Party as a North Carolina political party under N.C. Gen. Stat. § 163-96(a)(2). See Buscemi, 964 F.3d at 263; Pisano, 743 F.3d at 933.

preliminary injunctive relief. See Winter, 555 U.S. at 20. The Board unanimously determined that the Green Party qualified as a new political party under N.C. Gen. Stat. § 163-96(a)(2). See [D.E. 54, 54-1]. The Board, however, lacks the authority to alter the July 1 candidate-filing deadline, and as discussed, nothing short of a court order or an act of the North Carolina General Assembly can ensure the Green Party has the access to the ballot to which it is entitled. Moreover, the shadow of the August 12, 2022 ballot-printing deadline looms large. Absent preliminary injunctive relief, plaintiffs will suffer irreparable harm because Green Party candidates will not be able to run in the November 2022 general election.

Plaintiffs have also demonstrated that the balance of equities strongly tips in their favor. See Winter, 555 U.S. at 20. Again, the Board certified the Green Party as a new political party and has stated that there is still time to ensure the Green Party's candidates appear on the November general election ballot. Moreover, the Green Party timely held a nominating convention and selected candidates. Thus, the only obstacle standing between the Green Party and ballot access is the July 1 candidate-filing deadline, with which the Green Party, Hoh, and Trudeau attempted to comply. As discussed, applying that deadline to the Green Party in advance of the 2022 general election likely violates the First and Fourteenth Amendments. Thus, the court finds that the balance of equities strongly tips in favor of preliminary injunctive relief.

Finally, preliminary injunctive relief is in the public interest. See Winter, 555 U.S. at 20. As evidenced by the Board certifying the Green Party as a political party on August 1, 2022, North Carolina voters have expressed interest in joining the Green Party and voting for Green Party candidates. Thus, they have exercised their right to "hav[e] a voice in the election of those who make the laws under which, as good citizens, we must live." Burdick, 504 U.S. at 441 (quotation omitted). The First and Fourteenth Amendments protect the public's interest in "develop[ing] new

29

political parties" that will "enlarg[e] the opportunities of all voters to express their own political preferences." Norman, 502 U.S. at 288. Accordingly, the court finds that it is in the public interest to issue a preliminary injunction.

Plaintiffs have demonstrated they are entitled to preliminary injunctive relief under the governing standard. See Winter, 555 U.S. at 20; Centro Tepeyac, 722 F.3d at 188. Accordingly, the court grants in part plaintiffs' motion for a preliminary injunction.

## V.

On August 3, 2022, plaintiffs filed a notice with the court that the intervenors have sued defendants and the Green Party in Wake County Superior Court over the Board's decision to certify the Green Party as a political party. See [D.E. 60, 60-1]. The Supremacy Clause of Article VI, clause 2, of the United States Constitution reads:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

The Supremacy Clause creates a rule of decision whereby courts "must not give effect to state laws that conflict with federal laws." Armstrong v. Exceptional Child Center, Inc., 575 U.S. 320, 324 (2015); see Gibbons v. Ogden, 22 U.S. 1, 210–11 (1824). This rule of decision applies not just to federal judges but the "Judges in every State." Espinoza v. Montana Dep't of Revenue, 140 S. Ct. 2246, 2262 (2020). To be sure, the Supremacy Clause is not itself a source of federal rights. See Armstrong, 575 U.S. at 324; Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 107 (1989). But the First and Fourteenth Amendments do create federal rights, and the Supremacy Clause provides a rule of decision that elevates federal law, including the First and Fourteenth Amendments, to a privileged position. The preliminary injunction the court issues today honors that

30

constitutionally mandated hierarchy with respect to the application of N.C. Gen. Stat. § 163-98 to the Green Party and its candidates in light of the Board's decision to certify the Green Party and the unconstitutionally severe burden N.C. Gen. Stat. § 163-98 places on the Green Party in light of the timing of the Board's decision to certify.[13]

As such, absent a contrary order from a federal appellate court, defendants shall follow this court's order enjoining the application of N.C. Gen. Stat. § 163-98 to ensure the Green Party's candidates, Matthew Hoh and Michael Trudeau, are on North Carolina's November 2022 general election ballot. "[A]n order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings." United States v. United Mine Workers of Am., 330 U.S. 258, 293 (1947). This principle applies even if the person subject to the injunction challenges "the constitutionality of the Act under which the order is issued." Id. "It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished." Id. at 294 (quotation omitted); see Maness v. Meyers, 419 U.S. 449, 460 (1975); see Pasadena City Bd. of Educ. v. Spangler, 427 U.S. 424, 439 (1976) ("[T]his Court has held that even though the constitutionality of the Act under which the injunction issued is challenged, disobedience of such an outstanding order of a federal court subjects the violator to contempt even though his constitutional claim might be later upheld."); Walker v. City of

_____

[13] At the July 18, 2022 status conference, counsel for defendants acknowledged the role of the Constitution and the Supremacy Clause in this court's authority to issue a preliminary injunction. The court asked counsel: "Are you satisfied that the Constitution of the United States of America, including the Supremacy Clause, would allow this Court to move that deadline?" Counsel for defendants responded: "Of course, Your Honor. [Plaintiffs] had an option. They could have come here [to federal court]. They could have also gone to Wake County Superior Court."

Birmingham, 388 U.S. 307, 314–21 (1967) (same); Howat v. Kansas, 258 U.S. 181, 190 (1922) (same). In light of these principles, the court retains jurisdiction to enforce the preliminary injunction. Cf. Fed. R. Civ. P. 65(d)(2).

## VI.

In sum, the court CANCELS the hearing scheduled for 1:00 p.m. on August 8, 2022. The court GRANTS the intervenors' motion to intervene [D.E. 15] and DENIES as moot the intervenors' motion to expedite [D.E. 21]. The court GRANTS the NRSC's motion for leave to file as amicus curiae [D.E. 42]. Finally, the court GRANTS IN PART and DENIES IN PART plaintiffs' motion for a preliminary injunction [D.E. 28].

THEREFORE, the court ORDERS the following:

1. Pursuant to Federal Rule of Civil Procedure 65(d)(1)(A), the court is issuing this preliminary injunction for all the reasons stated in this order, particularly the court's conclusion that it has jurisdiction over this case and that plaintiffs have demonstrated that they are entitled to preliminary injunctive relief under the governing standard.

2. Damon Circosta, Stella Anderson, Jeff Carmon, Stacy Eggers IV, and Tommy Tucker, in their official capacities as members of the North Carolina State Board of Elections, and Karen Brinson Bell, in her official capacity as executive director of the North Carolina State Board of Elections, are hereby **ENJOINED** from enforcing the July 1 filing deadline in N.C. Gen. Stat. § 163-98 as applied to the Green Party and its candidates, particularly Matthew Hoh (nominee for the United States Senate) and Michael Trudeau (nominee for the North Carolina Senate District 16).

3. Green Party candidates certified at the party's June 30, 2022 nominating convention—namely, Matthew Hoh and Michael Trudeau—**SHALL** submit their notice of candidacy, filing fee, and application to change party affiliation to the North Carolina State Board

32

of Elections, or the appropriate county board of elections, no later than Wednesday, August 10, 2022. In the event that any county board of elections declines to accept these submissions, the court hereby **ORDERS** that Damon Circosta, Stella Anderson, Jeff Carmon, Stacy Eggers IV, and Tommy Tucker, in their official capacities as members of the North Carolina State Board of Elections, and Karen Brinson Bell, in her official capacity as executive director of the North Carolina State Board of Elections, **SHALL** accept these submissions. Provided that such candidates submit such materials on or before Wednesday, August 10, 2022, Damon Circosta, Stella Anderson, Jeff Carmon, Stacy Eggers IV, and Tommy Tucker, in their official capacities as members of the North Carolina State Board of Elections, and Karen Brinson Bell, in her official capacity as executive director of the North Carolina State Board of Elections, **SHALL** accept the submissions as timely filed.

4. The court **ORDERS** that Damon Circosta, Stella Anderson, Jeff Carmon, Stacy Eggers IV, and Tommy Tucker, in their official capacities as members of the North Carolina State Board of Elections, and Karen Brinson Bell, in her official capacity as executive director of the North Carolina State Board of Elections, **SHALL** include on North Carolina's November 8, 2022 general election ballot the names of Green Party candidates who comply with the terms of this order and who are qualified for the office they seek.

5. The court **RETAINS** jurisdiction to enforce the terms of this order.

6. The court **RETAINS** jurisdiction of all claims asserted by plaintiffs to grant such further and additional relief as the court deems appropriate, including declaratory relief, injunctive relief, and an award of reasonable attorney's fees and litigation costs pursuant to 42 U.S.C. § 1988.

33

SO ORDERED.  This 5th day of August, 2022.

JAMES C. DEVER III
United States District Judge