IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| NORTH CAROLINA GREEN PARTY, ANTHONY NDEGE, MICHAEL TRUDEAU, MATTHEW HOH, SAMANTHA WORRELL, SAMANTHA SPENCE, K. RYAN PARKER AND AARON MOHAMMED, <br><br> Plaintiffs, <br><br> v. <br><br> NORTH CAROLINA STATE BOARD OF ELECTIONS, et al., <br><br> Defendants, <br><br> *and* <br><br> NORTH CAROLINA DEMOCRATIC PARTY; DSCC, <br><br> Intervenor-Defendants. | Case No. 5:22-cv-00276-D-BM |

**INTERVENORS' MEMORANDUM IN SUPPORT OF THEIR EMERGENCY MOTION
FOR STAY PENDING APPEAL**

1

## INTRODUCTION

In their Amended Complaint and Preliminary Injunction Motion, the North Carolina Green Party ("NCGP") challenged only one provision of North Carolina law: the party certification statute, N.C. Gen. Stat. § 163-96(a)(2). That challenge became moot when the North Carolina State Board of Elections ("NCSBE") certified NCGP on August 1. But in order to be placed on the ballot for the November 2022 elections, in addition to achieving party certification, a party's candidates must file the necessary papers by July 1 under N.C. Gen. Stat. § 163-98. NCGP failed to do so, and, despite many opportunities, failed to argue at any point that § 163-98, as applied to them, is unconstitutional. Nor could they credibly raise such a claim, as the delay in certification which caused them to miss the July 1 deadline was entirely self-inflicted. NCGP submitted numerous admittedly fraudulent petition signatures and refused to cooperate with NCSBE's investigation, hampering NCSBE's efforts to "determine the sufficiency" of NCGP's petitions in time for the July 1 candidate filing deadline.

For these reasons, Intervenors are likely to succeed on the merits of their appeal of this Court's order placing NCGP's candidates on the ballot for the November 2022 general election. And, absent a stay of that order pending the Fourth Circuit's resolution of the appeal, Intervenors will be deprived of any opportunity for meaningful appellate review. NCSBE has indicated that it needs to begin printing ballots on August 12, just four days from now. A stay is needed to protect Intervenors from irreparable injury and safeguard the public interest in orderly elections.

Because of the impending August 12 deadline, Intervenors respectfully request that the Court rule on its motion as promptly as possible. Intervenors intend to seek a stay from the Fourth Circuit tomorrow morning, August 9, if this Court has not yet ruled by that time. *See* Fed. R. App. P. 8(a)(2)(A)

1

# BACKGROUND

I. **After NCGP submitted petitions plagued by "blatantly obvious" fraud, NCSBE concluded it could not certify NCGP without further investigation.**

Under North Carolina law, a new party seeking ballot access must follow a two-step process. First, the party must obtain recognition from the NCSBE under N.C. Gen. Stat. § 163-96(a)(2). Under § 163-96(a)(2), NCSBE may recognize a new political party if it files a minimum number of valid signatures—in this case, 13,865—from registered and qualified North Carolina voters. N.C. Gen. Stat. § 163-96(a)(2); ECF No. 50-3 at 6. After these petitions are collected, county boards do an initial check for their validity, *see* N.C. Gen. Stat. § 163-96(c), and then the aspiring party must submit their petitions to NCSBE, which "shall forthwith determine the sufficiency of petitions." *Id.* § 163-96(a)(2). Then after the party is certified, the party's candidates must register as members of the new party, the party must nominate candidates, and those candidates must file to run as members of the party by July 1 under § 163-98. The process thus has two distinct steps: certification and ballot placement.

"[I]n early May" of this year, after NCGP initially submitted its signatures to the relevant county boards of election, "several [county boards] alerted the NCSBE of irregularities identified during review of [NCGP's] petitions" and NCSBE "opened an investigation" into the petitions. ECF No. 50-3 at 12; *see also* N.C. Gen. Stat. § 163–22(d). The NCSBE's preliminary investigation uncovered "blatantly obvious" fraud in NCGP's petition submissions. ECF No. 50-1 at 10. As NCSBE staff summarized, "[n]umerous petition pages have obvious signs of fraud." ECF No. 15-2 at 12. NCSBE's investigators uncovered two paid circulators of particular concern who appeared to have committed fraud on a wide scale, and who were responsible for submitting a large volume of signatures. ECF No. 15-1 at 9.

NCSBE's preliminary investigation was hampered by the refusal of NCGP and its agents to cooperate. In early May 2022, after multiple county boards informed NCSBE of obviously fake petitions in NCGP's petitions, NCSBE reached out to NCGP's president—Plaintiff Ndege—to discuss the matter, but he disclaimed responsibility for the petitions and refused to meaningfully engage with NCSBE. *Id.* ¶¶ 4-7. As NCSBE continued to receive complaints from other county boards about NCGP's petitions, it began a criminal investigation into the matter. *Id.* ECF No. 53 ¶¶ 8-14. NCGP's president remained unresponsive to requests to meet with NCSBE investigators during this time. *Id.* ¶¶ 15-17. The two circulators most suspected of fraud, along with one of NCGP's vendors, likewise refused to respond to NCSBE's subpoenas during this time. ECF No. 15-1 at 11. NCGP later acknowledged it directly contracted with these individuals and, after the Board's preliminary findings, did not dispute the existence of at least some fraud in its petition sheets. ECF No. 27 ¶ 60; ECF No. 27-3 at 7; ECF No. 50-1 at 7-8.[1] But only on June 22—days before the June 30 meeting and well over a month after NCSBE first contacted the party—did NCGP first meet virtually with NCSBE investigators and provide limited information about contractors hired by the party who were known to have engaged in widescale fraud. *Id.* ¶¶ 18-20.

Intervenors, for their part, soon became aware of additional problems with NCGP's petition sheets, namely that many signatories—including Intervenors' members and supporters—were misled into signing the petition sheets. ECF No. 15-1, Ex. A at 7; Ex. C ¶¶ 3-4, 6. This deception was consistent with instructions promulgated by NCGP, which advised its circulators to avoid discussing the party's ideology or leadership, contrary to the requirements of N.C. Gen. Stat. §

---

[1] *See also* Shadowproof, *Democrats Unfairly Block Disabled Marine Veteran and US Senate Candidate from Ballot*, Youtube, (June 30, 2022), https://www.youtube.com/watch?v=vQ20m3BKf-k&t=1s, at 2:15, 3:05 (statement of NCGP Senate candidate Matthew Hoh acknowledging "it does look like there was some fraud").

3

163-96(b).[2] NCSBE staff also reported that they had spoken with voters who *had* signed the petition, but who were never informed about the purpose or intent of the petition. *See* ECF No. 15-2 at 16.

The Board first met to consider the sufficiency of NCGP's signatures on June 30. NCSBE staff recommended the Board "table consideration [of NCGP recognition] to a future date" because the number of "known questionable signatures exceeds the [] threshold" needed for certification, and determining the sufficiency of the petitions would "[r]equire[] further investigation, including subject interviews." ECF No. 15-2 at 17.[3] Consistent with staff's recommendation, NCSBE Chairman Damon Circosta explained he would not be comfortable certifying the NCGP "today" because "[t]here's enough questions, including a criminal investigation, into the signature petition gathering process" and thus in "good conscience" he could not vote to certify that day in view of the statutory requirement "to verify these signatures." June 30 Hr'g at 1:30:54-31:16, 1:36:20-40. The Board ultimately voted 3-2 *not* to certify NCGP on June 30 due to the open investigation into its fraudulent petitions. As a result, NCGP was not a certified party on July 1, the date by which its candidates need to file to have their names printed on the November 2022 general election ballot. *See* N.C. Gen. Stat. § 163-98.

---

[2] N.C. Green Party, Tips, Instructions, and Script for Ballot Access Petitioning (Rev. Mar. 30, 2021), available for download at https://www.ncgreenparty.org/petition (last visited July 17, 2022).
[3] NCSBE's preliminary investigation also revealed that the NCGP worked with Michigan-based First Choice Consulting, led by principal Shawn Wilmoth. ECF No. 1-3 at 4; *see also* ECF No. 15-1 at 9. Both Mr. Wilmoth and First Choice Consulting were recently implicated in a massive petition-fraud scandal in Michigan that led to the disqualification of numerous Republican candidates, including the party's leading choice for Governor. *See, e.g.*, *How One Firm In A 'Wild West' Industry Upended the Michigan GOP Governor Race*, Bridge Michigan (June 16, 2022), https://www.bridgemi.com/michigan-government/how-one-firm-wild-west-industry-upended-michigan-gop-governor-race (last visited July 17, 2022).

## II. NCGP files federal lawsuit seeking recognition under state law.

Two weeks after the Board declined to certify NCGP as a new political party on June 30—that is, nearly two weeks after the July 1 deadline—NCGP filed this action. Its amended complaint raises two claims: (1) a purported *Anderson-Burdick*-style claim challenging "NCSBE's failure to certify NCGP as a new political party"; and (2) a Fourteenth Amendment claim that "NCSBE's failure to certify NCGP as a new political party" violated due process. Am. Compl. ¶ 91, ECF No. 27. It asks primarily for relief declaring and requiring that NCGP be certified as a recognized political party in North Carolina. It also asks for an injunction barring "NCSBE from enforcing the July 1 filing deadline under § 163-98." But, critically, the amended complaint *nowhere* alleges that the July 1 deadline itself violated NCGP's constitutional rights, or that it imposed any unreasonable burden as applied to them. Neither of NCGP's claims even reference § 163-98.

In its Preliminary Injunction Motion filed on July 22, NCGP continued to challenge the Board's decision not to recognize NCGP at its June 30 meeting, and asked for injunctive relief compelling the Board to certify NCGP as a political party despite the ongoing investigation into the "blatantly obvious" fraud in its petitions. NCGP's motion pivoted substantially from its amended complaint; whereas the Party's pleading exclusively alleges claims concerning the NCSBE's decision not to recognize the party under N.C. Gen. Stat. § 163-96(a)(2), ECF No. 27 ¶¶ 86-88, 91-92, its preliminary injunction motion expanded the party's grievances to include NCSBE's application of *both* N.C. Gen. Stat. § 163-96(a)(2) and § 163-98, which NCGP deemed the "Challenged Provisions." ECF No. 30 at 8. The party's supporting memorandum nonetheless, like the amended complaint, focused on the burdens imposed by NCSBE's choice not to certify NCGP under § 163-96(a)(2), and only passingly discussed the July 1 deadline set by § 163-98. Nowhere did the party explain why the deadline itself burdened NCGP's constitutional rights,

5

particularly given that NCSBE's inability to certify by that deadline was due to NCGP's submission of tainted and fraudulent petition sheets requiring *criminal* investigation.

Both NCSBE and Intervenors opposed NCGP's request for preliminary relief, explaining its claims were unripe; that the court had a duty to abstain from exercising jurisdiction; and that NCGP had shown little likelihood of prevailing on the merits. In particular, both responses explained that NCSBE did not violate NCGP's constitutional rights by declining to certify NCGP at its June 30 meeting in the face of NCSBE's investigation into "an organized effort to falsify petition signatures." ECF No. 15-1 at 7.

The State Board's response set forth new details showing that NCGP had refused to meaningfully cooperate with its investigation and had also long been aware of problems with its petitions. For example, it explained that NCSBE first learned of problems with NCGP's petitions in October 2021 and that the party ignored emails from the Board seeking to discuss the matter. ECF No. 52 ¶¶ 6-8. And it further set out details about NCGP's refusal—for more than a month—to respond to NCSBE's inquiries into fake signatures on the petitions. *Id.* ¶¶ 5-20.

### III. NCSBE reverses course and certifies NCGP on August 1.

On August 1, NCSBE met again to consider NCGP's certification in view of its ongoing investigation. NCSBE explained that there were still many unknown questions about the scope of the fraud given NCGP's circulators' refusal to speak with investigators or respond to subpoenas. In particular, Board staff explained that it "remains unknown" "[w]hether fraudulent signatures were submitted by the Michigan contractor," whose petition "sheets are not identifiable"; "[w]hether fraudulent signatures were submitted by any other contractors or petitioners paid by the Green Party," and "[w]hether the two collectors [Griffin and Mullins] submitted additional petition sheets that did not contain their name or initials." ECF No. 57-1 at 9. Its investigators

6

confirmed "the matter is still an active criminal investigation." *Id.* at 10. Nonetheless, NCSBE voted to recognize NCGP as a political party. *See* ECF No. 54.

Shortly thereafter, the Court invited NCGP and NCSBE to submit a proposed consent order that would allow the NCGP to place candidates on the November 2022 ballot. *See* ECF No. 55. In its response to the Court's order, NCSBE maintained that the district court lacked jurisdiction, but nonetheless submitted a proposed consent order that would enjoin the July 1 deadline. NCSBE nowhere suggested or admitted that application of the deadline itself would be unconstitutional as applied, or even that NCGP had suffered a constitutional violation of any kind. NCGP submitted a competing proposed consent order, which likewise failed to suggest any constitutional violation had occurred.

On August 5, the Court preliminarily enjoined NCSBE "from enforcing the July 1 filing deadline in N.C. Gen. Stat. § 163-98 as applied to the Green Party, and its candidates." ECF No. 64. The Court relied on two arguments never made by the NCGP: that application of § 163-98 to NCGP constituted a "severe burden" and that the deadline was not narrowly drawn in view of the one-month-plus gap between the date and the state's ballot printing deadline. However, the Court found the NCGP's demand for recognition under § 163-96(a)(2)—the actual basis of its pled claims—to be moot.[4]

---

[4] The Court also instructed that "absent a contrary order from a federal appellate court," NCSBE must follow the court's order, regardless of any parallel state proceedings initiated by the North Carolina Democratic Party. That lawsuit, filed shortly after NCSBE certified NCGP on August 1, challenges only whether the Board violated its duty under state law to "determine the sufficiency" of NCGP's petitions under N.C. Gen. Stat. § 163-96(a)(2). It poses an altogether separate issue from whether the July 1 deadline in § 163-98 unconstitutionally burdens NCGP, the only violation of federal law found by the district court. It is intervenors' view that, should the North Carolina Democratic Party prevail in its state court suit, the necessary premise of the Court's injunction— that NCGP has been certified as a political party under state law—will be removed, thus obviating any potential Supremacy Clause issues.

**LEGAL STANDARD**

To merit a stay pending appeal, appellants must show that they are likely to succeed on the merits, they will be irreparably injured absent a stay, the equitable balance favors a stay, and a stay benefits the public. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

**ARGUMENT**

I. **Intervenors are likely to succeed on the merits.**

   A. **Plaintiffs' claims, as pled, are moot and the Court erred in finding a constitutional violation not alleged in the complaint.**

Plaintiffs alleged two claims, both asserting that NCSBE unconstitutionally declined to certify them as a political party under N.C. Gen. Stat. § 163-96(a)(2). ECF No. 27 at 84-92. But NCSBE now *has* certified NCGP. The Court therefore properly "denie[d] as moot plaintiffs' request for a preliminary injunction ordering the Board to certify the Green Party as a new North Carolina political party." ECF No. 64-12.[5] That should have ended the litigation because NCGP's asserted claims exclusively concerned the appropriateness of the Board's action under § 163-96(a)(2).[6] ECF No. 27 at 84-92.

Intervenors respectfully submit, however, that the Court erred by going further to conclude that NCGP is likely to establish that § 163-98, as applied here, is unconstitutional. A "court's equitable power lies only over the merits of the case or controversy before it. When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the

---

[5] While the North Carolina Democratic Party continues to challenge the Board's conclusion as a matter of state law in state court, this Court was nonetheless correct that NCGP's request for such recognition in federal court is moot.

[6] As Intervenors explained in their motion to dismiss and opposition to NCGP's preliminary injunction motion, NCGP did not allege an as-applied challenge to § 163-96 either. Instead, they alleged only that NCSBE acted *contrary to* that statute—a state law claim that has no place in federal court.

8

authority to issue an injunction." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015). The Supreme Court recently reaffirmed the bedrock principle that "in both civil and criminal cases, in the first instance and on appeal, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (cleaned up). In the context of a request for a preliminary injunction, that means "there is no substantial likelihood that [a] Plaintiff will prevail on the merits of assertions that he has not pled." *Marable v. Dep't of Com.*, No. 3:18-CV-3291-N-BN, 2020 WL 10964604, at *1 (N.D. Tex. Apr. 6, 2020). Here, "[t]he injunction is therefore overly broad because it reaches beyond the scope of the complaint and enjoins government regulations that were explicitly never challenged or litigated." *Church of Holy Light of Queen v. Holder*, 443 F. App'x 302, 303 (9th Cir. 2011) (unpublished); *see also Santiago v. S. Health Partners*, No. 1:15CV589, 2015 WL 8179617, at *1 (M.D.N.C. Dec. 7, 2015) (same); *City of Hurricane v. Disposal Serv. Inc.*, No. CIV.A. 3:14-15850, 2014 WL 7005888, at *5 (S.D.W. Va. Dec. 10, 2014) (expressing "doubt" as to "authority to issue a preliminary injunction enjoining enforcement" of a provision "outside the scope of the pleadings").

The Fourth Circuit has explained that "a preliminary injunction may never issue to prevent an injury or harm which not even the moving party contends was caused by the wrong claimed in the underlying action." *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997). Thus, the "party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." *Id.* But Plaintiffs have never done so here. The gravamen of their amended complaint is that the Board violated NCGP's constitutional rights by improperly refusing to recognize it on June 30. ECF No. 27 at 84-92. But that question is now moot. And both NCSBE and Intervenors

9

explained why the Board acted well within its lawful discretion in denying recognition to NCGP at that time—NCSBE was actively investigating the scope of undisputed fraud in the party's petitions.

Nowhere has NCGP separately alleged that it would be a violation of its constitutional rights for NCSBE to apply the deadline in § 163-98 even if it later certified the party. Nor is any such claim plausible—any prejudice to NCGP here was self-inflicted. Even though the Board later recognized the party, it can hardly be faulted for being unable to do so on June 30 given the scope of the fraud at issue and the refusal of NCGP's agents to cooperate. NCGP should not be allowed to sandbag the NCSBE by submitting fraudulent petition signatures, declining to cooperate with NCSBE investigators, and then claiming the resultant delay violates its constitutional rights.

The amended complaint only briefly discusses § 163-98 as a matter of fact. ECF No. 27 ¶¶ 24, 29, 31-34, 64, 69. And NCGP's preliminary injunction motion contains no argument concerning the application of § 163-98. NCGP therefore presented no basis to conclude that "N.C. Gen. Stat. § 163-98 imposes a severe burden on the Green Party's right to have candidates appear on the November general election ballot," or that "N.C. Gen. Stat. § 163-98 is not narrowly tailored" as applied here. ECF No. 64 at 26-27.

Nor were these points raised clearly in NCGP's preliminary injunction motion—which is in any event not a vehicle to constructively amend Plaintiffs' pled claims. For example, while NCGP argued generally that the "Challenged Provisions" were not narrowly tailored, it nowhere suggested—as the Court found—that North Carolina law is not narrowly tailored because it gives NCSBE roughly a month to prepare ballots after the July 1 filing deadline. NCGP's proposed consent order in turn *nowhere* proposes that the Court find, as the Court did, that application of

10

§ 163-98 violated NCGP's constitutional rights, even where the Board was reasonable in waiting to certify the party until it completed more of its investigation. ECF No. 61.

Finally, NCSBE's willingness to set aside the deadline through a consent order is legally irrelevant.[7] While parties may "settle their litigation with consent decrees, they cannot agree to 'disregard valid state laws.'" *St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264, 268 (8th Cir. 2011) (quoting *Perkins v. City of Chicago Heights*, 47 F.3d 212, 216 (7th Cir. 1995)). The Court may therefore enter the consent judgment only if doing so "is *necessary* to rectify a *violation of federal law*." *Id.* (quoting *Perkins*, 643 F.3d at 216). As explained, the only violation of federal law found by the Court is unrelated to Plaintiffs' claims as pled, and therefore cannot serve as a basis for the court's injunction.

### B. The court erred in concluding that N.C. Gen. Stat. § 163-98, as applied here, is unconstitutional.

Even if Plaintiffs had alleged that § 163-98 independently violates their constitutional rights as applied, they failed to show any likelihood of success on the merits of such a claim. As the Court recognized, the Fourth Circuit held in *Pisano v. Strach* that a related deadline—the May 17 deadline in § 163-96(c) for first submitting new-party signatures to county boards—imposed only a modest burden. *See* 743 F.3d 927, 935-36 (4th Cir. 2014). The Fourth Circuit explained that deadline provided "ample time and opportunity to collect the reasonable number of required signatures" under § 163-96(a)(2). *Id.* at 936. Indeed, the court noted that many sister circuits have likewise "found that such schemes do not impose severe burdens." *Id.* at 935 (collecting cases); *see also Wood v. Meadows*, 207 F.3d 708, 714 (4th Cir. 2000) (finding similar statutory deadline

---

[7] As the Court noted, NCSBE's position here is not altogether clear. It initially indicated it would consent to the Court setting aside the July 1 deadline if the Board ultimately recognized NCGP, as it did on August 1. But it also has insisted the Court lacked jurisdiction to enter any relief at all.

11

in Virginia law "reasonable and nondiscriminatory"). The July 1 deadline at issue here likewise provides "ample time and opportunity" for compliance. NCGP's inability to achieve certification by July 1 was self-inflicted—due to "irregularities identified during review of [NCGP's] petitions" and the "blatantly obvious" fraud found as a result. NCGP's inability to present orderly and untainted petition sheets does not somehow render the July 1 deadline burdensome. As the Sixth Circuit explained in the context of a similar Ohio deadline, the "filing deadline for independent candidates is not so early that a diligent candidate cannot meet the requirement." *Lawrence v. Blackwell*, 430 F.3d 368, 373 (6th Cir. 2005); *see also Swanson v. Worley*, 490 F.3d 894, 909 (11th Cir. 2007) (explaining that "a diligent independent or minor party candidate could meet the filing deadline by collecting signatures many months before the June primary deadline"). The same is true of § 163-98.

In support of its conclusion that § 163-98 severely burdens NCGP, the Court relied upon the fact that NCGP could not comply with the deadline given that NCSBE only certified them on August 1. ECF No. 64 at 26. But NCGP's non-compliance with the deadline does not establish that it imposes a severe burden. "If the burden imposed by a challenged law were measured by the consequence of noncompliance, then every voting prerequisite would impose the same burden." *Democratic Party of Va. v. Brink*, No. 3:21-CV-756-HEH, 2022 WL 1159701, at *11 (E.D. Va. Apr. 19, 2022) (quoting *Ariz. Democratic Party v. Hobbs*, 18 F.4th 1179, 1188 (9th Cir. 2021)). Indeed, the Supreme Court has "rejected the idea" that "failure to follow a regulation could be said to disenfranchise [a] voter." *Id.* (citing *Rosario v. Rockefeller*, 410 U.S. 752, 757 (1973)). In *Rosario*, the Court rejected a challenge to a New York law requiring voters to enroll in a party at least 30 days ahead of the general election. It rejected the plaintiffs' characterization of the law as disenfranchising because "the statute merely imposed a time deadline on their enrollment." 410

12

U.S. at 757. The same is true here. The Court looked at the burden on NCGP *after the fact* of its noncompliance, rather than *ex ante*. *See Hobbs*, 18 F.4th at 1188.

It does not change matters that the Board did not vote to certify NCGP until August 1. The Court never found the Board acted improperly in waiting to certify until that time. It appropriately acknowledged that "[g]iven evidence of alleged fraud," the Board was required to "open[] an investigation into the sufficiency of the Green Party's petitions." ECF No. 64 at 26. But NCGP's delayed certification was a problem of its own making. For example, NCGP ignored NCSBE's initial request to discuss outdated signature sheets it submitted. ECF No. 52 ¶¶ 6-7. And when NCSBE's investigators first reached out to NCGP to discuss the fake signatures in its petitions on May 10, the party refused to meet with investigators until June 22, mere days before the Board met to consider the sufficiency of NCGP's petitions. ECF No. 53 ¶¶ 4-7, 12-19. NCGP similarly refused to turn over contact information for circulators known to have engaged in fraud until the same time. ECF No. 53 ¶ 19. The July 1 deadline was hardly unreasonable in these circumstances. NCGP failed to act as "a diligent independent or minor party candidate" in "meet[ing] the filing deadline." *Swanson*, 490 F.3d at 909.

North Carolina's interest in orderly election administration more than justifies the modest burden imposed by § 163-98. The Fourth Circuit has explained that "states have an interest 'in ensuring orderly, fair, and efficient procedures for the election of public officials.'" *Pisano*, 743 F.3d at 937 (quoting *S.C. Green Party v. S.C. State Election Comm'n*, 612 F.3d 752, 759 (4th Cir. 2010)). "This interest necessarily requires the imposition of some cutoff period 'to verify the validity of signatures on the petitions, to print the ballots, and, if necessary, to litigate any challenges.'" *Id.* (citing *Am. Party of Tex. v. White,* 415 U.S. 767, 787, n.18 (1974)); *see also Lawrence*, 430 F.3d at 375 (noting states' "administrative interest of being able to process

13

independent candidates' petitions and verify signatures in the midst of completing a host of other tasks necessary to conduct a fair election").

Although it recognized this compelling interest, the Court found the deadline here "is likely not narrowly drawn" because of the gap in time between the deadline and when NCSBE finalizes ballots. But the Constitution does not require North Carolina to set its filing deadline as close as practicable to the ballot printing date. That is shown by the Fourth Circuit's determination that Virginia's June ballot access deadline passed muster, *see Wood*, 207 F.3d at 711, along with numerous decisions upholding even earlier filing deadlines. *E.g.*, *Lawrence*, 430 F.3d at 373 (upholding March deadline); *Swanson*, 490 F.3d at 906 (June); *Rainbow Coal. of Okla. v. Okla. State Election Bd.*, 844 F.2d 740, 747 (10th Cir.1988) (May). North Carolina's July 1 statutory deadline for general election ballot access is eminently reasonable.

## II. Because of the approaching ballot printing deadline, Intervenors will be irreparably harmed absent a stay.

NCSBE has indicated that it must finalize ballots for the November general election on August 12. ECF No. 23 at 2. As it stands, the agency has been ordered to place NCGP's candidates on the ballot, notwithstanding their failure to comply with § 163-98, their previous non-compliance with the Board's ongoing investigation into the blatant fraud in NCGP's petitions, and ongoing state court litigation addressing whether NCSBE should have certified NCGP under state law.

Granting NCGP ballot access will irreparably harm Intervenors by forcing them to compete with a party that is not eligible for ballot access, requiring Intervenors to expend party resources they would otherwise use for other purposes. Many courts have recognized that political parties are harmed when forced to compete against "an allegedly ineligible rival on the ballot" because "doing so hurts the candidate's or party's own chances of prevailing in the election." *Hollander v. McCain*, 566 F. Supp. 2d 63, 68 (D.N.H. 2008) (collecting cases).

Given the state's need to finalize its ballots, this harm cannot be ameliorated by a favorable ruling for Intervenors at a later date, which would likely come well after the State distributes ballots to overseas voters. In other words, even if Intervenors "are ultimately successful on the merits, there is no guarantee that this case will be resolved quickly enough to ensure that any relief the Court orders could be implemented in time for this fall's general election, particularly in light of the required timeline for preparing ballots." *Pavek v. Simon*, 467 F. Supp. 3d 718, 754 (D. Minn. 2020); *see also Giroux v. LaRose*, No. 1:22-CV-309, 2022 WL 2128017, at *15 (S.D. Ohio June 14, 2022) (noting it would be "exceptionally difficult—basically impossible" to provide relief after ballots are printed); *Barr v. Galvin*, 584 F. Supp. 2d 316, 321 (D. Mass. 2008) (similar); *Duke v. Connell,* 790 F. Supp. 50, 52–53 (D.R.I. 1992) (similar); *Mann v. Powell*, 333 F. Supp. 1261, 1267 (N.D. Ill. 1969) (noting "difficulty of fashioning relief after ballots have been certified").

### III. The balance of the equities and the public interest weigh in favor of a stay.

As explained, the state has a compelling interest in regulating its elections in an orderly manner, and the July 1 deadline in N.C. Gen. Stat. § 163-98 reasonably serves those interests. In contrast, NCGP has never even actually pled that the N.C. Gen. Stat. § 163-98 is unreasonable or unconstitutional, even as applied here. Even if they levied such a claim, they would not able to do so with clean hands: NCGP repeatedly ignored NSCBE's requests to discuss fake signatures in the petition and only furnished relevant information mere days ahead of the deadline, despite being contacted close to two months in advance. *E.g.*, *Cap. One Fin. Corp. v. Sykes*, No. 3:20CV763, 2021 WL 2903241, at *15 (E.D. Va. July 9, 2021) (weighing equities against party whose own acts imposed hardship (citing *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002))).

15

Similarly, the public interest is harmed whenever a court enjoins the operation of laws enacted by the people's representatives. *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (citation omitted); *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, No. 22-1280, 2022 WL 986994, at *5 (4th Cir. Mar. 31, 2022) (Heytens, J., concurring) (same, and voting to stay order pending appeal). That is particularly true here in view of NCGP's failure to even plead that the law the Court set aside is unconstitutional. Given that lack of challenge, "it is in the public interest to comply with valid state statutes." *Topper Acquisition Corp. v. Emhart Corp.*, No. CIV. A. 89-00110-R, 1989 WL 513034, at *5 (E.D. Va. Mar. 23, 1989) (citing *Telvest, Inc. v. Bradshaw*, 618 F.2d 1029, 1036 (4th Cir. 1980)).

## CONCLUSION

For the foregoing reasons, the Intervenors respectfully ask that this Court to stay its Order pending resolution of Intervenors' appeal to the Fourth Circuit.

Dated: August 8, 2022

Respectfully submitted,

*/s/ Christopher D. Dodge*

Narendra K. Ghosh, NC Bar No. 37649
PATTERSON HARKAVY LLP
100 Europa Drive, Suite 420
Chapel Hill, NC 27517
Telephone: 919.942.5200
nghosh@pathlaw.com

Aria C. Branch*, DC Bar No. 1014541
Christopher D. Dodge*, MA Bar No. 696172
Christina A. Ford**, DC Bar No. 1655542
Richard A. Medina*, NY Bar No. 5704663
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
Facsimile: (202) 968-4498

16

abranch@elias.law
cdodge@elias.law
cford@elias.law
rmedina@elias.law

*Counsel for Intervenor-Defendants North Carolina Democratic Party and DSCC.*

*\*Admitted by Special Appearance*
*\*\* Special Appearance Forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I caused the foregoing document to be filed and served on all counsel of record by operation of the CM/ECF system for the United States District Court for the Eastern District of North Carolina.

DATED: August 8, 2022 /s/ *Christopher D. Dodge*