|                                           |     |                |
| ----------------------------------------- | --- | -------------- |
| NORTH CAROLINA GREEN PARTY, et al.,       | )   |                |
|                                           | )   |                |
| Plaintiffs,                               | )   |                |
|                                           | )   |                |
| v.                                        | )   | **ORDER**      |
|                                           | )   |                |
| NORTH CAROLINA STATE BOARD OF ELECTIONS, et al., | )   |         |
|                                           | )   |                |
| Defendants.                               | )   |                |

On July 14, 2022, the North Carolina Green Party ("the Green Party"), Tony Ndege ("Ndege"), Matthew Hoh ("Hoh"), K. Ryan Parker ("Parker"), Samantha Worrell ("Worrell"), Samantha Spence ("Spence"), Aaron Mohammed ("Mohammed"), and Michael Trudeau ("Trudeau") (collectively, "plaintiffs") filed a complaint against the North Carolina State Board of Elections ("the Board") and its five members in their official capacities (collectively, "defendants") seeking injunctive relief directing defendants to certify the Green Party and place the Green Party's nominees on North Carolina's 2022 general election ballot. See [D.E. 1] 23–24. On July 17, 2022, the Democratic Senatorial Campaign Committee ("the DSCC") and the North Carolina Democratic Party ("the NCDP") (collectively, "intervenors") moved to intervene as defendants [D.E. 15]. On August 5, 2022, the court granted intervenors' motion to intervene [D.E. 64].

On May 8, 2023, intervenors and defendants moved to dismiss for lack of jurisdiction [D.E. 86, 88]. On May 30, 2023, plaintiffs responded in opposition [D.E. 90, 91]. On June 13, 2023,

intervenors and defendants replied [D.E. 92, 93]. On August 7, 2023, the court granted intervenors' and defendants' motions to dismiss and dismissed as moot plaintiffs' action [D.E. 94]. In that order, the court stated "[p]laintiffs may seek costs and attorneys' fees in accordance with 42 U.S.C. § 1988, the Federal Rules of Civil Procedure, and this court's local rules." Id. at 11.

On October 23, 2023, plaintiffs moved for attorneys' fees from intervenors [D.E. 97], filed a memorandum in support [D.E. 98], and requested $59,268.75. See [D.E. 97] 4. On November 27, 2023, intervenors responded in opposition [D.E. 100]. On December 11, 2023, plaintiffs replied [D.E. 101]. As explained below, the court grants in part plaintiffs' motion for attorneys' fees and awards attorneys' fees in the amount of $6,525.00.

## I.

The North Carolina Green Party is a state affiliate of the Green Party of the United States. See Am. Compl. [D.E. 27] ¶ 6. The Green Party sought to place Hoh and Trudeau on the ballot as candidates in North Carolina's November 8, 2022 general election. See id. at ¶¶ 6, 8–9, 31–32. Although North Carolina recognized the Green Party as a political party with candidates on the 2020 general election ballot, the party failed to garner enough votes to automatically qualify as a political party entitled to place candidates on the 2022 North Carolina general election ballot. See Cox Decl. [D.E. 52] ¶¶ 3–4. Thus, to recertify as a political party and to place Hoh and Trudeau on the ballot as candidates in the 2022 general election, the Green Party had to comply with North Carolina General Statutes §§ 163-96 and 163-98. See id. at ¶ 5; Am. Compl. ¶¶ 21–26; [D.E. 51] 5.

To meet the statutory requirements for certification, the Green Party needed to submit 13,865 valid signatures to the Board by June 1, 2022. See Am. Compl. ¶ 26; [D.E. 52-1] (Green Party petition request form); N.C. Gen. Stat. § 163-96(a)(2). The Green Party's petitions were due

2

to the county boards of elections not later than 5:00 p.m. on May 17, 2022, so that the county boards of elections could validate the Green Party's petition signatures. See Cox Decl. ¶ 5; [D.E. 52-1].

In February 2021, the Green Party began a new petition drive to collect signatures to meet the May 17, 2022 deadline to submit signatures to the county boards of elections for validation. See Am. Compl. ¶ 25; Cox Decl. ¶ 5. Three issues emerged regarding the Green Party's petition drive. First, in October 2021, the Board received queries from county boards in roughly five counties because it appeared that the Green Party had submitted outdated petition sheets. See Cox Decl. ¶ 6. The Board was unable to address that issue with the Green Party at the time. See id. at ¶¶ 7–8; [D.E. 52-2].

Second, in March 2022, the Green Party told the Board that they did not intend to seek party recognition in 2022 but instead were starting their petition drive for 2024. See Cox. Decl. ¶ 9; [D.E. 52-4]. In response, the Board changed the deadline in the SEIMS Petition Module for the Green Party to submit petitions to county boards until May 17, 2024. See Cox Decl. ¶ 9. When the Green Party later decided to seek certification in 2022, the reversion back to the May 17, 2022 deadline caused confusion. Some county boards accidentally validated signatures submitted after the May 17, 2022 deadline, mistakenly believing they were timely under the May 17, 2024 deadline. See id.

Third, the process to validate petition signatures that the Green Party submitted to county boards of elections was hampered by alleged evidence of fraudulent signatures and county board incompetence. Beginning in April 2022, the Board received notice from some county boards of elections that some of the petitions evinced fraud. See Martucci Decl. [D.E. 53] ¶ 4. The Board received similar information in May and June from other counties. See id. at ¶¶ 8–9. Based on

3

this information, the Board began to investigate the fraud allegations concerning the Green Party's petitions. See id. at ¶ 3. The Board's investigation found "what appeared to be noticeably fraudulent signatures, largely submitted from three counties, and bearing the signature marks of the same two individuals throughout." Id. at ¶ 11. After meeting with Green Party leadership in June 2022, the Board narrowed its investigation to two persons of interest and possibly a third. See id. at ¶ 19. These persons of interest apparently were connected to consulting firms or individuals that the Green Party hired to assist with signature gathering. See id. at ¶¶ 13, 17–20, 25.

As part of its investigation, the Board determined that "the entire universe of possibly fraudulent signatures was believed to be" 2,653 signatures based on 1,382 signatures collected by the three persons of interest and 1,271 signatures collected by a consulting firm. Id. at ¶ 25. "Board staff examined roughly 3,560 submitted petition pages" to try to identify signatures that fell within the group of possibly fraudulent signatures. Id. at ¶ 21. The Board ultimately identified 1,472 signatures gathered by persons of interest in the investigation. See id. at ¶¶ 23, 25. Of those signatures, the Board accepted 624 signatures and rejected 848 signatures. See id. at ¶ 23.

Board staff also contacted more than 200 voters to ask whether they signed the Green Party petition. See id. at ¶ 24. Of those that responded, "28 individuals did not sign the petition, 12 did not remember whether they signed, 10 did sign it, and 4 thought they were signing a petition for something else." Id.[1]

The process to validate signatures submitted by the Green Party was also delayed by county boards of elections not validating the signature petitions within the two-week window specified in

---

[1] At the July 18, 2022 status conference, counsel for the Board told the court that there is no allegation from the Board that the Green Party itself committed any fraud.

4

N.C. Gen. Stat. § 163-96(c) or not properly reviewing the petitions. As for not meeting the two-week deadline, the Board did not hold the delay against the Green Party so long as the Green Party had submitted the petitions to the relevant county board by 5:00 p.m. on May 17, 2022. See Cox Decl. ¶¶ 11–12. Thus, although the Green Party made a timely initial submission to the Board on June 1, the Green Party supplemented its petitions on June 8, June 17, and June 24 with additional signatures after the county boards validated them. See id. at ¶ 14. Board staff reviewed the petitions as they received them. See id. at ¶ 21. In early July, the Board learned that some county boards of elections were not properly verifying petitions because they "did not check to see whether the signature itself resembled that of the voter." Id. at ¶ 26. This oversight potentially affected "large volumes" of the Green Party's signatures. Id.[2] On July 11, 2022, the Board's general counsel instructed county boards to conduct proper signature comparisons by July 29, 2022, if they had not already done so. See id. at ¶ 27; [D.E. 52-10].

The Green Party submitted 22,530 signatures to the county boards of elections for validation. See Am. Compl. ¶ 26. As discussed, the county boards of elections reviewed those signatures for (1) signatures on outdated petition pages; (2) signatures submitted after the May 17, 2022 deadline; (3) signatures showing alleged evidence of fraud; and (4) signatures otherwise not bearing a reasonable resemblance to the corresponding signature in the voter record. See Cox. Decl. ¶¶ 17–20.

On June 30, 2022, the Board met and voted 3 to 2 not to certify the Green Party as a new political party under North Carolina General Statute § 163-96(a)(2) because of the Board's

---

[2] For example, three counties comprising approximately 40 percent of the Green Party's approved signatures had not conducted the proper signature review. See Cox. Decl. ¶ 27.

Case 5:22-cv-00276-D-BM   Document 103   Filed 04/02/24   Page 5 of 16

ongoing investigation of alleged fraud. See Am. Compl. ¶¶ 63–74; [D.E. 52-8]; [D.E. 51] 3 & n.2; [D.E. 52-10] 1.

The same day, notwithstanding the Board's vote, the Green Party held its nominating convention. See Am. Compl. ¶ 31; N.C. Gen. Stat. § 163-98. At the convention, the party selected Matthew Hoh as its candidate for the United States Senate and selected Michael Trudeau as its candidate for North Carolina Senate District 16. See id. On July 1, 2022, Hoh and Trudeau submitted their applications to change their party affiliation to the Green Party, and Ndege, the Green Party's chair, certified Hoh and Trudeau as the Green Party's candidates. See id. at ¶ 32. Trudeau also submitted a notice of candidacy and his candidacy filing fee to the Board and the Wake County Board of Elections. See id. On July 12, 2022, the Board's counsel sent Hoh and Trudeau forms for new party candidates. See id. at ¶ 33. On July 13, 2022, Trudeau submitted the form to the Wake County Board of Elections. See id. The same day, Hoh submitted the form and the candidate filing fee to the Board. See id. The Board did not accept Hoh's submission. See id.

On July 20, 2022, the Board noticed an August 1, 2022 meeting at which the Board anticipated reconsidering the Green Party's petition for certification as a political party. See [D.E. 51] 4; [D.E. 52] ¶ 28. The same day, the court accepted plaintiffs' and defendants' proposed briefing schedule and scheduled an August 8, 2022 hearing on plaintiffs' motion for a preliminary injunction. See [D.E. 26]. By scheduling the hearing on August 8, 2022, the court allowed the county boards to complete their review by the Board's July 29 deadline and allowed the Board to hold its August 1 meeting and to reconsider the sufficiency of the Green Party's petition for certification as a political party.

6

After completing their review, the county boards validated 15,472 signatures.  See [D.E. 57-1] 11.  Thus, as of July 29, 2022, the county boards of elections found that the Green Party submitted 1,607 more signatures than the statutory requirement of 13,865 signatures.  See id.  On August 1, 2022, the Board met and voted unanimously to certify the Green Party as a new political party.  See [D.E. 54].  The Board determined that the Green Party complied with the statutory requirements in North Carolina General Statute § 163-96(a)(2) by timely submitting more than the required number of valid signatures and certified the Green Party as a political party eligible to have its candidates on the November 2022 general election ballot.  The Board immediately informed the Green Party of its determination.  See [D.E. 54-1].

After the Board certified the Green Party as a North Carolina political party, the court issued an order forecasting plaintiffs' request that the court order the Board to certify the Green Party as moot.  See [D.E. 55] 2.  The court also noted that plaintiffs and defendants appeared to agree that if the Board certified the Green Party, injunctive relief to ensure the Green Party's candidates appeared on the ballot would be appropriate.  See id. at 2–3.  The court ordered plaintiffs and defendants to file a proposed consent order resolving that issue or to file competing proposed orders if they could not agree.  See id. at 3.  They did not agree, and each filed a proposed order on August 3, 2022.  See [D.E. 61-1, 63].

On August 5, 2022, the court enjoined defendants in their official capacities from enforcing the July 1 candidate-filing deadline in North Carolina General Statute § 163-98 against the Green Party and its candidates and ordered defendants in their official capacities to place Green Party candidates Hoh and Trudeau on North Carolina's November 8, 2022 general election ballot.  See [D.E. 64] 32–33.  Intervenors appealed.  See [D.E. 65].

7

On August 8, 2022, intervenors filed an emergency motion to stay. See [D.E. 67]. On August 10, 2022, the court denied intervenors' emergency motion to stay. See [D.E. 74]. On August 11, 2022, the United States Court of Appeals for the Fourth Circuit denied intervenors' emergency motion for stay pending appeal. See [D.E. 75]. On August 30, 2022, the Fourth Circuit dismissed intervenors' appeal under Federal Rule of Appellate Procedure 42(b). See [D.E. 76].

Hoh and Trudeau appeared on the November 2022 ballot. On November 8, 2022, the election was held. Hoh was not elected to the United States Senate, and Trudeau was not elected to the North Carolina Senate.

## II.

Generally, "the prevailing party in a suit is not entitled to recover reasonable attorneys fees and costs from the losing party." Brat v. Personhuballah, 883 F.3d 475, 480 (4th Cir. 2018); see Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975). Congress may carve out exceptions to the general rule, and 42 U.S.C. § 1988(b) "confers discretion on courts to award attorneys fees to the prevailing party in an action brought under, inter alia, 42 U.S.C. § 1983." DeBauche v. Trani, 191 F.3d 499, 510 (4th Cir. 1999).[3] When a plaintiff seeks attorneys' fees from losing "blameless" intervenors (i.e., intervenors not liable on the merits of the action), the court may award those fees "only where the intervenors' action was frivolous, unreasonable, or without foundation." Indep. Fed'n of Flight Attendants v. Zipes, 491 U.S. 754, 761 (1989); see Brat, 883 F.3d at 481; Ohio River Valley Env't Coal., Inc. v. Green Valley Coal Co., 511 F.3d 407, 416 (4th Cir. 2007); Bethune-Hill v. Va. State Bd. of Elections, No. 3:14CV852, 2020 WL 5577824, at *3 (E.D. Va. Sept. 17, 2020) (three-judge court) (unpublished).

---

[3] The parties agree that plaintiffs prevailed in this section 1983 action. See [D.E. 98] 4–5; [D.E. 100] 13–14; cf. [D.E. 94] 11.

8

Plaintiffs contend that intervenors' actions were "frivolous, unreasonable, or without foundation" because: (1) the court concluded intervenors did not come to court with clean hands; (2) intervenors filed a state court action that allegedly threatened to place the Board in contempt of court; (3) intervenors allegedly used this action to perpetuate false allegations of fraud against plaintiffs; and (4) intervenors asserted frivolous arguments in support of their motion to stay. See [D.E. 98] 14–18.

As for plaintiffs' first argument, plaintiffs contend "[i]ntervenors' attempt to thwart [p]laintiffs' petition drive and to delay the Board's certification of NCGP as a party was patently unreasonable and warrants an award of attorney's fees." [D.E. 98] 15. A court, however, cannot award attorneys' fees on the basis of intervenors' pre-litigation conduct, even where the "intervenors were directly involved in violating the plaintiffs' rights," if intervenors were not "legally responsible for relief on the merits." Bethune-Hill, 2020 WL 5577824, at *5 (quotation omitted). Plaintiffs sought a declaratory judgment that the Board's failure to certify the Green Party as a new political party was unconstitutional and an injunction certifying the Green Party as a new political party entitled to place its candidates on North Carolina's ballot. See Am. Compl. ¶ 93. Intervenors could not have provided the relief plaintiffs sought. See, e.g., Bethune-Hill, 2020 WL 5577824, at *5. Accordingly, this argument fails. See, e.g., Costco Wholesale Corp. v. Hoen, 538 F.3d 1128, 1134 n.2 (9th Cir. 2008) (applying Zipes to "individual claims or arguments advanced by an invervenor" and "their conduct during litigation"); HRPT Props. Tr. v. Lingle, 775 F. Supp. 2d 1225, 1238 (D. Haw. 2011) ("To determine whether [an intervenor] is liable for fees,

the Court must ascertain whether [the intervenor]'s manner of litigating was frivolous, unreasonable, or without foundation.").[4]

As for plaintiffs' second argument, plaintiffs contend that intervenors "knew or should have known that [their] attempt to seek" relief in state court "was improper" and "manifestly unreasonable." [D.E. 98] 16. Although intervenors interpret this argument as one for attorney fees incurred in the state action, plaintiffs seek 0.9 hours' worth of attorneys' fees incurred in this action for their attorney to review the state complaint and draft a notice of a related case. See [D.E. 101] 4; [D.E. 97-1] 7; [D.E. 60] (notice of related case). Intervenors contend that "seeking relief from the state courts was in fact the only procedural avenue for seeking review of the Board's application of state law." [D.E. 100] 22–23 (emphasis removed). In response to intervenors' state filing, the court reminded intervenors of the Supremacy Clause. See [D.E. 64] 30–31, 31 n.13. By pursuing this "procedural avenue," the intervenors potentially subjected defendants to contempt of court via inconsistent judgments. See id. Accordingly, intervenors' action in filing the state suit was frivolous. Thus, the court awards plaintiffs 0.9 hours' worth of fees incurred when counsel Oliver Hall reviewed the state complaint and filed a notice of a related case. See [D.E. 101] 4; [D.E. 97-1] 7.

As for plaintiffs' third argument, plaintiffs contend that intervenors' "inflammatory repetition" of false allegations of fraud "appears calculated to cause [p]laintiffs maximum harm in the news media, at the height of what should have been their campaigns for public office" and was "unreasonable." [D.E. 98] 17. The parties merely dispute intervenors' characterization of the

---

[4] In their reply, plaintiffs recast their first argument as relying on intervenors' "baseless claim that Plaintiffs 'caused' the Board's delay in certifying [the Green Party] as a new party." [D.E. 101] 3–4. Intervenors, however, made that argument in support of their motion to stay. See [D.E. 67-1] 2–4; [D.E. 74] 4 (rejecting that argument). Accordingly, the court considers that argument concerning intervenors' motion to stay.

Board's investigation. Intervenors, however, had some basis for these allegations. See, e.g., Martucci Decl. ¶¶ 3, 4, 8–9, 11, 19, 21, 23, 25; [D.E. 52-8]; [D.E. 51] 3 & n.2. "Without more, the mere act of asserting an unsuccessful legal position is not 'frivolous, unreasonable, or without foundation.'" Bethune-Hill, 2020 WL 5577824, at *5. Accordingly, the court rejects this argument for attorneys' fees. See, e.g., Democratic Party of Wash. State v. Reed, 388 F.3d 1281, 1288 (9th Cir. 2004); Heald v. Granholm, 457 F. Supp. 2d 790, 792–93 (E.D. Mich. 2006).

As for plaintiffs' fourth argument, plaintiffs contend "[i]ntervenors' arguments in support of their requested stay were frivolous." [D.E. 98] 17–18. Intervenors respond that, although their motion to stay was unsuccessful, the motion was "supported both legally and factually." [D.E. 100] 23–25 (citing Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 420 (1978); Bethune-Hill, 2020 WL 5577824, at *5). Intervenors did not make "a strong showing" of their likelihood of success on the merits in their motion to stay. [D.E. 74] 3 (quotation omitted). "The record flatly contradict[ed] all of" intervenors' arguments. Id. Indeed, intervenors "tilt[ed] at windmills," id. at 7 n.2, out of "fear that some voters will vote for the two Green Party candidates instead of the Democratic candidates." Id. at 9. Unlike Bethune-Hill, in which intervenors' position garnered four Supreme Court justices' votes, see Bethune-Hill, 2020 WL 5577824, at *5, intervenors' motion to stay was "without foundation." Zipes, 491 U.S. at 761. Thus, the court awards 12.6 hours' worth of attorneys' fees concerning intervenors' motion to stay for counsel Oliver Hall and 1.5 hours' worth of attorneys' fees concerning intervenors' motion to stay for counsel Pooyan Ordoubadi. See [D.E. 97-1] 7; [D.E. 97-2] 3.

In total, plaintiffs incurred 13.5 hours' worth of attorneys' fees for Oliver Hall's work as a result of intervenors' frivolous actions. Plaintiffs also incurred 1.5 hours' worth of attorneys' fees for Pooyan Ordoubadi's work as a result of intervenors' frivolous actions.

As for the amount of attorney fees, the court begins with "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). Courts refer to this as the "lodestar figure." Robinson v. Equifax Info. Servs. LLC, 560 F.3d 235, 243 (4th Cir. 2009). The court determines the reasonableness of the hours expended and the hourly rate by evaluating:

> (1) [t]he time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

McAfee v. Boczar, 738 F.3d 81, 88 n.5 (4th Cir. 2013) (quotation omitted); see Barber v. Kimbrell's Inc., 577 F.2d 216, 226 n.28 (4th Cir. 1978). "These factors are typically subsumed within the lodestar calculation." Bethune-Hill, 2020 WL 5577824, at *6; see McAfee, 738 F.3d at 88–90. Courts may not award attorneys' fees incurred litigating unsuccessful claims. See Hensley, 461 U.S. at 435; McAfee, 738 F.3d at 91; Grissom v. Mills Corp., 549 F.3d 313, 321 (4th Cir. 2008); Johnson v. City of Aiken, 278 F.3d 333, 337 (4th Cir. 2002); Bethune-Hill, 2020 WL 5577824, at *6 n.4. Courts also may not award attorneys' fees against a party for fees incurred by the prevailing party litigating against a third party. See Brat, 883 F.3d at 484; Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 178 (4th Cir. 1994); Bethune-Hill, 2020 WL 5577824, at *10.

Plaintiffs seek $59,268.75 in total attorneys' fees based on 98.1 hours of work from Oliver Hall at $450 per hour, plus 10.9 hours of work from Pooyan Ordoubadi at $300 per hour, multiplied by 1.25. See [D.E. 97] 3; [D.E. 97-1] 7–8; [D.E. 97-2] 3. As discussed, intervenors' frivolous conduct only includes their state action and motion to stay. Accordingly, the court awards

12

attorneys' fees for only that conduct. See Hoen, 538 F.3d at 1134 n.2; cf. Grissom, 549 F.3d at 321. Plaintiffs' remaining requests for attorneys' fees concern actions counsel took in response to defendants, not intervenors. See, e.g., [D.E. 97-1] 8 (listing 33.2 hours spent responding to defendants' motion to dismiss). Accordingly, the court declines to award fees on that basis. Cf. Brat, 883 F.3d at 484; Rum Creek Coal Sales, Inc., 31 F.3d at 178; Bethune-Hill, 2020 WL 5577824, at *10.

The court has considered the novelty and difficulty of the questions plaintiffs' counsel faced, the skill required to properly represent plaintiffs, plaintiffs' attorneys' opportunity costs of this representation, fees for like work, the successful results counsel obtained, and the experience of plaintiffs' attorneys. See McAfee, 738 F.3d at 88 n.5. Oliver Hall reasonably spent 13.5 hours responding to intervenors' frivolous conduct. See [D.E. 97-1] 7–8. Pooyan Ordoubadi reasonably spent 1.5 hours responding to intervenors' frivolous conduct. See [D.E. 97-2] 3. Accordingly, the court uses these figures to calculate plaintiffs' lodestar figure.

As for the reasonableness of the attorneys' hourly rate, plaintiffs must show "that the requested hourly rates are consistent with the prevailing market rates in the relevant community for the type of work for which [they] seek[] an award." McAfee, 738 F.3d at 91 (quotation omitted); see Plyler v. Evatt, 902 F.2d 273, 277 (4th Cir. 1990). Plaintiffs may meet this burden through "affidavits of other local lawyers who are familiar both with the skills of the fee applicants and more generally with the type of work in the relevant community." McAfee, 738 F.3d at 91 (quotation omitted); see Robinson, 560 F.3d at 245; Grissom, 549 F.3d at 323; Plyler, 902 F.2d at 277–78.

Plaintiffs offer two declarations from North Carolina lawyers. See [D.E. 97-3]; [D.E. 97-4]. Both attorneys are familiar with attorneys' market rates in the Raleigh, North Carolina market.

13

See [D.E. 97-3] ¶¶ 2, 14, 18; [D.E. 97-4] ¶ 13. Both attorneys familiarized themselves with Oliver Hall's and Pooyan Ordoubadi's work. See [D.E. 97-3] ¶¶ 15–16; [D.E. 97-4] ¶¶ 14–15. Both attorneys conclude that Oliver Hall's and Pooyan Ordoubadi's hourly rates are reasonable and comport with the prevailing market rates in the Raleigh, North Carolina community for this kind of case. See [D.E. 97-3] ¶¶ 17–18; [D.E. 97-4] ¶ 16. Intervenors do not contest plaintiffs' counsels' hourly rates. Accordingly, the court accepts Oliver Hall's and Pooyan Ordoubadi's hourly rates as stated in their declarations. See [D.E. 97-1] 7–8; [D.E. 97-2] 3. Thus, the court calculates the lodestar figures to be $6,075.00 for Oliver Hall and $450.00 for Pooyan Ordoubadi for a total of $6,525.00.

As for plaintiffs' requested multiplier, courts indulge "a 'strong presumption' that the lodestar figure is reasonable." Perdue v. Kenny A. ex rel. Winn, 559 U.S. 542, 554 (2010). Plaintiffs may overcome the presumption in "rare" and "exceptional" circumstances. Id. (quotation omitted); see Blum v. Stenson, 465 U.S. 886, 897–902 (1984). These circumstances include: (1) "where the method used in determining the hourly rate . . . does not adequately measure the attorney's true market value"; (2) where "the attorney's performance includes an extraordinary outlay of expenses and the litigation is exceptionally protracted"; and (3) where "an attorney's performance involves exceptional delay in the payment of fees." Perdue, 559 U.S. at 554–56. Courts also may enhance the lodestar figure through "a contingency multiplier" to "compensate counsel for the risk of not prevailing and therefore being paid nothing under their contingency fee contract" provided plaintiffs show "that without an adjustment for risk the prevailing party would have faced substantial difficulties in finding counsel in the local or other relevant market." Spell v. McDaniel, 824 F.2d 1380, 1403–04 (4th Cir. 1987) (quotations

14

omitted); see Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 483 U.S. 711, 731–34 (1987) (O'Connor, J., concurring).

Plaintiffs contend they are entitled to enhanced attorneys' fees because plaintiffs "could not have pursued this litigation had Mr. Hall not agreed to represent them pro bono in partnership with Mr. Ordoubadi, who represented Plaintiffs at a reduced rate." [D.E. 98] 12. Plaintiffs, however, fail to cite evidence that either attorney agreed to represent plaintiffs on contingency. Instead, Hall's pro bono representation suggests he expected no compensation at all. Accordingly, plaintiffs fail to show "that a contingency enhancement [is] necessary to insure that competent counsel would . . . be willing to undertake contingency representation" in this case. Spell, 824 F.2d at 1404–05.

Plaintiffs also contend they are entitled to an enhancement because Hall declined to take other cases while representing plaintiffs in this case. See [D.E. 98] 13. An "attorney's opportunity cost," however, "merge[s] into the lodestar calculation." McAfee, 738 F.3d at 89. Generally, courts do not double-count factors that have "already been incorporated into the lodestar analysis." Id. (quotation omitted); see E. Associated Coal Corp. v. Dir., Off. of Workers' Comp. Programs, 724 F.3d 561, 570 (4th Cir. 2013). Plaintiffs fail to justify such double counting. Plaintiffs also fail to cite evidence of any other rare or exceptional circumstance justifying an enhanced fee. Accordingly, the court declines to enhance plaintiffs' attorneys' fees award beyond the lodestar figure.

III.

In sum, the court GRANTS IN PART plaintiffs' motion for attorneys' fees [D.E. 97] and awards attorneys' fees in the amount of $6,525.00. The clerk shall close the case.

15

SO ORDERED.  This 2 day of April, 2024.

JAMES C. DEVER III
United States District Judge